Page 58

MS. DURANT: Objection.
A. Actually, I don't understand the question.
Q. Okay. Are you aware of any established policy or procedure that would have defined the amount of time you had to respond to Exhibit 4 after having received this?
A. No.
Q. Okay. Were you the person in charge of determining your own time lines as far as responding to the type of letter that we have in front of us, as Exhibit 4?
THE WITNESS: An inmate correspondence to me?
MR. DIMAIO: Yes.
A. Yes, depending on what issue the inmate presented in the writing of the letter or the correspondence.
Q. Okay. And now, after reading this letter now today, what time frame do you feel you should have responded after reading this letter?
A. Within approximately about a week. In the general scheme of things inmates write letters like this every day of the week when there's nothing wrong with them, so --
Q. And so, certainly, that's an issue, you're always

Page 59

concerned that an inmate is writing when there's nothing wrong with them; correct?
A. That's a concern.
Q. Okay. And likewise, there are inmates that are writing when there is a valid, justifiable issue; correct?
A. Most definitely.
Q. After receiving a letter such as Exhibit 4, what efforts would you take to determine whether it was a valid issue?
MR. PALOMBO: Objection. You can answer.
A. In either of those scenarios that you just presented, if an inmate wrote a letter to me complaining about a medical condition or lack of treatment, I would always contact the facility where the inmate is housed to verify if, in fact, the inmate had gone through normal, appropriate channels to present an issue or if he didn't present an issue. In many instances, the nursing staff assigned to the particular facility that an inmate is housed in know their patients and know any issues or problems that they're encountering.
Q. Okay. Now, do you recall the language we read where it says, "I placed a slip in to see the eye

Page 60

doctor"?
A. Yes.
Q. Do you recall what you did in response to that sentence after having received Exhibit 4, if anything?
A. I would have called the dispensary involved, spoke to the nurse to see that -- to verify if, in fact, the particular inmate had spoken to the nursing staff regarding seeing the eye doctor due to the fact he was having trouble seeing.
Q. And do you have recollection of doing that in this instance?
A. I can only say that's what I would normally do in every case. I would assume I did it in this case, also. It's my standard practice.
Q. And did you have a standard practice for noting your activities with regards to following up with a medical request referenced by a slip such as in this letter?
MR. PALOMBO: Objection.
A. I would have responded in writing of any activity that I've taken, and notify the inmate.
Q. Do you have a habit of recording a note regarding any conversation you would make after calling a dispensary in response a letter such as Exhibit 4?

Page 61

A. Depending upon the incident involved, I might ask the nurse to memorialize my telephone conversation in the medical record.
Q. Would you make any notation yourself regarding what you instructed the nurse to do, if anything?
A. Other than keep an inmate file -- correspondence file, no.
Q. Okay. So the only place you would make a note is in your own correspondence file relative to any particular action or conversation you had; correct?
A. Correct.
Q. And do you recall making any such notation with regards to your response to Exhibit 4?
A. I believe I sent Inmate Moreau a letter.
Q. And do you recall speaking to the nurse at the dispensary to verify whether he, in fact, put in a slip as indicated in his letter?
MR. PALOMBO: Objection. You can answer.
A. Again, that would have been my standard protocol.
Q. If you thought that the statement was not accurate, would that have affected your response to the inmate?



EXHIBIT – C