MR. PALOMBO: Objection as to the form. The statement of Moreau?
MR. DIMAIO: I'll ask a different question.
Q. If you thought Mr. Moreau's statement indicating that he placed a slip in to see the eye doctor was not accurate, would that have affected your response to him in any way?
MR. PALOMBO: Objection. You can answer.
A. No.
Q. Okay. And why is that?
A. Well, if an inmate writes a letter such as the one that he wrote dated September 17, 2001, and is complaining about a problem with his sight, and I called the dispensary, and they told me, no, this guy has never complained about a sight issue, I would have requested that they -- that the nursing staff bring him up, speak to him, and see if he is having problems with his vision.
Q. And now, if the nursing staff brought him up to speak to them, would they have been obligated as far as you know to record that meeting with Mr. Moreau?
A. It would be in the medical record.



Q. What portion of the medical record would it be found?
A. I would assume in the nursing notes.
Q. Is it fair to say then that if it does not occur in the nursing notes, than more likely than not the conversation would not have taken place?
MR. PALOMBO: Objection.
MS. RAND: Objection.
MR. PALOMBO: You can answer.
A. I wouldn't assume that, no.
Q. Why would you not assume that?
A. Because then I would check -- in this particular instance, the scenario you played out, then I would check to see if there was an appointment made for him to see the eye doctor in timely fashion.
Q. Where would you check out to see if an eye doctor appointment was made for him in a timely fashion?
A. That would have been made probably -- I'm not sure. I probably would have asked the nursing supervisors to check to see if Mr. Moreau was placed on the list to see the eye doctor the next time he would have been at the Intake Service Center.
Q. And do you have a recollection of doing that in



this instance?
A. I believe I did because during the period of time that this all occurred, Mr. Moreau was transferred from the Intake Service Center to the High Security Center. The date of his appointment, I believe, was October the 29th to see Dr. Smiley, and I had Nurse Abelli make special arrangements to get him transferred from High Security to the Intake Service Center to be seen on the 29th by Dr. Smiley.
Q. Now, did Dr. Smiley have a relationship with th Department of Corrections for examination of patients in the fall of 2001?
A. Yes, he's a consultant optometrist.
Q. And how frequently would he perform those consulting services?
A. Dr. Smiley is at the Department of Corrections on a weekly basis.
Q. So in the fall of 2001, he would come in on a weekly basis; is that correct?
A. Yes.
Q. Was there any particular day of the week that was designated as his day or was it unpredictable?
MR. PALOMBO: Objection. You can answer.



A. He -- he came in on a specific day based on his practice. I'm not sure what day that is. It could have been a Tuesday or Wednesday, I believe, and Dr. Smiley would go from facility to facility and see the inmates that were prepared on a list by the nursing staff of the facility that needed to see an optometrist to have their eyes examined.
Q. So it is your impression he would go from facility to facility on the same day to see inmates at different facilities, if necessary?
A. Yes.
Q. Was it your impression in the fall of 2001 that Dr. Smiley was responsible to make sure he went to each facility that had an inmate requiring his services?
MR. PALOMBO: Objection.
MS. RAND: Objection.
MS. DURANT: Objection.
A. I don't believe it was Dr. Smiley's --
MR. PALOMBO: You can answer.
A. -- responsibility. It was our responsibility to schedule appointments for him to see inmates. We directed Dr. Smiley where to go.
Q. And you would say that -- if his day was a Monday, then you would correct your earlier response that



EXHIBIT-E