Page 14

you would look at first before acting on a medical record?
A. No.
Q. Okay. Was there an understanding as to which documents carried more importance than others within the medical record?
MR. PALOMBO: Objection. You can answer.
A. No.
Q. Okay. What was the purpose of this medical entrance screening form as known by the Department of Corrections in the year 2000?
A. It would give us an idea of what his basic medical condition was upon admission.
Q. Okay. And now, do you recognize the signature of the person who completed this?
A. Yes.
Q. Okay. Who was that person?
A. Judith Henderson.
Q. Is this the type of form that you could have customarily completed yourself in the year of 2000?
A. No.
Q. Okay. Why do you say no?
A. Inmates are committed at the Intake Center. That's the jail. That's where non-sentenced inmates

Page 15

are. So he would have come in as a non-sentenced inmate waiting for sentencing, and then would have been dispersed into population after sentencing.
Q. Okay. So you had seen forms similar to this completed by Judith Henderson within your employ of the State of Rhode Island; is that fair to say?
A. Yes.
Q. Okay. And what was the purpose of this form in the medical chart for a patient in the year 2001?
A. It would give the doctor when they do the physical exam a heads up.
Q. What do you mean by heads up?
A. It would give them an idea of any problems that are imminent or need a second look.
Q. And how was it that you have the understanding that it was used by doctors in that fashion in the year 2001?
A. Because it says medical screening.
Q. And that term medical screening was known to be significant in some fashion? Is that the point you're making?
A. Yes.
Q. Okay.
(DISCUSSION OFF THE RECORD)
(PLAINTIFF'S EXHIBIT 15 MARKED FOR IDENTIFICATION)
Q. Now, during your -- during my questions I asked you

Page 16

about the physician order form. Do you recall those questions?
A. Yes.
Q. Okay.
MR. TATE: Is this Exhibit Number --
MR. PALOMBO: 15.
MR. TATE: Right. So this is a new exhibit. I didn't know if it had been previously marked.
Q. Now, I'm handing to you what's been marked as Plaintiff's Exhibit 15. Is that the form that you were referring to when you answered my prior questions?
A. Yes.
Q. Okay. And what's the purpose of this physician's order form as it relates to a patient's medical record in the year 2001?
A. The physician would write directions for the nurse.
Q. When you say the physician would write directions for the nurse, is this something that also a nurse practitioner was known to make directions on?
A. Yes.
Q. Okay. And so it's your understanding that Barbara Carroll would customarily make notes on physician

Page 17

order forms in the year 2001, correct?
A. Not notes, no.
Q. You qualified not notes. Did I call it the wrong thing?
A. Yes.
Q. She would make directions on the physician order form; is that correct?
A. Yes.
Q. And anything noted on the physician order form was expected to be carried out by the nursing staff; is that correct?
A. That's correct.
Q. It was not expected that she would be carrying out her own directions, was it?
A. No.
Q. And now, in fact, your handwriting appears on that physician order form; is that correct?
A. Many times.
Q. Okay. And drawing your attention to the center of the top page, do you see where it says, inmate transfer date?
A. Yes.
Q. 10/29/1?
A. Yes.
MR. PALOMBO: Mr. DiMaio, did we go





2bd61acb-580b-4420-a0e5-7e25d42be6b3

Page 18

over this at the last deposition?
MR. DIMAIO: I just checked. I didn't --
MR. PALOMBO: Please don't let me interrupt you. I thought we did.
MR. DIMAIO: When you say last deposition, you mean her last deposition?
MR. PALOMBO: Yes. Yes.
MR. DIMAIO: I quickly looked, and I'll double-check. I didn't see -- I've got them here, Tom.
MR. PALOMBO: You know what? Just continue. No problem.
(DISCUSSION OFF THE RECORD)
Q. Now, do you see where it says reviewed by and there's a signature next to the notation nurse?
A. Yes.
Q. All right. That's your signature, correct?
A. Correct.
Q. And would you have signed it on the same day indicated in the date block?
A. Usually, yes.
Q. Is that your handwriting, 10/29/1?
A. No.
Q. Do you recognize whose handwriting that is indicating

Page 19

10/29/1?
A. No.
Q. And in the "from" block and the "to" block where it indicates ISC and HSC, do you recognize that handwriting?
A. No.
Q. Okay. And what was the purpose of you signing next to the nurse area on this block?
A. Gives the notation that I reviewed the chart.
Q. Now, this is the physician order form sheet, correct?
A. Correct.
Q. And this was understood to be a physician or nurse practitioner's direction to nursing staff, correct?
A. Yes.
Q. And that what was on this document was intended to be carried out by nursing staff, correct?
A. Correct.
Q. Okay. And so, your signature where it says reviewed by nurse simply noted that you reviewed the order form; is that correct?
A. It signifies that I reviewed the chart.
Q. Reviewed the chart. And would it convey that you carried out some course of action?
A. No.
Q. And do you remember why you would have reviewed the

Page 20

chart prior to putting your signature on this line?
A. I would have taken information I received off the chart and put it in the appropriate places at my work area.
Q. What does that mean, that you would have put it in the appropriate place?
A. They have a chronic care list. Anybody with a chronic condition would go on that. Anybody that needed a physical, the name would go on that list.
Q. Okay. Is the chronic care list a different physical list than the one for people who need physicals?
A. Yes.
Q. Okay. Now, the list for people who need physicals, what is that list called?
A. It's just my own notations to remind me to do -- have a physical done on an inmate.
Q. So that's not a Department of Corrections wide form or list that's used by all the nurses, is it?
A. No.
Q. Okay. So you kept your own notes regarding which inmates would need a physical and when?
A. Yes.
Q. And would you store that in some system that would organize it by date?
A. No.

Page 21

Q. And when I say organize it by date, that would include for example a calendar. Would you write that notation on a calendar of some sort?
A. No.
Q. And how would you use your own note if you needed to schedule somebody for a physical?
A. I have a nurse practitioner that works on the off shift. I would make arrangements for her to come and do physicals.
Q. So for example, if you wanted to schedule somebody who was under 40 for an annual physical because they had some chronic issue, how would you do that for yourself?
A. We don't do annual physicals on people under 40.
Q. If somebody had a chronic issue, would that be a reason to schedule them for an annual physical?
A. No.
Q. Is there some document that you would be able to refer to in the patient's medical record to determine the reason why an inmate under 40 would have received more than one physical?
MR. PALOMBO: Objection. You can answer.
A. I'm not sure what you're asking.
MR. DIMAIO: Okay. I'd like this next





2bd61acb-580b-4420-a0e5-7e25d42be6b3

Q. Okay. And do you know whether Barbara Carroll would conduct her own eye exam?
A. Yes.
Q. And would she conduct eye exams for the patients she was conducting a physical examination on?
MR. PALOMBO: Objection. You can answer.
A. I think so.
Q. And do you recognize the handwriting on this document?
A. I see her signature. I thought she writes larger than that. I don't recognize anything on here as belonging to one person or another. I don't have much experience with seeing her physicals.
Q. Okay. Now, what's the purpose of the area marked intake data approximately two thirds of the way down the sheet?
A. What in particular are you asking for? The vision?
Q. You see two bold lines running parallel from left to right on that sheet roughly two thirds down, correct?
A. Yes.
Q. And in that area in large bold print there are the words intake data, correct?
A. Right. Yes.
Q. And what's the purpose of the markings -- what's



the -- strike that. What's the normal use of making markings in that area on this form?
MR. PALOMBO: Objection. You can answer.
A. Well, let's see. It says mammogram. That would be whether or not he had it done. Whether there was a tetanus that was up to date, what some of the lab tests that would have been performed. There is a vision, place to write down vision.
Q. Okay. And if there were instructions that resulted after a physical examination, where should that be marked on this sheet?
MR. PALOMBO: Objection. You can answer.
A. It would not be marked on this sheet.
Q. Why not?
A. Because this is a history and exam form. Any instructions would have been written on the doctor's order sheet.
Q. Now, was it normal practice for a nurse to assist either a physician or a physician extender in 2001 while conducting a physical examination?
MR. PALOMBO: Objection. You can answer.
A. No.



Q. And if a physician or a physician extender needed to make some type of further direction after a physical, that would be noted only on the physician order form; is that correct?
A. That's correct.
Q. Okay. And it should not be noted on this physical examination form; is that correct?
A. The -- there may be a statement or a notation of a problem. Below the intake data there is a list, a place for problems, but it wouldn't -- there wouldn't be anything on here about what they were going to do about the problems.
Q. Okay. And do you see the area under the intake category that says plan, indicate if priority?
A. Yes.
Q. What's the -- in 2001 what was the normal use of that area of this form?
MR. PALOMBO: Objection. You can answer.
A. Well, I guess it would be to put down how an inmate would be taken care of a problem.
MR. PALOMBO: I move to strike the answer.
Q. And now, do you see the portion that says chronic care clinic below the problems in the plan area?



A. Yes.
Q. Okay. And do you see a check mark in the yes area?
A. Yes.
Q. Okay. What's the purpose for checking that off on this form?
MR. PALOMBO: Objection. You can answer.
A. Well, I don't really know. I mean, she must have had a reason. It says medical.
Q. What was the normal use in 2001 of the chronic care clinic portion of this form?
MR. PALOMBO: Objection. You can answer.
A. I don't know. I don't know what you're asking me.
Q. After a physical had you experienced reviewing these forms in 2001 in general?
A. No. I don't in general review them.
Q. Okay. After -- are you familiar with the standard practice of physicians or physician extenders in 2001 for the processing of this form after a physical?
A. The practice of --
Q. Yes. What were they supposed to do with this form after they finished the physical.
A. They put it in the chart.
Q. That's it? Just put it in the chart?

Page 42

that we're all on the same page. So for example, the fourth page, is a -- it begins with the date 1/2 of '01?
MR. TATE: Yes.
MS. RAND: Yes.
MR. PALOMBO: In fact, that is the only entry on that page. Then the fifth page begins with 10/23/00?
MS. RAND: Yes.
MR. DIMAIO: Yes.
MR. PALOMBO: Whatever you want to do then is fine. If you need a copy, you can take mine back.
MR. DIMAIO: Actually, I think what we can do is I think we can all stipulate and agree that we can supplement the exhibit that's been marked. Exhibit 15 currently has the first entry on the first page which is 9/15/01 in front of the deponent, correct?
A. 9/5/01.
Q. The marked exhibit, the next page top entry would be 3/17/01; is that correct?
A. That is what I have.
Q. Then the next page the top entry is dated what, please?

Page 43

A. Looks like 1/08 -- or it could be 28/01.
MR. DIMAIO: Okay. So we agree, we can add these fourth and fifth pages to that exhibit which Attorney Palombo just articulated, which I am handing to the deponent now. Tom, do we have a stapler?
MR. PALOMBO: Madam stenographer, do you have a stapler? I'm surprised you don't have a stapler.
MR. DIMAIO: I'm going to circulate those additional -- everybody else has those additional pages.
MR. PALOMBO: Do you want it right now?
MR. DIMAIO: No. We'll use a paper clip to keep those pages together.
(DISCUSSION OFF THE RECORD)
Q. Now, referring to Exhibit 15, which contains now five pages, which date entries do you find your signature appearing next to?
A. 10/29/01 at the inmate transfer. 11/10/01, twice. 12/7/01, 1/7/02, and that's all.
Q. Okay. At the bottom of the top page, your handwriting also appears below physician's order form, correct?
A. Yes. I'm sorry. 2/1/02.

Page 44

Q. And looking at the first page of that exhibit, do you recognize a handwriting of any other nurse that's on that first page of Exhibit 15?
A. I'm not sure, but I might recognize that top signature. No. I'm not sure.
Q. And when you say that top signature, you're referring to the cursive handwriting which is across the one next to the security area block; is that correct?
A. That's correct.
Q. Okay. And now, turning the page, do you recognize the handwriting of any other nurses on the second page of Exhibit 15?
A. Well, 3/17/01 is Phyllis Achilles. And that's all I recognize.
Q. And turning the next page to the third page, do you recognize any nurse's handwriting on that page?
A. 1/08/01 is Phyllis Achilles. This one, 3/09 -- it might be '01 -- Mary Lou O'Neill. That's it.
Q. When you said 3/09/01, was that the second to the last entry?
A. Yes.
Q. Okay. And the next page, the fourth page, do you recognize the nurse handwriting on that page?
A. No.
Q. The fifth page, do you recognize any particular nurse

Page 45

handwriting on that page?
A. No.
Q. And are you aware of the protocol that was used to administer chronic care at the Intake Service Center for the year 2001?
A. No. This is new to me.
Q. When you say this is new to you, are you referring to what's been marked as Plaintiff's Exhibit 17?
A. Exhibit 17, yes.
Q. Now, you indicated earlier that you had a chronic care list in your facility; is that correct?
A. Yes.
Q. And you indicated that was different from a list you personally maintained to schedule annual -- strike that -- to schedule physicals, correct?
A. Correct.
Q. And do you know whether the Intake Service Center had a chronic care list in 2001?
MR. PALOMBO: Objection. You can answer.
A. No. I don't know.
Q. Okay. And do you know if the Intake Service Center had a list used to schedule patients for physicals in 2001?
MR. PALOMBO: Objection. You can





2bd61acb-580b-4420-a0e5-7e25d42be6b3