Q. Would you submit any type of payroll document in 2001 to record your own different places of employment?
A. No.
Q. Is that kept for you solely by the institution or facility that you were stationed at?
A. Yes.
Q. Was it exclusively the roll call document?
A. No. It was the payroll document. I don't know what you'd call it.
Q. Was it a voucher that you had to fill out?
A. No.
Q. Did you have a supervisor fill out a voucher?
A. No. It was done by the -- I don't --I don't know who it was done by, actually what title they had.
Q. Describe the process in which you were paid by the Department of Corrections in the fall of 2001.
A. Every two weeks on a Friday a check would be issued, and I would pick up the check. Part of the check was directly deposited.
Q. Describe the process in which they verified the different places that you performed your services in the fall of 2001.
A. I have no knowledge of how they do it. They just write it down.
Q. When you say they just write it down, who are you



referring to?
A. Whoever does the payroll. They write it down and send it to central processing.
Q. What document are you aware of that payroll would have that would instruct them as to which facility you worked in?
A. The payroll. They send in the hours worked to the central payroll office.
Q. Who sends in the hours you worked?
A. I believe it's signed by either the warden or the deputy, deputy warden.
Q. So if you are stationed at the Intake Service Center in September of 2001, who was responsible for recording your payroll activities?
A. I would believe the clerk.
Q. Do you recall who that clerk was?
A. Several people.
Q. Did you get friendly with anybody in particular that you can name by name?
A. Again, several people performed the function. It was signed by the deputy warden and the warden. Either one or the other.
Q. All right. Describe the process by which you would check into work in September 2001.
A. Report to roll call, get briefed by the shift



commander, report to my area of responsibility.
Q. Now, when you report to roll call, was there any type of payroll documentation that was completed to your knowledge?
A. No.
Q. How would payroll get information that you showed up for work that day?
A. I believe the clerk would record from the roll call who worked what hours.
Q. So your understanding is the clerk would get a copy of the roll call for each facility; is that correct?
A. Yes.
Q. And what were the different shift times in September of 2001?
A. 6:52 a.m. to 3:00 p.m., 12:52 p.m. to I believe it's 9:15 p.m., 2:52 p.m. to 11:00 p.m., 10:52 p.m. to 7:00 a.m.
Q. Do you recall which shifts you worked in September of 2001?
A. Not off the top of my head. I think I worked days, but I'm not sure.
Q. In either September or October of 2001, do you recall having yard details where you supervised inmates responsible for picking up weeds or cigarette butts?
A. Would you clarify that, please.



Q. In September or October of 2001, do you recall having duties where you supervised inmates whose jobs were to pick up weeds or cigarette butts?
A. Not specifically.
Q. Okay. What do you recall about that type of activity?
A. That type of activity, as a normal course of my duties I would supervise the officer who supervised the inmates, detainees performing those tasks.
Q. Now, who is a detainee in September, October of 2001?
A. Please?
Q. What was a detainee in September and October of 2001?
A. Any person awaiting trial for an offense in the State of Rhode Island. It could be a federal. It could be a state.
Q. What was an inmate in September and October of 2001?
A. Interchangeable terms.
Q. When you say interchangeable, interchange with the term detainee?
A. They mean the same thing at this point.
Q. Did they mean the same thing for you in September and October of 2001?
A. Yes.
Q. Okay. And who was your direct supervisor in September and October 2001?
A. That would depend on the shift.





f23dab6e-512c-4300-ba29-0dd0b4dad17e

Page 26

A. No.
Q. It was solely the correctional officer's job to do that, correct?
A. If he reported an incident, yes.
Q. If his supervisor witnessed an incident, would his supervisor fill out one of those forms?
A. Yes. He could. Any department.
Q. So the person completing the form is whoever directly observed it, firsthand information, right?
A. Yes.
Q. Thank you. And then you said they would submit it to the shift supervisor's office, right?
A. Yes.
Q. And would this have been --
A. Excuse me. I wish to correct you on that. Shift commander's office.
Q. If you were on duty, was that person yourself or a different person?
A. Usually a different person. Very occasionally me.
Q. Did you have a particular office in the Intake Service Center in the fall of 2001 called something different than the commander's office?
A. Yes.
Q. What was your office called?
A. South side lieutenant's office.

Page 27

Q. So should I understand that there is more than one lieutenant's office in the fall of 2001 at the Intake Service Center?
A. Yes, there is.
Q. And your area of responsibility was on the south side; is that correct?
A. The south building.
Q. The south building. And how many correctional officers would you supervise underneath you during the daytime?
A. It varied.
Q. What's the range of maximum and minimum?
A. Anywhere from ten to 30.
Q. Do you recall in the fall of 2001 having Correctional Officer Jeff Laurie work underneath your supervision?
A. As I said before, I'm not sure dates, but he did work under me.
Q. And was Jeff Laurie one of those officers that would supervise inmates performing yard cleanup details?
A. Yes.
Q. Now, I'm calling it yard cleanup details. Is that what yourself and the correctional officers would refer to them as?
A. I believe so.
Q. So there's no other special term that I should

Page 28

describe the job function that inmates were performing that would pertain to picking up cigarette butts and weeds then, right?
A. Maybe porter.
Q. So it's what they call a yard porter perhaps?
A. Could be.
Q. And do you recall Jeff Laurie reporting an incident of an inmate complaining he could not see cigarette butts or weeds?
A. No.
Q. And if they were short staffed, would you on occasion directly supervise yard porters?
A. No.
Q. The correctional officers that would have been supervising yard porters in the fall of 2001, would they have been outside and you inside for example?
A. I don't know yes or no actually. It could be either way.
Q. How were they situated physically?
A. Depended on the situation. I'm not trying to be nonresponsive. I'm trying to tell you they could be inside. They could be outside with them. They could be either place. They had an area to watch.
Q. If there were outside details that involved picking up cigarette butts or weeds in the south building, where

Page 29

would that have taken place?
A. In the yard area, which is the courtyard.
Q. How many yards did they have for the south building?
A. Two.
Q. And now, where would you have been stationed to supervise correctional officers supervising those two yards?
A. I would be wandering the whole area.
Q. So you would be wandering both inside and outside those areas?
A. No. I would be supervising my entire building area, which means I could be in the office. I could be anywhere else.
Q. Would you go outside to supervise?
A. No.
Q. So you would never --
A. Or rarely. Let's put it that way.
Q. Rarely. What would some -- what would be some of the events in the fall of 2001 that would cause you to go outside to supervise?
A. Maybe to go out and talk to the officer. I don't know. I don't recall being outside. That's the whole thing.
Q. So it could have happened? You wouldn't challenge if somebody said you did?





f23dab6e-512c-4300-ba29-0dd0b4dad17e

A. Again, I don't know. I --
Q. If you were outside, is it -- if you were outside and you saw an inmate do something that you thought was inappropriate, would you say something to the inmate?
A. No. I'd say it to the officer.
Q. And if an inmate had an issue with a job they were doing in the time period that I've specified, would they be able to approach you and talk to you about it?
A. After they spoke to the officer.
Q. So the inmate would have to follow chain of command first, ask permission to speak to you before he could speak to you or something like that?
A. Absolutely.
Q. Is that the only way it would work?
A. Just about.
Q. Okay. If an inmate approached you on his own, he'd be in trouble?
A. No. If the inmate approached me on his own, I'd refer him back to the officer.
Q. And if the inmate approached you on his own complaining about something, would you give him any direction to continue what he was doing?
A. I don't understand the question.
Q. Would you instruct an inmate to perform any particular yard detail if you observed him doing something wrong?



A. Okay. I don't understand what you mean by that.
Q. All right. I'll ask a different question.
A. Okay.
Q. If you observed an inmate doing something that you thought wasn't correct while performing his yard porter services, and you happened to be the closest correctional officer to that inmate, would you say something to the inmate?
A. No. I'd go talk to the officer to find out what was going on, unless it was a dangerous situation.
Q. And if an inmate had a medical issue that affected his ability to perform yard porter services that was brought to your attention, what instructions would you have given?
A. If someone came to me with a medical question, problem, et cetera, the first process he would be told to do is fill out a medical request form and give it to the nursing staff.
Q. Now, was there nursing staff on duty in the fall of 2001?
A. Yes.
Q. How many people?
A. I don't know.
Q. And where were those forms if they had to fill a medical request form?



A. At the entrance to the dining rooms there were medical request forms. There's a box that they can put them in.
Q. Is that box secured in any fashion?
A. I don't know.
Q. And do you know who has access to the box?
A. Okay. Would you be more specific?
Q. Do you know if there was somebody who on a regular basis would take the slips out of the box?
A. Yes. The nurses.
Q. Was there an established policy or procedure for the handling of those medical slips that you're aware of?
A. As far as I know, the nurses handled them and made medical decisions based on them.
Q. So it's fair to say that the only procedure you knew of is you would instruct the inmate to fill it out, put it in the box, then at that point the correctional officer's obligation is done with that slip?
MR. PALOMBO: Objection, but you can answer.
A. No. It's not my understanding. If there's a problem with -- at the point where an individual says he has a problem that's not being responded to, he would then fill out a request form to see the lieutenant or someone in the area to explain his



problem. I don't recall any of those things happening with this individual.
Q. Okay. You don't recall this individual seeing an officer relative to a problem of no responses?
A. I don't know.
Q. Okay. I'm just trying to understand your last response. That's all.
A. Can we go off the record for a second? Let me try to explain this.
Q. Sure.
(DISCUSSION OFF THE RECORD)
Q. Did you have an understanding as to the use of the medical request slips in the fall of 2001?
A. Yes.
Q. What was your understanding?
A. Medical request slips were the only -- were the way that the nurses dealt with medical problems or the medical staff dealt with medical problems.
Q. Okay. And when we went off the record, you referred to that slip as what type of a slip?
A. That's a medical slip. I referred to a request slip that an inmate would put in if he had a problem that he felt was not being dealt with.
Q. Did you refer to it by a particular color?
A. Pink slip. I'm sorry.





f23dab6e-512c-4300-ba29-0dd0b4dad17e

Q. If there were medical issues that affected an inmate's ability to perform yard detail services, who would inform you as to those medical issues during the time period that I'm referring to?
A. Medical staff would just take him off a job if they felt he was unable to do it.
Q. Who was Mr. Joseph Marocco in the fall of 2001?
A. I don't know his title. I don't know his title. I know the man personally, but I don't know his title.
Q. That's all right. Do you know what function he performed within the correctional institution in the fall of 2001?
A. Not specifically.
Q. What do you think he did in the fall of 2001?
A. Worked in medical. I just am not sure what his title was.
Q. Do you know what jobs he would perform in medical?
A. No. I wouldn't have -- I had -- over the time period that I've known Mr. Marocco, I have had very limited interaction with him.
Q. All right. Do you know what a health care administrator is?
A. Generally.
Q. All right. Are you familiar with that position as it pertains to the Department of Corrections in the fall



of 2001?
A. No.
Q. Did you know they had a health care administrator?
A. Yes.
Q. If an inmate had a health-related issue that was not getting addressed, would anybody indicate or suggest to him that he should bring it to the attention of a health care administrator?
A. I don't know. I assume.
Q. Do you have an understanding whether Mr. Joseph Marocco is under the umbrella of medical staff at the Department of Corrections?
A. Yes. I understand that.
(MR. GRANT ENTERS THE ROOM)
Q. Did you have any understanding as to where he would rank in terms of being a supervisor or a subordinate?
A. I believe he was the supervisor, but I don't know what position he holds. Any specifics. I don't know what his responsibilities are.
Q. That's okay. I'm going to ask you some questions to try to get some conceptual ideas on what you thought he supervised. What did you think he supervised?
A. I didn't deal with the man. I had no dealings at all. Other than hi, how are you doing? That was about it.



Q. Okay. So the extent of your knowledge of Mr. Marocco's position was that he was in some capacity related to the medical staff of the Department of Correction, and that's about it?
A. Basically.
Q. You knew him by name and you would say hello?
A. Yes.
Q. Okay. And you would be very surprised if you found out that Mr. Marocco sent a letter to anyone in medical staff complaining that he couldn't see cigarette butts or weeds in the fall of 2001, correct?
MR. PALOMBO: I object to the form. I thought you said Marocco, but maybe I was wrong. Instead of Moreau I thought you said Marocco, but sorry.
MR. DIMAIO: The words after, would you be surprised that Mr. --
THE REPORTER: Marocco.
MR. DIMAIO: Thank you. I stand corrected.
Q. So would you be very surprised to find out that Mr. Moreau did send a letter in September 17, 2001 to anyone within the medical umbrella of the Department of Correction?
MR. PALOMBO: I object. You can



answer.
A. I wouldn't know what Mr. Moreau did. As I said before, I really don't know Mr. Moreau other than vaguely from a picture I saw, and I'm not sure if I know him.
Q. In the fall of 2001 do you remember any blind people picking up weeds or cigarette butts?
A. Not specifically.
Q. Okay. Did it happen?
A. I doubt it.
Q. Why do you doubt it?
A. I don't know how to say this, but I can't see somebody that was blind being assigned to a job like that.
Q. Why?
A. Because they'd have to pick stuff up.
Q. And if you saw it happen, what would you do?
A. I didn't see it happen to my knowledge.
Q. If you knew it was happening, what would you do?
A. As I said, I did not see it happen. I don't know it happened, therefore, I am not going to speculate on what my actions would be.
Q. In order to perform your duties, is it necessary to know something about the physical limitations and attributes of inmates that are being supervised during





f23dab6e-512c-4300-ba29-0dd0b4dad17e