UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**RICHARD MOREAU**
**PLAINTIFF**

**V.** **C.A. NO. 04-459 S**

**STATE OF RHODE ISLAND, ET AL.**
**DEFENDANTS**

**STATEMENT OF UNDISPUTED FACTS**

Now come Defendants, State of Rhode Island, Department of Corrections ("DOC"), Joseph Marocco, Barbara Carroll and Marilyn Hale (formerly, "Grejudus") ("State" or "Defendants") and, pursuant to Local Rule 56, respectfully submit the following Statement of Undisputed Facts with Exhibits A-O:[1]

1. Plaintiff, Richard Moreau ("Moreau"), was at all times material an inmate at the DOC Adult Correctional Institution. **Exhibit A** - First Amended Complaint ("Cpt.) ¶ 1.
2. Defendant, State of Rhode Island, Department of Corrections ("State" or "DOC"), is sued as the employer of the named Defendants. Cpt. ¶ 13.
3. Defendant, Joseph Marocco ("Marocco"), was at all times material the DOC Associate Director of Health Care Services and is sued in his official and individual capacities. Cpt. ¶ 4.

[1] Exhibits to this Statement are alphabetical (A-O). Exhibits to the Affidavit of A.T. Wall are numerical (1-7). Several Exhibits appear in both the Statement, by letter, and in the Affidavit, by number.

4. Defendant, Barbara A. Carroll ("Carroll"), was at all times material a DOC registered nurse and physician extender and is sued in her official and individual capacities. Cpt. ¶ 8.

5. Defendant, Marylyn Hale ("Hale"), was at all times material a DOC registered nurse and is sued in her official and individual capacities. Cpt. ¶ 9.

6. Plaintiff's Complaint contains three (3) claims: Count I - Negligence and Professional Malpractice; Count II - Violation of Open Records Statute and Count III - Constitutional Deprivations. See Cpt. Moreau alleges that, while incarcerated within the R.I. Department of Corrections ("DOC"), he lost his vision and became legally blind. Id. Moreau asserts that this was caused by the Defendants unconstitutional acts and omissions and by their negligence. Id.

7. DOC Director A.T Wall has filed an Affidavit in support of summary judgment. See Affidavit of Wall ("Wall Aft.").

8. DOC Policy 18.11, Inmate Complaints Relative to Health Care Services, which became effective on April 12, 1999 and remained effective until June 2004, provides all persons committed to the care of DOC a mechanism to address health services complaints in a timely manner. Wall Aft., ¶ 5; Exhibit 1.

9. The DOC also had in force and effect in the year 2001 an Inmate Grievance Procedure, Policy No. 13.10, that provided a procedure for the resolution of those inmate complaints, problems and grievances which cannot be resolved informally. Wall Aft., ¶ 16; Exhibit 6.

10. On September 17, 2001, Mr. Moreau wrote to Mr. Marocco and on September 26, 2001, Mr. Marocco wrote a Memo. back to Mr. Moreau. Director Wall has reviewed the Letter and Memo. Wall Aft., ¶ 6-9; Exhibits 2 and 3.

11. Mr. Moreau's letter complained of a vision problem and his eyeglasses. The letter mentions his eyeglasses numerous times and that he was willing to pay for new glasses. Wall Aft., ¶ 7; Exhibit 2.

12. Mr. Moreau asked to be placed at the top of the list to see the eye doctor the next time he visited. Wall Aft., ¶ 8; Exhibit 2.

13. Mr. Marocco wrote back on September 26, 2001, stating that he had spoken to a nurse, that Mr. Moreau was on the list to see Dr. Smiley, an optometrist, on October 29, 2001, and that he should speak to a nurse if he had further questions. Wall Aft., ¶ 9; Exhibit 3.

14. Mr. Moreau wrote a second letter to Mr. Marocco on October 14, 2001 and Mr. Marocco received the Letter on October 25, 2001 and wrote a Memo. back on November 5, 2001. Director Wall has also reviewed this Letter and Memo. Wall Aft., ¶ 10-12; Exhibit 4 and 5.

15. Mr. Moreau stated that his eyesight was very bad, that it was very dark and that he could read a newspaper, but barely. Wall Aft., ¶ 11; Exhibit 4. He also stated that he understood he was on the list to be seen by Dr. Smiley on October 29, 2001, but had heard that sometimes Dr. Smiley did not see all the people on the list. Id. Mr. Moreau expressed his fear that he would not be seen by Dr. Smiley and asked about contacting Dr. Smiley directly. Id. He also wrote that he had $100 set aside to buy new eyeglasses; Id.

16. Mr. Marocco received Mr. Moreau's letter on October 25, 2001 and wrote back on November 5, 2001. Wall Aft., ¶ 12; Exhibit 5. Mr. Marocco stated that he had called the Intake Service Center and learned that Mr. Moreau had been transferred to High Security. Id. Mr. Marocco wrote that he made arrangements for Mr. Moreau to be transferred back to Intake for his October 29, 2001 appointment with Dr. Smiley. Id. Mr. Marocco also stated his understanding that Mr. Moreau was seen on that date. Id. He also asked Mr. Moreau to let him know if he had any additional concerns regarding his eyesight. Id.

17. DOC Policy 18.11 was established so that persons committed to DOC's care could file complaints regarding health services such as those found in Mr. Moreau's September and October letters to Mr. Marocco. Wall Aft., ¶ 13.

18. DOC Policy 18.11 requires that Mr. Moreau's complaint filed first be presented to the health care administrator, Mr. Marocco, as Mr. Moreau did. Then, if unresolved, an appeal may be taken to the Medical Program Director, who was Dr. Anne Spaulding at all pertinent times. Wall Aft., ¶ 14.

19. Director Wall reviewed any and all complaints and letters by Mr. Moreau maintained by the office of the DOC's Medical Program Director. The records do not contain any complaint or appeal of the issues raised in Mr. Moreau's September 17 and October 14, 2001 letters to Mr. Marocco. Wall Aft., ¶ 15

20. The DOC Inmate Grievance Procedure, Policy No. 13.10, permits a sentenced or pre-trial inmate to file a grievance concerning the interpretation or application of policies, rules, and procedures. Inmates may also file a grievance on any matter relating to access to privileges, programs, and/or services; conditions of care or

supervision; and living facility conditions within the authority of DOC. Wall Aft., ¶ 18; Exhibit 6.

21. The inmate grievance policy does state that decisions by qualified medical personnel relating to an inmate's health are non-grievable. Wall Aft., ¶ 19; Exhibit 6.

22. Mr. Moreau's complaint that his oral and written requests for medical care were not addressed, or were not addressed in a timely manner, is grievable under the inmate grievance policy. Wall Aft., ¶ 20; Exhibit 6.

23. Mr. Moreau's complaint that DOC's failure to retain medical request slips is a violation of law is also grievable under the policy. Wall Aft., ¶ 21; Exhibit 6.

24. The inmate grievance policy requires an inmate filing a grievance to initiate a complaint at the lowest level of the chain of command via an informal request. If the grievance is not resolved informally, the inmate may submit the complaint to the warden of the facility. If the warden's response is unsatisfactory, the inmate may submit the grievance to the director, through the departmental grievance coordinator. Wall Aft., ¶ 22; Exhibit 6.

25. Mr. Moreau had access to and was aware of the inmate grievance policy because all secured facilities maintained a copy in their law library. Also, Mr. Moreau himself filed a grievance on October 5, 2000, that he should be designated as a protective custody inmate. His request was denied on October 16, 2000 by Warden Cudworth. He did not appeal the denial. Wall Aft., ¶ 17; Exhibit 7.

26. A review of DOC's records shows that at no time during his incarceration with DOC did Moreau ever file a grievance concerning the issues he raised in his September 17 and October 14, 2001 letters to Mr. Marocco. Wall Aft., ¶ 23.

27. Emergency grievances are also provided for in the inmate grievance policy. The emergency grievance is forwarded to the level at which corrective action can be taken and needs to be plainly marked emergency. Wall Aft., ¶ 24; Exhibit 6.

28. A review of DOC's records shows that at no time during his incarceration with DOC did Mr. Moreau ever file an emergency grievance concerning the issues he raised in his September 17 and October 14, 2001 letters to Mr. Marocco. Wall Aft., ¶ 25.

29. On January 22, 2000, Mr. Moreau came to the DOC Intake Services Center at which time it was noted that he had hydrocephalus and a shunt that drained fluid from his brain to his stomach. **Exhibit B** – Medical Entrance Screen dated 1-22-00 and attached paperwork.

30. On March 1, 2000, Mr. Moreau stated to a DOC physician that he knew the signs of blockage and/or infection of his shunt and that he would alert medical staff if any of these symptoms occur. **Exhibit C** - Physician Contact Note by Dr. Albert Osei dated 3-1-00.

31. On March 3, 2000, in his admission physical examination, Mr. Moreau's hydrocephalus was noted as congenital and mild. A stent shunt was noted. A nurse conducted an eye examination and his vision was 20/40 in both eyes. **Exhibit D** - DOC Physical Examination by Dr. Santa Teresa dated 3-5-00.

32. In November 2000, Dr. Osei considered a CAT Scan for Moreau. He spoke to Moreau's previous neurosurgeon in Connecticut, Dr. Salame. In December 2000, a CAT Scan was ordered by Dr. Osei. In January 2001, Moreau had the CAT Scan at Rhode Island Hospital. The CAT Scan report was faxed to Dr. Salame, who discussed it with the DOC physician, stated it looked benign, that there was no shunt blockage and that there was no pressure on the brain. In March 2001, the DOC physician informed Moreau of the above. **Exhibit E** - DOC Physician Contact Notes dated November 3 and 29 and December 4, 2000 and January 19 and 25 and March 8 and 9 2001 by Dr. Osei.

33. In March 2001, Moreau complained of an occasional and less than one minute feeling of swaying, with no other symptoms. Moreau was advised to report if it recurs, increases, or persists. He asked to be tested for diabetes. In March and April 2001, Moreau complained of dizziness, headaches, earwax, and ear pain. Moreau came to DOC with hearing problems and hearing aids. At this time, Moreau requested a new hearing aid or aids. Moreau's ear problems were treated by the medical staff. **Exhibit F** - Physician Contact Notes by Drs. Osei and Motola dated March 9, 17 and 21 and April 23, 2001.

34. On September 17, 2001, Moreau wrote to Joseph Marocco, DOC Health Services, and complained of a vision problem and his eyeglasses. Moreau asked to see the eye doctor. **Exhibit G** - Letter from Moreau to Marocco dated 9-17-01.

35. Moreau's letter repeatedly mentioned eyeglasses (six times), stated that he needed new eyeglasses, and stated that he was willing to pay for them if necessary. Id.

36. Marocco's September 26, 2001, Memo. in response to Moreau shows that he understood Mr. Moreau to be complaining about his eyeglasses as the cause of his vision problem. Marocco wrote that he spoke to a member of the nursing staff regarding Moreau's request to see the eye doctor, Dr. Smiley, that the doctor was scheduled to be at Intake on October 29, 2001, and that Moreau was on the list to see him at that time. He was advised that if he had any further questions to speak to a nurse. **Exhibit H** – Memo. from Marocco to Moreau dated 9-26-01 and **Exhibit I** - Answer to Interrogatory No. 13.
37. Mr. Marocco was a health services administrator and not a medical professional. **Exhibit J** - Marocco Answer to Interrogatory No. 10.
38. Also on September 26, 2001, Barbara Carroll, a registered nurse physician extender, conducted a physical exam. **Exhibit K** – Physical Examination dated 9-26-01. An eye test, conducted by another nurse on that date, was noted as 20/40 without glasses. Id.
39. Carroll's opinion was that Mr. Moreau should see a doctor of optometry, and she recorded that in the physical examination. Id.
40. Carroll's examination was reviewed and signed by a medical doctor the following day. Id.
41. On or about September 26, 2001, an appointment with the optometrist, Dr. Smiley, was scheduled for October 29, 2001. **Exhibit H.**
42. Moreau saw the optometrist on that date. **Exhibit I.**

43. Carrol has testified that if she thought Moreau was in an acute medical state she would have asked medical staff to transport him to the emergency room. **Exhibit L** - Carroll Answer to Interrogatory No. 10.

44. Mr. Moreau wrote a second letter to Mr. Marocco on October 14, 2001 and I also reviewed this letter. **Exhibit M** – Moreau Letter to Marocco dated 10-14-01.

45. Mr. Moreau stated that his eyesight was very bad, that it was very dark and that he could read a newspaper, but barely. Id. He also stated that he understood he was on the list to be seen by Dr. Smiley on October 29, 2001, but had heard that sometimes Dr. Smiley did not see all the people on the list. Mr. Moreau expressed his fear that he would not be seen by Dr. Smiley and asked about contacting Dr. Smiley directly. He also wrote that he had $100 set aside to buy new eyeglasses; Id.

46. Marocco received Mr. Moreau's letter on October 25, 2001. **Exhibit N** – Memo. from Marocco to Moreau dated 11-5-01. Marocco wrote back on November 5, 2001, stating that he had called the Intake Service Center and learned that Mr. Moreau had been transferred to High Security. Id. Marocco wrote that he made arrangements for Mr. Moreau to be transferred back to Intake for his October 29, 2001 appointment with Dr. Smiley. Marocco also stated his understanding that Mr. Moreau was seen on that date. He also asked for Mr. Moreau to let him know if he had any additional concerns regarding his eyesight. Id.

47. Marylyn Hale was the nurse at the High Security Facility to which Mr. Moreau was transferred in very late October 2001. The medical records show that she was not involved in Mr. Moreau's care until November 2001 and that much of

Hale's care was routine. Nurse Hale did respond to Mr. Moreau's "dizzy spell" on December 24, 2001; the event had subsided, he felt better, and he was advised to hydrate, eat lunch and return to the clinic as needed. **Exhibit O** - Hale's Nursing Contact Note dated 12-24-01 and Answer to Interrogatory No. 13.

48. At no time while incarcerated, including September and October 2001, did Mr. Moreau did not inform any DOC staff member that the vision and eyeglass problems he was experiencing had to do with his hydrocephalus and/or his shunt. See Exhibits above.

Respectfully submitted,

DEFENDANTS
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Thomas A. Palombo, Bar No. 4212
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2296
Fax: (401) 222-2995

**CERTIFICATION**

I, the undersigned, hereby certify that I mailed a true copy of this Statement of Undisputed Facts by first class mail, postage pre-paid, on this 27th day of July 2006 to:

**Joseph-Anthony DiMaio, Esquire**
McKinnon & Harwood
1168 Newport Avenue
Pawtucket, RI 02861