**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RICHARD MOREAU | ) | |
| | ) | |
| VS. | ) | C.A. No: 04-459S |
| | ) | |
| STATE OF RHODE ISLAND, et. al. | ) | |

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO MOTION FOR SUMMARY JUDGMENT AS TO COUNT I AND COUNT III

**NOW** comes the Plaintiff, Richard Moreau, and in support of his objection to the Motion for Summary Judgment filed by Defendants, State of Rhode Island, Department of Corrections ("State" or "DOC"), Joseph Marocco ("Marocco") Barbara Carroll ("Carroll") and Marilyn (formerly, "Grejudus") Hale ("Hale") (all such parties collectively referenced herein as "Defendants"), as to Count I and Count III of Plaintiff, Richard Moreau's ("Plaintiff" or "Moreau"), First Amended Complaint ("Cpt."), states as follows:

## FACTS AND TRAVEL:

The general facts regarding Plaintiff's suit are set forth in more detail in Plaintiff's First Amended Complaint ("Cpt.") (SUF, Exhibit A). Plaintiff also attaches hereto and incorporates by reference herein Plaintiff's Fourth Statement of Disputed and/or Undisputed Facts ("FSOF"), pursuant to Local Rule 56. Plaintiff disputes significant facts submitted by Defendants SUF (FSOF ¶¶1,2). The facts relevant to Plaintiff's opposition of the arguments and issues raised in Defendants' Motion are addressed in detail with there respective argument, below.

Defendants[1] filed the present motion for summary judgment on July 27, 2006 (FSOF ¶3) ("Motion"). Attached to their motion is the requisite statement of undisputed facts (FSOF ¶4). Their Motion (Document #97) pertains[2] to the Defendants, the State of Rhode Island, Joseph Marocco, Barbara Carroll, R.N., and Marylyn Hale, R.N.,[3] regarding Count I and Count III (FSOF ¶5). Their Motion raises only five (5) issues. (1) Whether Plaintiff exhausted his administrative remedies; (2) Whether a suit can be maintained against the Defendants in their Official Capacities; (3) Whether the Defendants violated the eighth amendment; (4) Whether any of the Defendants enjoy qualified immunity; and (5) Whether Plaintiff can establish a legal duty and a casual relationship between the act or omission and the injury (*inter alia* Document #97).

**LAW:**

In determining a motion for summary judgment, Rule 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." USCS Fed Rules Civ Proc R 56(c).

---

1 While the present motion does not purport to include A.T. Wall ("Wall") and James Weeden ("Weeden") it should be noted that Defendant A.T. Wall has filed an Amended Motion for Summary Judgment (FSOF ¶6) which Plaintiff has opposed. To the extent the present Motion for Summary Judgment is considered and incorporated into Wall's Motion for Summary Judgment, the discussion regarding official capacity liability infra for constitutional deprivation is intended to equally apply both to Wall's and Weeden's Amended Motion for Summary Judgment (Document #103) and their original Motion for Summary Judgment filed on or about June 16, 2006 (Document #81).

2 While the primary focus of Document #97 is as a Motion for Summary Judgment on behalf of the defendants that have not previously filed a Rule 56 motion, it should be noted that these defendants have filed an amended motion for judgment on the pleadings (FSOF ¶7) which Plaintiff has also opposed. To the extent the present Motion for Summary Judgment is considered and incorporated into Document #102, the Amended Motion for Judgment on the Pleadings, the discussion regarding violation of clear statutory duty or obligation infra and the liability flowing therefrom is intended to equally apply to the Amended Motion for Judgment on the Pleadings (Document #102).

3 All named Defendants, Marocco, Carroll, and Hale have been sued "alias " John Doe or Jane Doe, respectively (see Cpt. –caption "Page 1 of 8 pages"). It should also be noted that the Defendant, James Weeden, was also sued "alias" John Doe which may be significant to the extent the present Motion for Summary Judgment is incorporated into the pending Amended Motion for Summary Judgment filed by Wall and Weeden (Document #103).

"In determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party. Harlow v. Fitzgerald, 457 U.S. 800, 816 (U.S. 1982).

Additional authorities germane to Plaintiff's arguments are cited with the respective arguments, below.

**ARGUMENT:**

In response to the numbered arguments, one (1) through five (5) of Defendants' Memorandum of Law (Document #97), Plaintiff argues respectively as follows:

**1. Plaintiff has complied with the requirements of PLRA**

Health care decisions were not grievable at the Department of Corrections under Policy 13.10 (FSOF ¶2(c)(v) "Exhibit C") or under Policy 18.11 (FSOF¶2(c)(vii) "Exhibit B"). Thus the due process protections and emergency expedited procedures provided in policy 13.10, "Inmate Grievance Procedure" (FSOF, Exhibit C), were not available to the Plaintiff (FSOF ¶2(c)(iv)). The inability to file a grievance regarding medical complaints was made clear upon Mr. Moreau's entrance into the correctional facility when he received his inmate handbook (FSOF ¶22) which stated under section "IX" entitled "Grievance Procedures" that "Decisions made by qualified medical personnel related to an inmate's health, are not grieved. Also, unlawful acts committed by an inmate are not grieved." (FSOF ¶2(c)(viii)) "Exhibit E"). "[G]rievance procedures must be understandable to the prisoner, expeditious, and treated seriously." Nyhuis v. Reno, 204 F.3d 65, 77 (3d Cir. 2000).

Policy 18.11, "Inmate Complaints Relative to Health Services" (FSOF, "Exhibit B") is different from Policy 13.11, the grievance policy. However, even Policy 18.11, regarding inmate complaints relative to health services fell far short of providing any

relief (FSOF ¶2(c)(iii)) to plaintiff. It too reiterated that health care issues were not grievable (FSOF ¶2(c)(vii); FSOF “Exhibit B”¶II(A)). Policy 18.11, as compared to Policy 13.11, contained no formal process for complaining (see generally FSOF, Exhibit B), and suggests a second medical request would suffice (see FSOF, Exhibit B¶III(A)(1)(a))[4]. It also fails to prescribe forms for complaints or appeals, or a time line for appeal or expedited responses in the case of emergencies (FSOF ¶2(c)(iv); see generally FSOF “Exhibit B”).

Plaintiff was "led to understand that under R.I.D.O.C. policy it is not allowed for inmates to grieve any complaints they have concerning medical treatment" (FSOF ¶10). Plaintiff could not utilize Policy 13.10 entitled "Inmate Grievance Procedure" (see "Exhibit C" to FSOF) to grieve, so he did not. And, although Policy 18.11 is not a grievance procedure, the Plaintiff did follow Policy 18.11 by submitting his request slip (Exhibit D to FSOF "the reply was put a slip in to see the doctor"), which Mr. Moreau did on “numerous” occasions (FSOF ¶11). Thus, all pertinent policies (“Exhibit B” to FSOF; FSOF ¶23) and qualified personnel, including the correctional officer[5] in charge of overseeing Mr. Moreau’s work detail as a yard porter, gave Mr. Moreau medical directions regarding his growing vision concerns to “put in a slip” (FSOF ¶12, line 8 through pp 56, line 11).

Moreover, Plaintiff complied with Policy 18.11 by complaining in a September 17, 2001 letter to the Health Care Administrator (SUF Exhibit G “I placed a slip in to see the eye doctor and was told he come in every few weeks”; Exhibit AB, pg2), and subsequently to the Medical Director, Scott Allen (FSOF ¶(2(c)(xiii) "Exhibit D" dated November 27, 2001; “Exhibit W” to FSOF dated February 15, 2002.), and again to the assistant director for the correctional facility, Mr. A. Bucci (see "Exhibit H" to FSOF ¶¶10,11 dated December 14, 2001) all such documents are entirely consistent with Policy 18.11. None of the procedures in place offered any remedy to Mr. Moreau, let alone

[4] Defendants have admitted that "written medical requests are destroyed after a medical request is handled by the medical staff." See Document #22, "Amended Answer," ¶45.)

[5] Since Policy 18.31 places the burden on correctional officers to address emergency sick calls, presumably he is a qualified medical person deemed appropriate to respond to the inmate request (see FSOF ¶24).

timely or appropriate remedies. By the time Mr. Moreau was finally examined by Dr. Smiley, the eye doctor, there was nothing that could be done (FSOF ¶¶15-18; see also FSOF "Exhibit J")[6]

Accordingly, all available administrative remedies were exhausted and complied with. Plaintiff maintains, however, that there were no remedies available to the Plaintiff since his complaints were all based upon non-grievable "Decisions by qualified medical personnel relating to an inmate's health" (SUF, ¶19; Wall Aft., ¶19). Thus he was not required to comply with the recommended procedures set forth in Policy 18.11 (see "Exhibit B" ¶III to FSOF). Based upon a fair reading of the Plaintiff's complaint (Cpt.) each and every action or in action, including that of destruction of the medical slip, was a decision by a qualified medical person, whether it be the Health Care Administrator in charge of health care, or the nurse responsible for triage (FSOF ¶20), or the doctors or the correctional officers.

In Defendants' supporting memorandum , the Defendants' assert that "Moreau is not complaining about medical decisions. Moreau's claims are not against medical doctors. Instead he sues an administrator (Marocco) and two nurses (Carroll and Hale)[7]." (Document #97, Defendants' Supporting Memorandum ("Dft.s'Mem") at 5). This is a gross mischaracterization of Plaintiff's claims (see generally "Exhibit A" to FSOF).

---

6 It was on the basis of Plaintiff's expert opinion (FSOF "Exhibit J") that since Mr. Moreau's vision was permanently and irreparably damaged by the point he was examined by Dr. Smiley, there was no legal injury sufficient to justify keeping Dr. Smiley as a defendant in the present action. Upon filing of the initial complaint in state court, Dr. Figueroa was named but not served more as a precautionary measure in the event that discovery indicated there was potential exposure. It was not until completion of discovery that Dr. Smiley, and all others participating after that point in time, could be ruled out as a Defendant. Dr. Allen was likewise dismissed after discovery was conducted and a firmer opinion could be obtained which ruled out Dr. Allen as a defendant based upon whether any legal damages were incurred as a result of Dr. Allen's role.

Mr. Moreau's vision was stable on and after October 29, 2001, thus his surgery was appropriately scheduled on a non-emergency status. Had his symptoms further deteriorated, then his condition would have been upgraded requiring more immediate action than what was followed in light of his stable condition. (FSOF ¶19)

7 Defendant fails to address the representative capacities of each defendant actually served "alias John Doe" and as plead in Cpt. ¶10-12.

First, Plaintiff's complaint makes it abundantly clear that he criticizes the medical care and decisions regarding whether, when, and the type of care to provide, even under a narrow interpretation of his complaint (see generally "A" to FSOF). Second, Defendant Joseph Marocco, was a qualified medical person making decisions related to inmate health contemplated by Policy 13.11 supra and Policy 18.10 supra and as contemplated the Inmate handbook supra, by virtue of his normal and usual duties and authority (FSOF ¶26; FSOF ¶28; FSOF ¶25)); by virtue of his education, training, skill and experience (FSOF ¶26); by virtue of the actual decisions[8] he made related to Plaintiff's health as demonstrated by the communications and actions evidenced by many of his official instructions and letters. (see Exhibit O, Exhibit Q, Exhibit R, and Exhibit S to FSOF). Third, there can be no dispute that nurses, whether Barbara Carroll, Marylyn Grejudus a/k/a Hale a/k/a "John Doe" must be licensed consistent with Rhode Island General law §5-34-2. Thus, by definition and by virtue of their license, nurses are qualified medical personnel whom make decisions relating to an inmate's health when they perform those services at the adult correctional facility.

It stands to reason that if the superior to the Correctional Officer Hospital Supervisor is Joseph Marocco (Exhibit F, pg 123, lns 1-17), and both positions have authority to schedule outside appointments (Exhibit F, pg 124, ln 1-2), when Defendant, Joseph Marocco, instructs a nurse to take some different course of action (scheduling beyond a normal 5-day window (FSOF ¶38)), then he too necessarily has made a decision which related to an inmate's health.

Suggesting that a licensed nurse or nurse practitioner or correctional facility doctor, or their superior within the DOC hierarchy, i.e. the Health Care Administrator, is not a "qualified medical personnel" within the meaning of the hand book and Policy 18.11 and Policy 13.10 is a stretch and is disingenuous. If the state intended the word "qualified medical personnel" to be restricted exclusively to persons licensed to practice medicine and not include the decisions of those whom triage patients or otherwise handle medical request slips and arrange health care appointment such as Joseph Marocco did supra, then it would have restricted that language. If the Defendants now argue that certain persons acted

[8] It is significant to note at this juncture the Nurse, Barbara Carroll, testified indicating that vision related complaints are ordinarily scheduled for an appointment with an optometrist within five (5) days (FSOF ¶38)

beyond the scope of their authority, then this court should revisit its grant of the Defendants motion to certify and substitute.

It should be noted that the authorities cited by Defendants in their supporting Memorandum (Dft.s'Mem) may have limited applicability to the instant case. The Booth case is distinguishable from the present case because in Booth some form of relief was available to Booth, just not the one Mr. Booth wanted (see generally Booth v. Churner, 532 U.S. 731 (U.S. 2001)). Mr. Booth did not challenge the availability or existence of administrative relief, Booth challenged only the availability of an acceptable remedy (see Booth v. Churner, 532 U.S. 731, 736 FN4 (U.S. 2001)) "…The parties do not dispute that the state grievance system at issue in this [Booth] case has authority to take some responsive action with respect to the type of allegations Booth raises"). It was recognized in Booth that "[w]ithout the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust." Id. This is the very situation Mr. Moreau is faced with. The Policies supra leave him with no possibility of any relief. Thus the argument that Mr. Moreau failed to exhaust all available administrative remedies is flawed and has no bearing on the instant matter. For Moreau, no form of administrative relief will restore his vision. Every link of the causation chain factually required an employee of the State to execute some form of medical decision including the decisions to retain or destroy medical request slips which are the basis of medical decisions to see or not to see patients.

As in Lofton, "[i]n short, defendants, whose burden it is to prove this affirmative defense, have not established that the [] grievance process was substantively available to plaintiff. Absent that showing, their motion to dismiss for failure to exhaust is denied." Lofton v. Sheahan, 2004 U.S. Dist. LEXIS 17611 (D. Ill. 2004). On a Motion for Summary Judgment, where issues of fact are presumed against the movant, this fact too must be presumed against the movant, the Defendants, because of the language contained in the policies and hand book discouraging and deterring grievances which are medically related, and because of the actual compliance of Plaintiff communications with those policies.

**2. Moreau's Constitutional Claims Do Not Fail against the State and the State Defendants in their Official Capacities.**

Defendants' argument on this topic appears based more on an interpretation of law rather than a dispute of facts. (generally Dft.s'Mem). Therefore, any factual issues or concerns regarding the proceeding argument should be resolved in favor of the Plaintiff.

Regarding the legal issue raised, our First Circuit Court has found that persons acting in their official capacities can be help liable, in a supervisory or official capacity so long as the theory is not one of "respondeat superior" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). Regarding "Official Capacity Liability" Maldonado sets forth in detail that:

> Although a superior officer cannot be held vicariously liable under 42 U.S.C. § 1983 on a respondeat superior theory, he may be found liable under section 1983 on the basis of his own acts or omissions.
>
> One way in which a supervisor's behavior may come within this rule is by **formulating a policy**, or **engaging in a custom,** that leads to the challenged occurrence. Thus, even if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it.
>
> Under this rubric, a supervisor may be held liable for what he does (or fails to do) if his behavior demonstrates deliberate indifference to conduct that is itself violative of a plaintiff's constitutional rights. Deliberate indifference, however, is not the be-all and the end-all of a section 1983 claim premised on supervisory liability. As we explain below, there is a causation element as well.
>
> To succeed on a supervisory liability claim, a plaintiff not only must show deliberate indifference **or its equivalent**, but also must affirmatively connect the supervisor's conduct to the subordinate's violative act or omission. This causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights; for example, a sufficient casual nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct. Consequently, deliberate indifference to violations of constitutional rights can forge the necessary linkage between the acts or omissions of supervisory personnel and the misconduct of their subordinates.
>
> A **causal link may also be** forged if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations. When the supervisor is on notice

> and fails to take corrective action, say, by better training or closer oversight, liability may attach.
>
> We hasten to add that **isolated instances** of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference. By like token, proof of mere negligence, without more, is inadequate to ground supervisory liability. **Gross negligence can signify deliberate indifference and serve as a basis for supervisory liability if it is causally connected to the actions that work the direct constitutional injury.** Hence, inadequate training of subordinates may be a basis for a section 1983 claim against a superior officer.

Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 583 (1st Cir. 1994)

Thus, applying Maldonado to the present facts, pattern or practice may be based upon the systematic destruction of the medical request slip resulting in a perilous interruption of a medical distress call that may not fit neatly within the Defendants' definition of "emergency"[9]. It may also be found in the pattern or practice of discouraging grievances which are medically related supra; or, upon the pattern or practice which relied upon use of the physician order form supra to convey instructions to subordinates to book follow-up appointments for patients with additional care providers (FSOF ¶¶46-48); or upon the person who implements or revises the underlying policies relevant to Mr. Moreau's treatment if those policies are created in a deliberately indifferent manner. It does not make sense that a fair jurisprudence system would protect upper hierarchy levels of persons "acting under color of law", while leaving the lower level employees or subordinate holding the constitutional bag of liability. "One way in which a supervisor's behavior may come within this rule is by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994).

Moreover, while one's position may in fact be of a supervisory nature over certain subordinates, if that supervisor has active duties and responsibilities that could be carried out, or not, in a deliberately indifferent manner, then that person is not insulated from liability in their Official Capacity. "A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The

[9] This definition is supplied by Policy 18.31 supra ("Exhibit K" to FSOF, ¶III(B))

defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event." (citations omitted) Williams v. Smith, 781 F.2d 319, 323-324 (2d Cir. 1986).

The arguments of Official Capacity liability thus apply equally to A.T. Wall[10], who has certain statutory power, duties, and obligations (supra) to personally fulfill those duties and obligations; and Joseph Marocco, who has certain specified duties and obligations to ensure proper care is provided, and to the Nurses and Physician Extenders whom would be responsible to ensure their decisions are followed-up and carried out through the adherence of normal practices, procedures, or standards of care. This argument would extend equally to the Warden, if facts exist establishing that he had a superior duty above A.T. Wall or any individual within the medical services hierarchy as it relates to medical care and services of inmates, or establishing that he took some active role as it relates to practice, policy, or procedure regarding medical care.

Arguably, A.T. Wall it would be reckless and deliberately indifferent for him to promulgate rules and regulations, i.e. policy, that effects medical attention or care, unless he is qualified to do so. It is presumed that through the assistance of his employees and other servants he hires through his statutory authority,[11] that he fulfills his statutory duty to provide care[12], and is thus is so qualified to promulgate the medical policies which he traditionally has implemented. The implementation of rules and regulations, i.e. policy, is also specifically within his statutory authority.[13] Thus, by virtue of his statutory position, by definition he must be responsible for any deliberate indifference in

10 This argument is made regarding A.T. Wall, notwithstanding the recent motion to amend which was deemed "moot" by Recommendation and Report of the Magistrate.

11 Rhode Island General Law ("R.I.G.L.") §42-56-10(7)

12 R.I.G.L.§42-56-10(22); also Id. (11) and (13)

13 R.I.G.L.§42-56-10(22)

implementing, or not, rules or regulations. Necessarily he must be a "qualified medical person" in order to promulgate medically relevant policy. Moreover, there was no indication in Maldonado that the highest ranking person on a given hierarchical chart could insulate him/herself from liability for deliberate indifferent that person exacts while occupying an office in an official capacity.

Consistent with Maldonado, ("causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights; for example, a sufficient casual nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct… [C]ausal link may also be forged if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations. When the supervisor is on notice and fails to take corrective action, say, by better training or closer oversight, liability may attach…; and Gross negligence can signify deliberate indifference and serve as a basis for supervisory liability if it is causally connected to the actions that work the direct constitutional injury." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994)) therefore, causation exists when those policies are omitted and/or have existed for such a time that harm results. In this instance, examples of causation exists, without limitation, by virtue of the destruction of medical request slips against a clear statutory duty to preserve and protect[14], and the adherence to old out-of-date policies which are subsequently revised after a harm is incurred.[15]

Otherwise, Plaintiff agrees with the statement of law put forth by Defendants that if a given defendant is solely responsible on a *respondeat superior* basis, as a figure-head representative, then by mere virtue of the office imbued upon that person as an intendment of his official capacity, the statement of law contained in Will v. Michigan, 491 U.S. 58 (1989) is a correct one. However it should be noted that when there is a dereliction of subordinates or of policies or a pattern or practice, then individual liability upon a corporeal person occupying a position in an "Official Capacity" based upon the dereliction of power or authority either exercised or not exercised is permissible

[14] R.I.G.L.§38-1-

[15] FSOF ¶53

consistent with the principals set forth in Maldonado supra. Each individual sued within the present action has some type of official capacity duty to supervise, whether it be follow-up of medical appointments, or proper triage and timely examinations. Thus each is potentially subject to Official Capacity liability for constitutional acts.

### 3. Defendants Violated the Eighth Amendment.

Reference to DesRosiers v. Moran, 949 F.2d 15 (1st Cir 1991) (Dft.s'Mem at 9), decided in 1991, is not helpful to the analysis since it predates Farmer, which was decided in 1994, and since DesRosiers applies an outdated "wontoness" standard which is either similar, in the first instance, to the unworkable "recklessness" definition void of a Farmer subjective component, or it becomes an additional "wontoness" avenue to deliberated indifference which may not contemplate a subjective component.

Deliberate indifference only needs to rise to level of recklessness not criminality. See Calvert v. Hun, 798 F. Supp. 1226, 1231 (D. W. Va. 1992). The requisite "culpable state of mind requires more egregious behavior than mere negligence. 'Deliberate indifference' is established, upon review of the totality of circumstances demonstrated by the record, **either by actual intent to deprive a prisoner of medical care or by reckless disregard of a prisoner's medical needs**. Id.; Parrish v. Johnson, 800 F.2d 600, 606 (6th Cir. 1986).) (emphasis supplied) Calvert v. Hun, 798 F. Supp. 1226, 1231 (D. W. Va. 1992). It should be noted that deliberate indifference means "serious" injury, there is no requirement that the Plaintiff experience pain. Edward Koehl v. Stephen Dalsheim, et. al., 85 F.3d 86; (2nd Cir. 1996).

Within the context of the case at bar, " 'a charge of deliberate indifference by prison authorities to a prisoner's request for essential medical treatment is sufficient to state a claim.' " (citing Corby v. Conboy, *457 F.2d* 251 (2d Cir. 1972*)* Sam Freeman v. A. L. Lockhart, Supt. et. al., 503 F.2d 1016; (8th Cir. 1974). A condition is 'sufficiently serious' if it is 'a condition of urgency, one that may product death, degeneration, or extreme pain. Richardson v. Nassau County Sheriff, et. al., 277 F. Supp 2d 196, 201 (E.D. N.Y. 2003). "Courts consider evidence of a diagnosable eye condition to be significant in determining whether a plaintiff has alleged a

serious medical condition" Id. Also, "[a] prison official's intentional denial or delay in accessing medical care may evidence deliberate indifference." Id at 203. "Deliberate indifference may be manifested 'when prison officials deny, delay or intentionally interfere with medical treatment,' or in the manner 'in which prison physicians provide medical care' ". Eric V. Holmes vs. S. Sherman, Warden, et. al., 2005 U.S. Dist. LEXIS 27352 (E.D. C.A. 2005)

Even under the language of Farmer "[d]eliberate indifference… is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825 (U.S. 1994). Farmer refines the degree of culpable recklessness necessary for a finding of deliberate indifference by stating "[t]hus, it is the equivalent of acting recklessly. Simply put it is a "disregarded risk of harm of which he was aware is a familiar" Farmer v. Brennan, 511 U.S. 825 (U.S. 1994). Plaintiff reiterates that the deliberate indifference standard of Farmer still well below "acts or omissions for the very purpose of causing harm or with knowledge that harm will result" Id.

Farmer also establishes that the level of culpability deliberate indifference entails, for the term recklessness is "not self-defining, and can take subjective or objective forms." Farmer v. Brennan, 511 U.S. 825 (U.S. 1994). Farmer further states in its holding that "[w]hether an official had the requisite knowledge **is a question of fact** subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious. Nor may an official escape liability by showing that he knew of the risk but did not think that the complainant was especially likely to be assaulted by the prisoner who committed the act. It does not matter whether the risk came from a particular source or whether a prisoner faced the risk for reasons personal to him or because all prisoners in his situation faced the risk."(emphasis supplied) Farmer v. Brennan, 511 U.S. 825 (U.S. 1994). Thus so long as Plaintiff can point to sufficiently obvious facts, the finding of whether the fact rises to the requisite level of subjective understanding, it is an issue of fact which requires denial of summary judgment since the fact is presumed in the non-movant's favor on a summary judgment basis. In addition, "[a] state-of-mind issue such as the existence of deliberate indifference usually presents a jury question. Sires, 834 F.2d at 13." Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991).

In Torraco, summary judgment was granted because there was "no evidence of treatment so inadequate…" Id. Plaintiff submits that while the injury realized by Torraco was serious, since there were no facts to establish the inadequacy of treatment, Torraco's case failed. Here, plaintiff's treatment was woefully inadequate (see generally "Exhibit J" to FSOF). Defendants did not comply with their own standards, let alone the minimum standards of care which the Plaintiff could have expected. Id. Marocco interrupted the normal 5-day referral, after having the opportunity to first speak directly with a nurse (see "Exhibit Q" to FSOF). Marocco can not plead innocence if he failed to then either ask questions regarding Mr. Moreau's condition or ignored information regarding the normal 5-day scheduling that would have been normally followed. Mr. Marocco was clearly only interested in those facts concerning coinciding Mr. Moreau's needs with the eye doctor's next visit to that facility, despite the ease of transporting Mr. Moreau to another building within the correctional facility.

"[A] charge of deliberate indifference by prison authorities to a prisoner's request for essential medical treatment is sufficient to state a claim." Freeman, Appellant, v. A. L. Lockhart, 503 F.2d 1016 (8th Cir. 1974) (citing Jones v. Lockhart, 484 F.2d 1192, 1193 (8th Cir. 1973);

In his September 17, 2001 letter, Plaintiff plead with Marocco that he needed to see the eye doctor "desperately" (FSOF ¶64), and complained that he put a slip in but was told the eye doctor would not return to the facility for another few weeks (Id.). Obviously the Plaintiff thereby indicated that he felt the urgency of his vision was deteriorating to the point that he felt waiting for his return to that same facility was not acceptable. Despite that plain and obvious plea, Mr. Marocco did nothing other than to make him wait.

Expert testimony is not needed in order to make the constitutional finding regarding Mr. Marocco. Mr. Marocco's subjective state of mind was interrogated regarding his knowledge of the complications of hydrocephalus, and he acknowledged that blindness was a complication of Plaintiff's preexisting condition (FSOF ¶32). Prior to the fall of 2001, Mr. Marocco had an understanding of hydrocephalus; that it was a condition where excessive pressure is formed in the brain cavity (FSOF ¶31). Mr. Marocco did not presume Plaintiff should know that blindness was a complication, stating "I don't expect any inmate to understand the complexities of his or her condition. That's why we have nurses that are on site to evaluate inmates, and we have

physicians available 24/7 to take that evaluation into consideration and make a decision whether somebody needs to be treated or not." (FSOF 2(c)(xiii))). Making matters worse, Mr. Marocco had just corresponded with the Plaintiff less than 1-year prior ("Exhibit O" to FSOF) and thereby had acknowledge that Plaintiff was afflicted with hydrocephalus.

Based upon Mr. Marocco's responsive letter (FSOF Exhibit Q), and Plaintiff's September 17, 2001 letter to Mr. Marocco (Exhibit AB to FSOF), Mr. Marocco knew Plaintiff did not need a physical, he needed an eye doctor; Plaintiff also did not need glasses, he had his glasses and "desperately needed to see [the eye doctor]" (FSOF ¶64). However Mr. Marocco took it upon himself to alter the normal 5-day appointment standard established by Barbara Carroll's testimony (FSOF ¶38). Mr. Moreau's fear of untimely treatment came true because he had Mr. Marocco intervene, consistent with Policy 18.11 supra. Thus, Defendant Joseph Marocco deprived Plaintiff of all effective and available medical attention regarding his serious medical issue.

Compounding the cruel and unusual nature of the punishment exacted by Defendant Joseph Marocco is the coincidence that on the very day Plaintiff is examined by Barbara Carroll, on September 26, 2001 (FSOF ¶52), Mr. Marocco calls an unidentified nurse (FSOF ¶60) and ensures Plaintiff is seen thirty-three (33) days later, which was well beyond the normal 5-day period testified by Barbara Carroll (FSOF ¶38). Equally compounding his liability is the fact that administrative remedies either were unavailable to Mr. Moreau, or they were exhausted with no relief (discussion supra), even despite the fact that Mr. Moreau complained that he was getting in trouble, that he couldn't see the weeds or the cigarette butts (FSOF ¶64). In essence, Mr. Marocco let a blind man get in trouble for not seeing the weeds or the cigarette butts that Plaintiff was required to pick-up.

Had Mr. Moreau never sent the letter September 17, 2001 letter to Defendant Joseph Marocco, then the Defendant may never have interrupted the normal five day scheduling, notwithstanding Barbara Carroll's own alleged deliberate indifference regarding her order that Plaintiff be examined by an optometrist infra. Since Plaintiff now received a response from Mr. Marocco, there was no need to complain further until he believed a transfer may delay his

examination (see Exhibit AG to FSOF)[16]. He had every reason to believe that his vision concerns were being properly cared for, thus he had a false sense of security. Likewise, had Mr. Marocco never called the unidentified nurse ("Exhibit Q" to FSOF) it is likely that Mr. Moreau may have seen the optometrist closer to the five-day period Barbara Carroll identified (FSOF ¶38).

Coincidentally it should be noted that it was not necessary to wait for the optometrist to be in the same building as it was possible to have inmates transported between buildings within the correctional facility ("Exhibit R" to FSOF). Point of fact, Plaintiff was transported to a different building for his October 29, 2001 examination with the optometrist, Dr. Smiley Id. Transporting inmates to buildings within the department of corrections was not an uncommon occurrence for the Optometrist (FSOF ¶55).[17]

Regarding Barbara Carroll, she too was subjectively interrogated regarding her understanding of the seriousness of vision complaints, and she acknowledged that "[n]obody should have to go blind" (FSOF ¶39). In addition, Defendant Barbara Carroll indicated that as a result of her examination of Mr. Moreu that he should be examined by an eye doctor (FSOF ¶44). By these two statements she meets the subjective standards required by the pertinent case law supra. In light of that subjective understanding that Mr. Moreau had a serious complaint and despite her understanding that he posed a sufficient risk that he should receive vision specific care, her following conduct completes the deliberate indifference analysis.

Her conduct consisted of failing to make a medical record indicating any priority (FSOF ¶58). Thus it is assumed that there may have been no need for same day "emergency" treatment, justifying the medical instruction of correctional officer Laurie supra to put a slip in, yet no excuse for examination by the Optometrist within five days as testified by Defendant Barbara Carroll (FSOF ¶38 (vision complaints ordinarily scheduled to be examined within five days)). In

---

16 It would be a travesty of justice to allow Defendant, Joseph Marocco, to presume inmates do not understand the complexities of their respective conditions, supra, however on the other hand permit him to avoid liability by suggesting that Defendant, Joseph Marocco, is a "non-medical" person and thought Plaintiff simply needed a new pair of glasses (generally Dft.s'Mem, at 9).

17 It should be noted that five days after Mr. Marocco's September 26, 2001 memo to Plaintiff (Exhibit Q to FSOF) was October 1, 2001, a day that Dr. Smiley actually was available within the correctional facility performing examinations (FSOF ¶56).

addition, she failed to alert other medical professionals of an "instruction" on the appropriate "Physician Order Form" as required of a physician extender per Policy 18.37 (see Exhibit U to FSOF) and in reckless disregard of the customary usage of the Physician Order Form as testified by Marylyn Hale (FSOF ¶46).

An expert is not necessary to understand that a mistake or deviation below her stated minimum 5 day referral would have catastrophic effects when the complaint is vision related. Despite clear policy regarding orders and the significance of the form designed to draw attention to urgent matters, she was grossly derelict in her duties. The direction to see an eye doctor is obscured and lost on a portion of the Physician Order form that one would not expect to find it. Compounding the dereliction there is no notation found on either the Nursing Contact Notes (see "Exhibit Y" to FSOF,) and no notation found in the Physician Contact Notes (see "Exhibit Z" to FSOF). In addition, she made no corresponding notation on the order, in dereliction of Policy #18.37 supra and in dereliction of her own stated understanding of the procedure for ordering further examination by another medical professional. Carroll did not make an appropriate direction or order, nor did she note vision as a priority in the priority section of the complaint, despite her testimony that this type of complaint should have received a 5-day referral.

Nurse Hale is representative of the unknown nurse that would have either triaged the slip, discarded the slip with no action, scheduled the appointment at Nurse Carroll's direction, discussed the matter with Marocco on 9/27/01, or arranged made sure that Plaintiff had timely review or follow-up of his medical file after 5-days, not the next day that a doctor reviewed the treatment note, presumable while still within their own standard response time. Discovery did attempt to bring for the identity of those nurses, however could not. Since they are in fact corporeal persons that, by testimony of the named defendants, necessarily interacted and participated in Plaintiff's direct medical care, substitution of "Jane Doe" is probably appropriate. Plaintiff's complaint does plead an "alias" to encompass this contingency. Since she was served and the potential "John Doe" was noticed, it is not unfair or unreasonable to require the State to continue their defense of a "John Doe" nurse on the basis of facts established on the record, and not those which are particularly identifiable to Nurse Hale. The gravity resulting from the failure of a subordinate nurse to follow the direction of her superior within the medical care context is readily apparent, and also readily understandable without the need of expert testimony.

A.T. Wall's deliberate indifference is established based upon the previous arguments of Official Capacity liability within a 42 USC §1983 suit supra (Maldonado supra)

**4. Defendants Qualified Immunity does apply in this instance.**

Regarding Qualified Immunity, Qualified immunity is an affirmative defense, and thus the burden of proof is on defendants. (internal citations omitted). Dimarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001). Harlow court held that "**government officials** performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (citations omitted) (emphasis supplied) Harlow v. Fitzgerald, 457 U.S. 800, 818 (U.S. 1982). "[T]his standard was initially developed for application to high executive officials..." Briggs v. Malley, 748 F.2d 715, 719 (1st Cir. 1984)

"Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], **or** if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury . . . ." (emphasis supplied) (internal citations omitted) Harlow v. Fitzgerald, 457 U.S. 800, 815 (U.S. 1982).

Respectfully, Plaintiff submits that Marocco, Carroll, Hale and/or John Does, fall outside the Harlow definition of government official and do not enjoy qualified immunity. In Rhode Island, a statute exists defining "Public Official" as "a person who is elected or appointed to office in accordance with the constitution, a statute, or a city or town charter, or who is a judge, assistant attorney general, special assistant attorney general, or law enforcement officer, or in the case of an elective office any person who has filed the required documents for nomination or election to that office or who is appointed by the governor to serve as the director or his or her designee of a state department which is established, and the qualifications and duties of which are prescribed by statute to discharge a public duty for the state of Rhode Island" R.I. Gen. Laws

§ 11--42-4. Our Public Official definition appears to capture all functional definitions contemplated by Harlow. A.T. Wall is a Public Official because he occupies an appointed position (R.I. Gen. Laws §42-56-2) and more particularly since that appointed position is created as an offspring of the Rhode Island Governor's executive authority. Id. Thus only A.T. Wall arguably has the benefit of the qualified immunity argument. The other Defendants do not appear to be so involved in the running of government or broad policy making that their functioning should enjoy qualified immunity. Regular rank and file employees are not Government Officials for purposes of Qualified Immunity.

Even if all Defendants enjoy the benefit of the qualified immunity argument, the Defendant's analysis must turn upon a 3-part test which is utilized in the First Circuit. "Drawing on Supreme Court precedent and our own case law, we employ a three-part test when determining if a public official is entitled to qualified immunity: (1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004). Defendants fail to work through the Mihos analysis. Their argument in this respect is therefore defective and should be denied.

Instead, much of Defendants memorandum on this topic focuses on the objective reasonableness of the actions complained of. Rebutting this portion of Defendants' memorandum, Plaintiff incorporates by reference the arguments above regarding Marocco, Carroll, Hale, and the "John Doe" defendants. It should be noted that while Marocco may have had discretion within the 5-day window to schedule an appointment for Mr. Moreau, deviating beyond that 5-day standard was not discretionary, it was blind and deliberate indifference. Likewise, the protocol for conveying instructions which would have triggered an appointment following Barbara Carroll's examination was beyond any discretionary period. Their actions were not objectively reasonable, nor were they subjectively reasonable for the reasons argued above. supra.

With regard to A.T. Wall, and all other acting on behalf of the state charged with the clear statutory duty to maintain adequate records of persons committed to the custody of the

department (FSF ¶6) each is equally subject to liability for the willful misconduct resulting and/or contributing to the Plaintiff's injuries. The duty to preserve and protect public documents is a clearly established right of which the Defendants knew. Title 38 of the Rhode Island General Laws establish a clear right of the Plaintiff to have his confidential medical record retained by the public agency, hence a public record. See generally R.I.G.L.§38 et. seq. Violation of a clearly established statutory or constitutional right of which a reasonable person acting under color of law would have known prevents the application of qualified immunity. see Hegarty v. Somerset County, 53 F.3d 1367, 1372 (1st Cir. 1995). (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); Burns v. Loranger, 907 F.2d 233, 235 (1st Cir. 1990)).

## 5. Summary Judgment on the negligence claim is not appropriate.

Defendants' argument regarding this topic is scant and simply relies upon a broad sweeping denial of liability. For this reason, their arguments must fail.

In addition, in a negligence action the plaintiff must establish that the defendant owed a duty of care to the plaintiff, that the defendant breached this duty of care and that the defendant's breach of that duty was a proximate cause of the harm or injury about which the plaintiff complains. Montuori v. Narragansett Electric Co., 418 A.2d 5 (1980).

Based upon the above arguments and upon Plaintiff's FSOF, and the exhibits referenced therein, all of which are incorporated by reference as if set forth fully herein, plaintiff submits that there are no genuine issues of material fact that dictate any judgment other than one in favor of the Plaintiff. Plaintiff points directly to his expert opinion ("Exhibit J" to FSOF) which supports a findings of negligence and deliberate indifference.

## CONCLUSION:

Defendants put forth five (5) arguments in support of their motion for summary judgment. The first argument focuses on failure to exhaust administrative remedies. Those

remedies either were non-grievable or non-existent, or complied with by the Plaintiff based upon the several letters and medical request slips Plaintiff submitted from the lowest level, the correctional officer and unidentified nurses responsible for triage of the medical request slip; right up through Defendant, Joseph Marocco, to the Health Care Director and an Assistant Director, Mr. Bucci. Plaintiff was not aware of the dire circumstances he faced, therefore relied upon those with the duty to provide those essential medical cares services which would have saved his vision. Had he been educated by the Defendants perhaps there may have been a different result.

The second argument, supervisory liability, overlooks the aspect of individual liability for the proper execution of one's job functions, in their Official Capacity. To the extent those functions include the active supervision or monitoring, it is required that the particular individual actually perform the supervision or monitoring. While Plaintiff is not making a respondeat superior claim, from a constitutional analysis of the obligations an individual owes in their Official Capacity it is required that each defendant, in their individual role, diligently carry out the responsibilities of their position. This analysis should hold true whether you are responsible for implementing policy regarding medical issues, or responsible for ensuring timely medical care, or even for ensuring that the appointments which you intend to order are in fact carried out.

Whether the Defendants violated the eighth amendment is supported by adequate facts (see generally FSOF); Defendants were interrogated and revealed their subjective understanding of the risks associated with vision complaint. While the seriousness is readily apparent and perhaps does not require expert testimony, it is clear that the deliberate indifference to Plaintiff's serious needs resulted in a substantial injury, legal blindness. Deliberate indifference is also found in the policies and/or procedures which facilitate the dire delay in rendering important vision specific medical services. Thus the charge of constitutional violations applies equally from those in a position to exercise discretion, to those whom fail to perform ministerial functions regarding record keeping, making medical notations, scheduling appoints which are directed, and retaining medical request slips which are relied upon by inmates to request vital medical services.

Whether any of the Defendants enjoy qualified immunity applies to those individuals cloaked with executive authority whom are integral in the running of government. These persons, Government Officials, a/k/a Public Officials, are a limited class and do not include rank and file employees. Even were qualified immunity to apply, given the clear statutes and polices, they cannot escape liability.

Last, negligence is simply the breach of a duty resulting in harm. Under these facts, Plaintiff need only show he was serving a term of incarceration in order for the duty to provide medical care to attach. Farmer v. Brennan, 511 U.S. 825, 832 (U.S. 1994) ("...prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care..." Id). The duty to provide adequate medical care begins with A.T. Wall's, either pursuant to his statutory charge or by Farmer and its progeny, and is entrusted upon all other named Defendants since they too were directly influencing Plaintiff's proper medical care.

Plaintiff's blindness is also known as optic atrophy (FSOF ¶70). Plaintiff's optic atrophy was caused by a malfunctioning shunt (FSOF ¶70) which would have been rectified on a timely basis but for the Defendants' actions or inactions (FSOF ¶70). Causation is supplied after review of the facts and in some cases with the assistance of expert opinion, which was obtained in this case (FSOF ¶59; see generally Exhibit J to FSOF), and ordinary tort concepts of causation Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 53 (1st Cir. 1997).

In sum and substance, the Plaintiff was virtually told on numerous occasions to go file his "KITE"[18], but to no avail. The serious medical risk which was objectively and subjectively acknowledged was intentionally disregarded, resulting in Plaintiff's irreversible legal blindness, from a condition of 20/40. Compounding matters, Plaintiff was getting in trouble, despite his complaints that he could not see the weeds and cigarette butts. Whether through individuals acting in their Official Capacity, or in their individual capacity, or based upon policy 18.10, plaintiff was effectively and repeatedly instructed to go file a KITE, which he blindly adhered to, despite his desperation and polite request for a cure. Defendants' actions and inactions are shocking and repugnant.

---

[18] FSOF ¶27

Plaintiff's is entitled to a trial on all facets of his complaint (Cpt.) and Defendants' Motion for Summary Judgment should be denied.

Plaintiff,
By Counsel,

/s/ Joseph-Anthony DiMaio, Esq.

Joseph-Anthony DiMaio, Esq.
Attorney #3910
Mckinnon & Harwood
1168 Newport Avenue
Pawtucket RI 02861
(401) 723-9655
contact@mckinnonharwood.com

## CERTIFICATION

I hereby certify that on Monday, August 14, 2006, a true copy of the within, was served upon the following and in the following manner(s):

**Thomas A. Palombo Esq.**, by electronic means only to " tpalombo@riag.ri.gov".

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio