**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RICHARD MOREAU | ) | |
| | ) | |
| VS. | ) | C.A. No: 04-459S |
| | ) | |
| STATE OF RHODE ISLAND, et. al. | ) | |

**PLAINTIFF'S, FOURTH STATEMENT**
**OF DISPUTED AND/OR UNDISPUTED FACTS ("FSOF")**

**NOW** comes the Plaintiff, Richard Moreau, and in support of his objects to the Motion for Summary Judgment filed by Defendants, State of Rhode Island, Department of Corrections ("state" or "DOC"), Joseph Marocco ("Marocco") Barbara Carroll ("Carroll") and Marilyn (formerly, "Grejudus") Hale ("Hale") (all such parties collectively referenced herein as "Defendants"), as to Count I and Count III of Plaintiff, Richard Moreau's ("Plaintiff" or "Moreau"), First Amended Complaint ("Cpt."), and pursuant to Local Rule 56 states as follows:

**Disputed:**

1. Plaintiff disputes the portion of the "Facts and Travel" contained in Defendants' Memorandum of Law (Document #98) which asserts "*inter alia"* that Plaintiff's blindness was caused by Defendants "unconstitutional acts and omissions and by their negligence." Id. A fair reading of Plaintiff's First Amended Complaint ("Cpt.") (Exhibit A) extends beyond mere negligence. Cpt. pleads not only negligent and unconstitutionally intentional acts, but also contemplates liability which may exist somewhere between the negligence

level, but below the level of a State or Federal constitutional deprivation ( see Exhibit A ¶¶41, 46, 48, and 49 ).

2. Plaintiff objects to and disputes the Defendants Statement of Undisputed Facts ("SUF") (Document #98) on whole because:

a. Exhibits A through O, inclusive, are non-compliant with local rule 56 requiring a statement of undisputed facts which "**concisely**" sets forth all facts relied upon (RI U.S. Dist. Ct. Rule 56(a)(1));

b. Defendants' SUF is not a statement of facts, but is an index of attached exhibits. Moreover, each "fact" in Defendants' SUF is not "set forth in a separate, numbered paragraph" (RI U.S. Dist. Ct. Rule 56(a)(2)) and does not "identify the evidence establishing that fact, including the page and line of any document to which reference is made" (RI U.S. Dist. Ct. Rule 56(a)(2)); and

c. The Affidavit of A.T. Wall ("Wall Aft.") incorporated by reference into Defendants' Motion (Document #97) contains inaccuracies and conclusions which are disputed with respect to the number paragraphs ("¶") contained in Wall. Aft. as follows:

i. "¶5" mischaracterizes Policy 18.11 (Exhibit B) as a mechanism to address health services complaints in a "timely manner". The policy speaks for itself and is void of any deadlines for initiating a complaint or for responses regarding same (see Wall Aft. ¶5, Exhibit 1);

ii. "¶13" lacks any support for the assertion that DOC Policy 18.11 (Exhibit B) was created to address complaints regarding health services "such as those found in Mr. Moreau's September and October letters" (Wall Aft. ¶13);

iii. "¶14" is permissive not mandatory stating that inmates "should write to Health Care Administrator" (Exhibit B ¶III(A)(2); Id., Wall Aft., Exhibit 1) and/or "may appeal to the "Medical Program Director" (Exhibit

B ¶III(A)(3); Id. Wall Aft., Exhibit 1). Moreover, Exhibit B does not offer any binding relief (see generally Exhibit B; compare Exhibit C, ¶III(D)(10) "Policy 13.10... Institutional Remedies"), thus there is no administrative procedure that is required and no remedies available to the Plaintiff.

iv. "¶15" is not accurate; Mr. Moreau wrote a letter on November 27, 2001 (Exhibit D)[1] to whom he believed to be the then Medical Program Director, Dr. Anne Spaulding. Mr. Moreau related a chronology and symptoms consistent with the facts complained of in his complaint (see Exhibit D[2]; compare Exhibit A). Moreover, Plaintiff reiterates that since Policy 18.11 does not prescribe forms, methods, time limitations, emergency procedures, or language for filing an appeal to the Medical Director, and since health care issues are "not grievable", the statement contained in Wall Aft. ¶15 erroneously presumes that an appeal letter to the Medical Program Director is a pre-requisite to suit, and is therefore objectionable.

v. "¶16" and "¶17" are objectionable since they directly conflict with the actual language in Policy No. 13.10 (Exhibit C), which specifically states that "Decisions by qualified medical personnel related to an inmate's health" (Id. ¶III(B)(6)(g)) were expressly not grievable; just as complaints regarding "State and Federal laws and regulations" were not grievable (see Exhibit C ¶III(B)(6)(a); Id. Wall Aft. Exhibit 6); and "formulation of Departmental policies" was not grievable (Exhibit C ¶III(B)(6)(c); Id. Wall Aft. Exhibit 6);

---

1 This exhibit is included as proof that the plaintiff raised the very same issues which are the subject of his complaint in a letter to the Medical Program Director, consistent with Policy 18.11. However, the exhibit also contains hearsay statements based upon the inaccurate medical information conveyed to the Plaintiff by the Defendants. It is not being offered for the truth or accuracy of the medical conclusions, but just for the point that the statement made in Wall Aft. ¶15 is not accurate.

2 This exhibit also contains some transcriptional errors due to the manner of Mr. Moreau's writing impaired by his vision. The exhibit erroneously indicates the year "2000" however was written in 2001. This exhibit was date stamped as received in "2001", and was testified to by Joseph Maracco (SUF Exhibit I, pg.6). The references in this exhibit, Exhibit D, to Dr. Smiley, to a letter to Joseph Marroco, to the direction to put in slips, and to the deteriorating vision are consistent with Plaintiff's prior correspondence also written in 2001.

vi. "¶18" is objectionable since it too is contradicted by the non-grievable Policy language (Exhibit C ¶¶ III(B)(6)(a), (c) and (g); Id. Wall. Aft. Exhibit 6).

vii. "¶20" is objectionable since it lacks support (Wall Aft. ¶20); and is against the express language of both policy 13.10 (Exhibit C ¶III(B)(6)) and Policy 18.11 (Exhibit B¶II(A)) making clear that "Health care is not a grievable area of institution life..." (Wall Aft. Exhibit 1 ¶II(A)). ¶20 also misconstrues Mr. Moreau's complaint. Mr. Moreau is not making a trivial complaint that he did not get a prompt administrative letter or oral response to his vision complaints. He is complaining that he did not received prompt or appropriate treatment as a result of his repetitive written and oral requests (see *inter alia* Exhibit A).

viii. It should be noted also that Wall. Aft. ¶¶5,13-18,and 20-25, conflicts with the hand book given to Mr. Moreau upon his admission to the correctional facility which includes a specific section entitled "Grievance Procedures" (Exhibit E). The inmate hand book clearly indicates that "Decisions made by qualified medical personnel related to an inmate's health, are not grieved" (see Exhibit E). The decision to treat, not treat, when to treat, what type of professional should render treatment, when to schedule appointments, or not, and decisions to retain or destroy the medical request slips which impact treatment, were "decision[s] by qualified medical personnel [Defendants] related to an inmate's health" Id.

ix. "¶21" is objectionable since R.I.G.L.§38-1 et. seq. is clear regarding the duty to preserve and protect records, and more particularly, since those documents form the basis of health care decisions when they are triaged[3] by a nurse[4] or other qualified medical personnel such as Joseph Morocco[5].

---

[3] The word "triage" first appears in Joseph Morocco's deposition transcript ("JM.TR"); Exhibit F, pg41,ln5

[4] see Exhibit F, JM.TR pg39, ln3-13; pg41, ln5.

[5] Id., JM.TR pg39, lns 14-25.

Thus the destruction of medical request slips, medical records, is not grievable pursuant to the express policy language supra since their destruction is based upon decisions of qualified medical personnel.

x. "¶22" is objectionable since it implies the Plaintiff was required to follow the procedure set forth in Policy 13.10, which is against the express language of that policy (see Wall Aft. Exhibit 6 ¶III(B)(6)(g)).

xi. "¶23" is objectionable to the extent it is argumentative and since the letters to Joseph Marocco, dated September 17 (Wall Aft. ¶6) and October 14, 2001 (Wall Aft. ¶10) and the letter to the Medical Director, Scott Allan dated November 27, 2001 (Exhibit D; SUF Exhibit I, p.6 "On November 29 2001 I wrote to Moreau relative to a letter he had sent to Dr. Allen dated November 27, 2001..."), are consistent with the procedure set forth in Policy 18.11. Thus, Plaintiff did exhaust administrative remedies.

xii. "¶24" is objectionable since it too presupposes the grievance policy was available for medical issues, which it was not (see Wall Aft. Exhibit 6, ¶III(B)(6)(g); see also Exhibit E "Decisions made by qualified medical personnel related to an inmate's health, are not grieved…")

xiii. "¶25" is also objectionable for the same reasons in paragraph "xii", supra, that procedure was not available to him by the express language of Policy 13.10 supra and Policy 18.11 supra. In addition, it presumes Mr. Moreau knew blindness was a complication of his condition, which he did not (Exhibit G, Richard Moreau deposition transcript ("RM.TR.") pg70, ln22 through pg 71, ln2; and pg72, ln22 through pg73, ln 21). Nor was Plaintiff expected to know of the potential complications or complexities (Exhibit F, pg 204, ln3). Plaintiff's November 27, 2001 letter to the Medical Director even suggests that as of that day he thought his blindness may be "cured", however he did convey a sense of deep and urgent concern that as time passes it may be too late to cure him (see generally Exhibit D, pg3).

**Undisputed:**

3. Defendants, State of Rhode Island, Joseph Marocco, Barbara Carroll, R.N., and Marylyn Hale, R.N. filed a motion for Summary Judgment with a memorandum of law on July 27, 2006 (Document #97).

4. Attached to Defendants Motion for Summary Judgment is Defendants' requisite Statement of Undisputed Facts ("SUF") (Document #98).

5. Defendants' motion for summary judgment (Document #97) focuses on the Defendants', the State of Rhode Island, Joseph Marocco, Barbara Carroll, R.N., and Marylyn Hale, R.N. regarding Count I and Count III Id.

6. Defendants A.T. Wall and James Weeden filed an amended motion for summary judgment on July 28, 2006 (Document #103), which attempts to incorporate by reference those arguments contained in Document #97, Defendants motion for Summary Judgment with supporting memorandum.

7. Defendants also filed an amended motion for judgment on the pleadings (Document #102), which also attempts to incorporate by reference those arguments contained in Document #97, Defendants motion for Summary Judgment with supporting memorandum.

8. Plaintiff did not know that hydrocephalus could cause visual disturbances, and no doctor ever told him that. (Exhibit G, Richard Moreau Deposition Transcript, "RM.TR." pg70, lns 22 through pg71, ln 2).

9. Plaintiff first learned that hydrocephalus can cause vision loss or disturbances when Dr. Figueroa came to examine him in November 2001. (Exhibit G, RM.TR, pg73, lns 7-12.

10. By December 14, 2001, Plaintiff was sufficiently "led to understand that under R.I.D.O.C. policy it is not allowed for inmates to grieve any complaints they have concerning medical treatment" (Exhibit H[6], at ¶1 "Thank you...");

11. By December 14, 2001, Plaintiff had "submitted numerous medical request slips" (Exhibit H, at ¶3 "In September...")

12. Plaintiff performed services as a yard porter in the fall of 2002 (Exhibit I, pg 29, lns 8-14);

13. Plaintiff was told to put in a medical request slip by Correctional Officer Jeffrey Laurie after Plaintiff told him that he could not see. (Exhibit I, pg 55 lns 8-24).

14. After Plaintiff communicated his vision problems to the correctional officer, Laurie, Plaintiff had to continue performing services as a yard porter (Exhibit I, pg56, lns 3-10; Id. lns 18-22).

15. Mr. Moreau was examined by Dr. Smiley on October 29, 2001 at the High Security Facility. (Exhibit AK); Dr. Smiley indicated that examination by Dr. Figueroa, an ophthalmologist, should have occurred "within days" after his referral (Exhibit AH, pg 64, lns 8-12).

16. The delay after October 29, 2001, did not result in any further significant harm. (Exhibit J, at p4 ¶"In fact...");

17. To a reasonable degree of medical certainty, Mr. Moreau... experienced permanent vision loss..." (Exhibit J, at p1 ¶"To a ...");

18. After October 29, 2001, reversing vision deterioration would have been medically futile (Exhibit J, at p 6 ¶"Once the...").

19. "Had the referrals been made while Mr. Moreau had vision, the private medical care providers , DR. Smiley and/or Dr. Figueroa, would have been (sic) made the appropriate surgical referrals on an urgent basis… Once… stabilized at its present low level, the need

---

6 Plaintiff was erroneously led to believe his shunt had been ruled out as a potential cause as is supported by additional documents obtained through discovery. Infra. This Exhibit is not offered for the truth of those heresy conclusions, but rather it is probative of the Plaintiff's own understanding and state of mind; complacency based upon the medical information filtered to him by the Defendants.

for [surgery] was less urgent… Had other symptoms presented subsequent to the vision loss…his condition would have been upgraded… which would have [ ] resulted in immediate surgery.” (Exhibit J, p4 ¶"Had the referrals...");

20. A nurse is supposed to triage medical request slips (Exhibit F, pg.41,ln5).

21. In the Fall of 2001, it was not the normal practice to retain medical requests slips, it was left up to the discretion of the nurse, and there was no policy in place retarding their retention despite conversations to create one (Exhibit F, pg 162, ln3 through pg 163, ln17).

22. Policy 18.31 DOC was in effect at all relevant times (Exhibit K). It provides that “[u]pon commitment, the inmate is issued a handbook which outlines the various services provided by the health care services at the Rhode Island Department of Corrections” (Exhibit K ¶III(A)).

23. Exhibit K ¶III(B)(1) provides a procedure for obtaining medical attention by filling out a request form and dropping the slip in any **facility mail box** or handing it to a nurse. (emphasis supplied) Id.

24. Exhibit K ¶III(B)(2) provides for emergency sick calls by contacting a correctional officer…” Id.

25. At all material times, Mr. Joseph Marocco was employed as the Associate Director of Health Care Services for the Department of Corrections (Exhibit L); which was also known as the Health Care Administrator (Exhibit F, pg 39, ln14).

26. At all material times, Mr. Joseph Marocco possessed the education, training, skill, and experience consistent with that indicated on his curriculum vitae, Exhibit L. His job duties and functions included those which he traditionally performed, including the handling of medical request slips (infra ¶28) and those substantially consistent with the written job description created afterwards (Exhibit F, pg 122, lns 2-25) (referring to Exhibit P “to work in collaboration with the Medical Program Director relative to the examination, diagnosis, care and treatment of inmates; and to do related work as required.”)

27. At all material times, a medical request slip consisted of three parts, a white part, a yellow part, and a pink part, and appeared as it does in the attached Exhibit M; (see also Exhibit F, pg 14, ln 10 through pg15, ln 13). These were also called a "KITE" by Mr. Marocco (Exhibit F, pg 14, ln 16).

28. At all material times before Plaintiff became permanently blind, Mr. Marocco was accustom to handling slips which he received in the normal course of business (Exhibit F, pg 14- 25). Usually he handled the "white" copy (Exhibit F, pg 39, 25). It was within Mr. Marocco's authority to have inmates placed on the optometrist list (Exhibit F, pg57, ln9-12), and he had the ability and authority over nurses within the Department of Corrections Health services to have inmates seen by the optometrist (Exhibit F, pg 57, lns 6-20).

29. At all material times before Plaintiff became permanently blind, Inmates could request medical appointments by using the medical request slip or corresponding directly with somebody either verbally or in writing (Exhibit F, pg 15, ln 14-17);

30. Inmates could also request medical appointments by corresponding directly with Mr. Marocco (Exhibit F, pg 17, ln6).

31. Prior to the fall of 2001, Mr. Marocco had an understanding of hydrocephalus (Exhibit F, pg 26, ln 20-22); that it was a condition where excessive pressure is formed in the brain cavity.

32. Prior to the fall of 2001, Mr. Marocco knew that blindness was a complication associated with hydrocephalus (Exhibit F, pg 26, ln 27, ln4).

33. Soon after Plaintiff's admission to the correctional facility, on October 24, 2000, Plaintiff gave written notice to the Defendants, by a letter to the Medical Program director, Ann Spaulding, of his hydrocephalus condition (Exhibit N).

34. Defendant, Mr. Joseph Marocco had actual knowledge of Plaintiff's hydrocephalus condition as early as November 15, 2000, by virtue of a letter (Exhibit O) Mr. Marocco wrote to Plaintiff in response to Plaintiff's letter to the Medical Program Director (<u>supra</u>, ¶34).

35. The Plaintiff reported his hydrocephalus condition upon his initial medical entrance screening on January 22, 2000, which was noted as "#5 Chronic Hydrocephalus" (Exhibit V, pg 1).

36. The Plaintiff reported that his vision deterioration stabilized by November of 2001 (Exhibit D, pg 3). It was opined that his vision loss probably had stabilized at its present low levels within days of October 29, 2001 (Exhibit J, pg5 ¶"Once the optic nerve…")

37. Even after his vision loss stabilized to its present low level of minimal functioning, the Plaintiff was under the misimpression that a cure for his blindness was possible (Exhibit D, and Exhibit H)

38. Barbara Carroll testified indicating that vision related complaints are ordinarily scheduled for an appointment with an optometrist within five (5) days (Exhibit T, pg89, lns 18 and 25).

39. Barbara Carroll subjectively recognized the seriousness of vision related complaints by offering information at her deposition that "there should be nobody go blind, nobody" (Exhibit T, pg 87, lns 7-9), so that's always kept in mind Id.

40. At all material times, Barbara Carroll was subject to Policy 18.37 (Exhibit U) requiring certain record keeping regarding written and telephone orders.

41. Barbara Carroll performed a general physical examination of the Plaintiff on September 26, 2001 (Exhibit X), and intended to order that the Plaintiff see an optometrist after here examination (Exhibit T; pg 144, lns 2-3).

42. Exhibit X is a true and accurate copy of the only note or record generated as a result of the September 26, 2001 examination. Barbara Carroll did not make any notation on the Nursing contact notes (Exhibit Y) or on the physician contact notes (Exhibit Z) or on the physician orders sheet (Exhibit AA).

43. The failure to make a notation on the physician order sheet is contrary to her recollection that she would have made a notation (Exhibit T, pg 144, ln7).

44. Barbara Carroll was under the impression that her notation "see O.D." (see Exhibit X) was extra and not required in order to direct that Plaintiff be seen by an optometrist (Exhibit T, pg 144, ln 9).

45. Defendant Marylyn Hale testified regarding Barbara Carroll's usual practices and regarding other usual nursing procedures. (Exhibit AC)[7].

46. If a physician extender, i.e. Barbara Carroll, needed to make some type of further direction for care after a physical, that notation should have been included on the physician order form. (Exhibit AC, pg 36, lns 1-5).

47. The only way for Plaintiff to get an eye exam was to either place a request on a request slip, or to have a doctor order it. (Exhibit AC, pg 43, lns 14-23).

48. For all practical purposes, a physician extender, i.e. Barbara Carroll, had the same powers and authorities as a physician necessary to order further examination of an inmate by an eye doctor (Exhibit AC, pg 19, lns 16-20).

49. A.T. Wall has those duties and obligations as set forth in Rhode Island General Law §42-56-10 (Exhibit AD)

50. It is has been opined that Plaintiff was considered legally blind as late as November 16, 2001 (Exhibit AE) and as early as within days of October 29, 2001 (FSOF ¶36 supra).

51. Mr. Moreau's vision was tested by the optometrist, Dr. Smiley, on September 17, 2000 and found to be "20/40" in his right eye, and "20/60" in left eye without glasses on (Exhibit AF).

52. On the date of Plaintiff's examination by Barbara Carroll on September 26, 2001, Mr. Moreau's eyes were found to be "20/40" in his right eye, and "20/40" in his left eye. (Exhibit X). Further, "chronic care" clinic was indicated by Barbara Carroll on that same examination.

[7] Due to Barbara Carroll's own recent medical concerns, Barbara Carroll's deposition was suspended. Thus other nursing practices and procedures common to the correctional institution were thus obtained from Marylyn Hale.

53. Policy 18.71 regarding procedures for conducting medical exams went into effect on October 22, 2001, just shortly after Nurse Carroll examined the Plaintiff on September 17, 2001. While there has been testimony to the existence and use of the doctor order form supra, there has been no written policy regarding those practices or procedures found in effect prior to that date.

54. It is believed that as of this date, there still exists no formal written policy regarding the retention of the medical request slip.

55. It was not an uncommon occurrence for the Optometrist to examine patients whom had been transported from other correctional facilities for the purposes of having him render services. (Exhibit AH, pg.44, lns. 10-15).

56. The Optometrist, Dr. Smiley, examined patients at the Minimum Security facility on October 1, 2001; Then did not examine any patients until October 23, 2001, when he next treated patients at the Medium facility, then next examined patients on October 29, 2001 at the Intake facility (Exhibit AJ).

57. The Optometrist usually came every Monday, after being instructed by the Defendants regarding his patient load for that week (Exhibit AH, pg48, ln 25 through pg 49, ln2).

58. Barbara Carroll failed to make any notation indicating whether her planned course of action after her examination merited any priority action (<u>see</u> "Exhibit X" §“Plan: (indicate if priority”)

59. To a reasonable degree of medical certainty, Mr. Moreau would not have experienced permanent vision loss had his shunt been properly monitored and revised on a timely basis after the occurrence of visual symptoms. Patients suffering from hydrocephalus will not suffer permanent blindness with the proper management and monitoring of the increased intracranial pressure, which is the basic anomaly which can lead to optic nerve damages. (Exhibit J at 1).

60. On the same day as Plaintiff's examination by the physician extender, Barbara Carroll, Mr. Marocco call the Intake Service Center, spoke with a nurse [unidentified] regarding

scheduling Plaintiff's appointment with the optometrist, and wrote Mr. Moreau a letter advising him of the appointment and to speak to a nurse if he had any further questions. (Exhibit Q).

61. On November 5, 2001, Mr. Marocco wrote to the Plaintiff indicating that Mr. Marocco had the ability to have Mr. Moreau transferred to the correctional facility where the optometrist was scheduled to be. (Exhibit R)

62. On November 29, 2001, Mr. Marocco wrote to Plaintiff in response to a letter Plaintiff wrote to the then Defendant, Scott Allen, and, *inter alia*, directed Mr. Moreau to continue waiting for an appointment and/or to speak to a nurse or submit a request slip if he had any further questions. (Exhibit S)

63. Plaintiff acted consistent with Policy 18.10 by writing to various persons regarding his medical situation, including the director, setting forth the exact chronology which pertains to this complaint. (see generally Exhibit W).

64. In his September 17, 2001 letter, Plaintiff plead with Marocco that he needed to see the eye doctor "desperately" (Exhibit AB, pg 2), and complained that he put a slip in but was told the eye doctor would not return to the facility for another few weeks (Id.). In that letter, Mr. Moreau also complained that he was getting in trouble, that he couldn't see the weeds or the cigarette butts (see Exhibit AB, at1 "getting yelled at by my boss…").

65. The attached "Exhibit AG", is a true and accurate copy of Plaintiff's October 14, 2001 letter from Plaintiff to Mr. Marocco.

66. The attached "Exhibit AH" is a true and accurate copy of excerpts from Dr. Smiley's deposition.

67. The attached "Exhibit AI" is a true and accurate copy of Dr. Smiley's billing notes for September 2001, as it pertains to services rendered by him examining correctional facility inmates in September of 2001.

68. The attached "Exhibit AJ" is a true and accurate copy of Dr. Smiley's billing notes for October 2001, as it pertains to services rendered by him examining correctional facility inmates in October of 2001.

69. On October 29, 2001, the Plaintiff's vision was determined by Dr. Smiley to be "light perception only" in his right eye and "hand motion at 6 [inches]" in his left eye, thus legally blind. (Exhibit AK).

70. Plaintiff's blindness is also known as optic atrophy. Plaintiff's optic atrophy was caused by a malfunctioning shunt (Exhibit AL and Exhibit AM) which would have been rectified on a timely basis but for the Defendants' actions or inactions (Exhibit J).

Plaintiff,
By Counsel,

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio, Esq.
Attorney #3910
Mckinnon & Harwood
1168 Newport Avenue
Pawtucket RI 02861
(401) 723-9655
contact@mckinnonharwood.com

## CERTIFICATION

I hereby certify that on Monday, August 14, 2006, a true copy of the within, was served upon the following and in the following manner(s):

**Thomas A. Palombo Esq.**, by electronic means only to " tpalombo@riag.ri.gov".

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio