Q. Okay. Do you have a recollection of reviewing any medical request slips submitted by Mr. Moreau?
A. No.
MR. DIMAIO: Okay. And so that we understand what a medical request slip is, I'm going to ask this next document be marked as Exhibit Number 2.
(PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)
Q. I'm handing to you what's been marked as Plaintiff's Exhibit 2. Do you recognize that document?
A. Yes.
Q. What is that document?
A. It's a medical request slip, or in the prison system, it's called a KITE.
Q. And you would agree that I have before me an original medical request slip; correct?
A. Yes.
Q. And the original medical request slip in blank form consists of three pages, all identical except in color; correct?
A. Correct.
Q. And there's colors noted at the bottom of the exhibit which is in front of you indicating



White-Dispensary, Yellow-Administrator, and Pink-Inmate; correct?
A. Correct.
Q. And that is, in fact, the color of the original document that I have before me today; correct?
A. Yes.
Q. Okay. Is that a true and accurate copy of the medical request slip which was used during the fall of 2001?
A. I believe it was.
Q. Were there any other slips or KITEs that were used in the fall of 2001 for inmates to request medical appointments?
A. Inmates could request medical appointments using the medical request slip or corresponding directly with somebody either verbally or in writing.
Q. When you say anyone, were there specific categories of persons that were to restrict their requests for medical appointments to, or was it really anyone?
MR. PALOMBO: Objection. You can answer.
A. Medical request slips can be filed in several manners in the prison system. If you would like



me to go through them, I would.
Q. As it pertains to the fall of 2001, please go through the different manners in which inmates could request a medical appointment.
A. An inmate could request a medical slip from correctional officers assigned to the inmate's living area. An inmate could request a medical slip from the correctional officer supervisor assigned to the living area. An inmate could request a medical slip from the nurse who actually goes to the specific living area to distribute medications. A medical request slip could be requested by an inmate when he went to a specific Medline to receive medication that he might have been on. An inmate could get a medical request slip by stopping by the infirmary and asking for a medical request slip. These are some of the ways they can get them.
Q. And as far as corresponding, who are the different people that they would correspond with for the purpose of requesting a medical appointment in the fall of 2001?
MR. PALOMBO: Objection. You can answer.
A. Who would have, could have? I mean, inmates



write to anybody and anything about anything to get what they want.
MR. DIMAIO: Okay.
A. They could use a slip. They could submit a slip to the infirmary. They could write a letter directly to myself. They could write a letter directly to the director of nursing. They could write a letter directly to the physician. They could write a letter to the director of the department. They could write a letter to the Speaker of the House. They could write a letter to the Governor. They could write a letter to the former Speaker of the House. They could write something to anybody.
Q. Some of those manners of communications were anticipated and already designed to then be followed up, and give them a medical appointment, you would agree?
A. Definitely, provided we got the medical request slip.
Q. And you would agree that the ones to the Governor or the Speaker of the House or the former Speaker of the House, you would not expect the Department of Corrections would be able to act timely on that; correct?

MR. PALOMBO: Objection. You can answer.
A. Other than what would be -- other than what would make practical sense, common sense, and the classes that I've taken in management and administration most of my life, no.
Q. Now, you're aware that the issues that we're dealing with Mr. Moreau pertain to his vision; correct?
A. Correct.
Q. And do you recall any education or training that would have assisted in your determination of a timely response to any of the communications he sent you?
A. No.
Q. And likewise, have you had any education or training relative to individuals with hydrocephalus such as Mr. Moreau?
A. Other than knowing what hydrocephalus is, no.
Q. What do you understand hydrocephalus to be?
A. It's a condition where excessive pressure is formed in the brain cavity.
Q. And are you aware of any complications that can be associated with hydrocephalus?
MR. PALOMBO: Objection. You can



answer.
A. Death.
Q. Any others?
A. Blindness, stroke, inability to function appropriately in today's society.
Q. And where did you get your information relative to death as a consequence of hydrocephalus?
A. Medical journals, discussion with medical people, medical staff.
Q. And did you get any of that information after the fall of 2001?
A. Specifically, no.
Q. Okay. Can you place a time frame on when you received any information as it pertains to those consequences of hydrocephalus?
A. Not really.
Q. Okay. So -- okay. Did the Department of Corrections train you in any timely response to any given medical complaint that would have been communicated by an inmate?
A. Actually, that's why the Department of Corrections hired me.
Q. That's why the Department of Corrections hired you?
A. Hired me.



Q. And why do you have that impression?
A. Based on the fact that when I was hired by the Department in June of 1990, they were under a federal lawsuit at the time, Parmigiano vs. -- I forget whatever governor it was, and one of my responsibilities upon being hired in 1990 was to work towards the finalization of that lawsuit, or conclusion of the lawsuit, I guess.
Q. I'm not sure if I understand what you're suggesting, so I'm going to ask you some follow-up questions.
A. Sure.
Q. When you indicate that the Department of Corrections hired you for a specific reason that had to deal with that lawsuit, should I understand that one of your specific functions was to help improve timely response of medical services to inmates that present issues?
A. That was one of the reasons. I was the first Health Care Administrator that the Department of Corrections hired. Prior to myself, I believe there was one other individual.
Q. So it's fair to say there was no training for your position, but, rather, they expected you to know what to do?



MR. PALOMBO: Objection. You can answer.
A. I was hired by the Department of Corrections as a Hospital Administrator, and as Hospital Administrator, there are clear-cut job specifications that define the role and responsibility of that individual. Prior to being hired by the Department of Corrections as a Hospital Administrator, I had been employed at the Department of Mental Health, Retardation & Hospitals at the Eleanor Slator Hospital for approximately 17 years as the Associate Hospital Administrator, again, dealing with patient issues, problems and concerns.
Q. Was there an established protocol for timely response to inmate complaints brought to your attention in the fall of 2001?
MR. PALOMBO: Objection.
MS. RAND: Objection.
MR. PALOMBO: You can answer.
A. Once I established one.
Q. And What was the established protocol that applied to your timely response to communications sent to you by inmates in the fall of 2001?
MR. PALOMBO: Objection.

Page 34

MR. PALOMBO: Objection. You can answer.
A. I think I know what the routine process is, but unfortunately, sometimes there is always exceptions to the routine.
Q. Who's Margie DiMuccio's supervisor?
A. Medical records supervisor, Pauline Marcussen.
Q. Who's Pauline Marcussen's supervisor?
A. I am.
Q. Who is your supervisor?
A. Dr. Michael Poshkus, Medical Program Director, Roberta Richman, Assistant Director of Rehabilitative Services.
Q. Could you spell Michael Poshkus's last name?
A. P-O-S-H-K-U-S, M.D.
Q. And the other person was whom again?
A. Roberta Richman, R-I-C-H-M-A-N. She's Assistant Director of Rehabilitative Services.
Q. And who was your supervisor in the fall of 2001?
A. I think it was Dr. Ann Spaulding at the time, S-P-A-U-L-D-I-N-G. She was the Medical Director at the time.
Q. And after she left, it was Dr. Scott Allen; is that correct?
A. Correct.

Page 35

Q. Do you recall when Dr. Ann Spaulding left?
A. I'm not sure of the exact date, no.
Q. Do you recall any period of time where she was not physically present for active duties?
THE WITNESS: Can you explain what you mean by -- you mean on vacation, stuff like that?
MR. DIMAIO: Yes, any reason that she would not show up for work prior to her eventual termination.
MR. PALOMBO: Objection.
MS. RAND: Objection.
MS. DURANT: Objection.
THE WITNESS: I can answer?
MR. PALOMBO: Go ahead. I'm sorry.
A. Vacation, illness, nothing long term; routine vacation, days off, sick leave, but nothing long term.
Q. And now, also in the fall of 2001, was Pauline Margie DiMuccio's supervisor?
A. Yes.
Q. Again, in the fall of 2001, you were Pauline's supervisor?
A. Correct.
Q. Do you know the process by which inmates submitted

Page 36

medical request slips at the Intake Service Center in the fall of 2001?
MR. PALOMBO: Objection. You can answer.
A. Yes.
Q. And do you have knowledge of any type of lockbox that was used at the Intake Service Center in the fall of 2001?
A. I believe there were two.
Q. Describe your knowledge relative to the use of the lockbox for submitting medical slips at the Intake Service Center in the fall of 2001?
A. Inmates would request the medical request slip from the individuals we had spoken about previously. Upon receiving the slip, the inmate would fill it out, and place it in a lockbox. I believe there was a lockbox at the time located in the dining hall. I think there was a lockbox at the time located outside the dispensary of the infirmary. And those boxes would be opened up and anything in them would be submitted to the medical unit.
Q. Do you know whose position was responsible for opening up those lockboxes?
MR. PALOMBO: Objection. You can

Page 37

answer.
THE WITNESS: Whose physician?
MR. DIMAIO: Position.
A. Whose position? No, I really don't know. I believe it was would be the correctional officers, but I don't know.
Q. Was there an established --
MR. PALOMBO: I move to strike. If he doesn't know, then he doesn't know.
Q. Do you know how long those lockboxes were in use at the Intake Service Center?
A. I have no idea.
Q. Were they in use upon your taking your position?
A. Yes.
Q. Okay. And do you know whether there was any established policy or procedure for individuals who had access to those boxes?
MS. RAND: Objection.
MR. PALOMBO: Objection. You can answer.
A. When you say "individuals," you mean inmates having access or staff? I'm confused.
Q. Do you know whether nurses would open the lockboxes and get the medical request slips out of the boxes?

MR. PALOMBO: Objection.
MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: You can answer.
A. They could, yes.
Q. Do you know if they, in fact, did do that in the fall of 2001?
MR. PALOMBO: Objection. You can answer.
A. Some did.
Q. Okay. And how do you know that some did?
A. From what was reported to me from nursing supervisors and the director of nursing.
Q. Do you have any information to believe that correctional officers actually did open up the lockbox and retrieve slips from inside the lockbox?
MS. RAND: Objection.
MR. PALOMBO: Objection. You can answer.
A. They could.
Q. Why do you say they could?
A. Because the lockbox that was located in the dining hall at the time was their responsibility.
Q. How do you know it was their responsibility?



A. Again, from what was told to me by nursing supervisors and the director of nursing.
Q. Now, do you have knowledge regarding how they would handle these slips they retrieved from the lockboxes in the fall of 2001?
MR. PALOMBO: Objection. You can answer.
A. No, I don't.
Q. Do you know who would have the most information regarding the handling of those slips in the fall of 2001?
A. Probably the staff nurses assigned to the Intake Service Center.
Q. In your position as Health Care Administrator, do you recall ever reading or examining an inmate's medical request slip?
A. Yes.
Q. And on the occasions that you recall reading or reviewing an inmate's medical request slip, with respect to the different colored copies, how many do you recall having possession of?
MR. PALOMBO: Objection. You can answer.
A. I don't have possession of any, but if you're asking me what copy I've seen, usually the white



copy.
Q. Okay. Referring your attention to Exhibit 1 and the distribution at the bottom --
MR. PALOMBO: I think that's 2.
Q. Strike that. Referring your attention to Exhibit 2 and the distribution at the bottom, do you see where it says White-Dispensary?
A. Yes.
Q. Who is that person?
A. That could -- the dispensary could be the nurse or the physician assigned to that dispensary.
Q. And referring to where it says Yellow-Administrator, who was that person?
A. Could be the nurse, the physician assigned to the dispensary, or could be sent to myself or to the medical director.
Q. And now, referring to -- I'm going to hand you the actual slip which is in my possession. Referring to the pink copy, which is the very last copy, do you see the dotted line approximately two-thirds towards the bottom of that slip?
A. Yes.
Q. And below the dotted line, what was that portion typically used for, where it says Health Care Response?



MR. PALOMBO: Objection. You can answer.
A. Well if you continue further down that, you see there is a signature line for a nurse and a date. So it's supposed to have been triaged by a nurse, filled in, and returned to the inmate.
Q. And how do you know that was the supposed treatment of that pink slip?
A. It says nurse's signature and date on the slip.
Q. So that was the design of the slip then; is that fair to say?
A. Correct.
Q. Do you know whether the nursing staff followed the triage of that pink slip in the fashion that you described in the fall of 2001?
MR. PALOMBO: Objection.
MS. RAND: Objection.
MS. DURANT: Objection.
A. If they received them.
(OFF THE RECORD)
(PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
MR. PALOMBO: I guess off the record.
(OFF THE RECORD)
Q. Mr. Marocco, I'm going to hand you what's been

4; correct?
A. Correct.
Q. And do you recall whether that is the correspondence that you were referring to in your previous answer that first alerted you to Mr. Moreau's vision-related complaints in the fall of 2001? And please, take time to review that.
(PAUSE)
A. As best as I can recollect, yes, this is the first time I've seen correspondence relative to a vision issue with Mr. Moreau.
Q. And now, did you review the entire contents of that letter?
THE WITNESS: The one you just handed me?
MR. DIMAIO: Yes.
A. Yes.
Q. And I'm going to draw your attention to the third paragraph that begins with language, "Just recently, I noticed"; do you see that language?
A. Yes.
Q. And it says, "Just recently, I noticed my eyes are worse. My glasses don't work. I placed a slip in to see the eye doctor and was told he comes in every few weeks, lately seeing nonsentenced



inmates. My job as an outside porter involves picking up cigarette butts in the ground cement cracks. My vision is so bad that I miss them. The cigarettes blend in. I can't see them. I'm getting yelled at by my boss for missing cigarette butts on the cement along with green weeds not being picked from the dirt. They too I can't see. As we speak, I can't see the thin, blue lines on this paper. Can you please place me at the very top" -- and now we just turn the page; correct?
A. Yes.
Q. "At the very top of the list for seeing the eye doctor next time he visits. I need to see him desperately to have it corrected. This time I am willing to buy my own eyeglasses. Without concentrating on this paper, it's a white, no blue lines to me." You agree that I read that accurately; correct?
A. Yes.
Q. And do you recall the first time you read that language?
A. Upon reviewing it, yes, I remember it.
Q. And do you recall roughly the date that you first reviewed that letter, Exhibit 4?
A. I can only tell you it was sometime after



September the 17th. I don't remember the exact date.
Q. Okay. Was it -- in September of 2001, was it your normal practice to review correspondence within seven working days as you had testified earlier?
A. Yes, seven working days once we received the correspondence.
Q. And now, a letter that asks for -- strike that. Now, this letter use the word "desperately"; correct?
A. Yes.
Q. And it referred to not being able to do his job picking up cigarettes and weeds; correct?
A. Yes.
Q. And he was getting yelled at; correct?
A. Yes.
Q. Now, who type of timely -- what type of response did this letter merit in the fall of 2001?
THE WITNESS: Can I look at my answer or would you like me to recollect it?
MR. DIMAIO: I'd like you to reflect first, and then I'll refer you to your answer.
A. I would assume that what I did when I received this letter is contacted the Intake Service



Center, asked them to place Mr. Moreau on the list to see the optometrist the next time he was going to be in the facility, probably found out when that date was going to be, and then probably contacted Mr. Moreau and told him that I will have him placed, or I had him placed on the list to see the optometrist the next time he was at the Intake Center.
Q. Now, was it within your authority to be able to have inmates placed on the optometrist list in the fashion that you described in the fall of 2001?
A. Yes.
Q. As a matter of fact, that was one of the specific functions that you installed in that position subsequent to that Parmigiano case; isn't that correct?
THE WITNESS: Can you say that again?
Q. To more or less make sure that patient's health care was followed up in a reasonable fashion?
A. Correct.
Q. Okay. Now, with this type of vision complaint, who would have determined the time frame for your action after you read this document?
MR. PALOMBO: Objection. You can answer.

2001.
Q. Okay. Did this position, Associate Director of Health Care Services, exist in the fall of 2001?
A. No.
Q. Is this the named title that your Hospital Administrator position turned into?
A. Correct.
Q. Does this fairly and accurately state the job duties and descriptions of the job that you were performing as Hospital Administrator in 2001?
A. Yes.
Q. Is it fair to say that the only thing that is different, therefore, on Exhibit 7 is the label of the class title?
A. Repeat that again.
Q. Is the only thing different from the position you were holding as Hospital Administrator --
A. The class title.
Q. -- the class title?
A. Yes, yes.
Q. Do you know if there was a job description that specifically stated the duties in a fashion such as we see in Exhibit 7 for the Hospital Administrator as it existed in 2001?
A. Yes.



Q. So there is such a document?
A. Yes, it is. It's a state -- certified state position which requires the passing of a civil service exam to obtain the position.
Q. And it's fair to say that your position was not as a Correctional Officer Hospital Supervisor in the fall of 2001?
A. No.
Q. Okay. Did you have any control over the position of Correctional Officer Hospital Supervisor in the fall of 2001?
A. They report to me in the health care service hierarchy.
Q. In the health care service hierarchy for the fall of 2001, where was the director of general nursing services in relation to your position?
A. She reported directly to me.
Q. Who occupied that position in the fall of 2001?
A. Colleen Capezza, C-A-P-E-Z-Z-A.
Q. And do you recall the testimony we had earlier today regarding the scheduling of Mr. Moreau for an eye appointment?
A. Yes.
Q. Would this position get involved in that scheduling?



A. Possibly if I weren't available, she would, yes.
Q. Now, you don't recall taking any extended time out of work in the fall of 2001 for personal days or vacation or something of that nature, do you?
MR. PALOMBO: Objection. You can answer.
A. I usually take a two-week vacation in the fall every year. It's usually the first two weeks of November.
Q. And you don't recall any family issues or emergencies that would have resulted in more than three days of time away from your job other than the vacation you specified in the fall of 2001?
A. Not that I recollect.
Q. Okay. And the position occupied by Ann Spaulding in the fall of 2001 was medical program director; is that correct?
A. That's correct.
(PLAINTIFF'S EXHIBIT 8 MARKED FOR IDENTIFICATION)
Q. I'm handing you what's been marked for identification as Exhibit 8.
A. Okay.
Q. Okay. During your testimony this morning relative



to the position of medical program director, is it fair to say that this is a true and accurate copy of the job duties and descriptions as they would have supervised your position?
A. Yes.
Q. And now, within your position, was it necessary for you to interact with people employed in the capacity as a physician, too?
A. From an administrative perspective, yes.
MR. DIMAIO: Okay.
(PLAINTIFF'S EXHIBIT 9 MARKED FOR IDENTIFICATION)
Q. I'm handing to you what's been marked as Plaintiff's Exhibit 9, a job description for the position of Physician II. Is that your understanding of the Physician II as it applied in the fall of 2001?
A. I think so, yes.
Q. In what capacity do you have any authority over the position of Physician II in the fall of 2001?
A. Again, from the administrative aspect, not from the clinical or medical management aspects.
Q. And does that document fairly state your understanding of the job duties of the position of Physician II in the fall of 2001?

A. Hydrocephalus - congen -- I can't make out the second word. Hydrocephalus, stent shunt from ventricular-something or other. I can't make it out. It looks like 6 or 7 -- whatever. I can't make out the writing.
MR. DIMAIO: Okay.
(PLAINTIFF'S EXHIBIT 11 MARKED FOR IDENTIFICATION)
Q. I'm handing to you what's been marked as Plaintiff's Exhibit 11, and you would agree that's a two-page exhibit; correct?
A. Yes.
Q. Okay. And the second page appears to be a blow-up of some of the portions of the first page; correct?
A. Yes.
Q. And feel free to refer to either page, if it will assist you, but I want to draw your attention to the notations -- the handwritten notations in the lower right-hand corner of the first page directly above where it has 9/27/01; do you see that language?
A. Yes.
Q. Whose handwriting do you believe that cursive language is?



THE WITNESS: This one you're referring to?
MR. DIMAIO: Yes.
A. I don't know whose handwriting that is. I don't recognize it.
Q. Do you know who Dr. Osei is?
A. Yes.
Q. Have you seen his handwriting before?
A. Yes.
Q. Does that look like Dr. Osei's handwriting?
A. Could be.
Q. Do you know who Dr. Mottola is?
A. Yes.
Q. Have you seen his handwriting before?
A. Yes.
Q. Is that his handwriting?
A. No.
Q. Why do you say "No"?
A. I know Dr. Mottola's handwriting.
Q. And would you agree that the word that appears two words -- or the second word above the date reference that I gave you of 9/27/01 is the word "Reviewed"?
A. It appears that way to me, yes.
Q. And the word that appears in between the date



reference and the word "reviewed," what does that look like to you?
A. That's what I'm having a problem with. Dr. Osei's name is Albert Osei. The last four letters are, obviously, O-S-E-I, which is Osei, but the first several squiggly lines doesn't look like Albert to me. That's why I didn't --
Q. Now, what is this document you have in front of you, and we've identified as Exhibit 11?
A. This is the Health Care Services History and Physical Form.
Q. And when do you believe this physical was performed?
A. According to Barbara Carroll on 9/26/01.
Q. Now, on 9/26/01, how old do you believe Mr. Moreau was?
A. I'm not sure.
Q. '71 to 2001, if you add 30?
A. It's approximately 30 years.
Q. He would have just turned 30 by 13 days; is that correct?
A. Yes.
Q. His date of birth is 9/13/71?
A. Yes.
Q. So on 9/13/2001, he would have turned 30?



A. Yes.
Q. So he would have been an individual under 40 years of age; correct?
A. Correct.
Q. Do you have any understanding as to why a physical would have been performed on Mr. Moreau being under 40 years of age --
MS. RAND: Objection.
Q. -- on September 26, 2001?
MR. PALOMBO: Objection. You can answer.
A. It's a history and physical form.
Q. Did you understand the question?
A. Yes, you said why would it have been done. I said it's a standard history and physical form.
Q. I understand it's a physical form. Why would they have conducted Mr. Moreau's physical being under the age of 40 for a second time?
MR. PALOMBO: Objection.
MS. RAND: Objection.
MR. PALOMBO: You can answer.
A. I don't know why they would have done it a second time.
Q. Is there some way you can determine why his physical would have been done approximately one

year after his admission physical?
MS. RAND: Objection.
MR. PALOMBO: Objection. You can answer.
A. I don't know why.
Q. Is there some way to determine why?
A. The only -- no, there's no way for me to determine unless he was released and came back into the system. I don't know why it was done again or they used this particular form.
Q. And if I represent to you he was not released and came back into the system, is there a way to determine how his physical was scheduled for that day?
A. I have no idea.
Q. Is there some documentation such as a log that would record that Mr. Moreau was to be examined on that day?
MR. PALOMBO: Objection. You can answer.
A. Possibly there might have been a note in the medical record.
Q. What type of note in the medical record would we look for to determine why he was given a physical on September 26, 2001, if it was not another



admission physical?
MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: Objection. You can answer.
A. I don't know. I really don't know. I'm looking at this second one that you handed me. There is a note that says, "As stated 3/5/00 - green sheet," and that's the first one you handed me. It's referring to this original one that was done.
(PAUSE)
Q. Do you recall indicating that if there was a particular condition, somebody would be given a physical on an annual basis if they were under 40 years of age?
MS. RAND: Objection.
MR. PALOMBO: Objection. You can answer.
A. I don't believe I said that. I said if somebody presented themselves with a medical condition that needed to be seen, and they were under the age of 40, they would be seen whenever necessary, depending on the condition. That was in response to the question that you said do they



have, I guess, a set timeliness. Inmates over the age 40 are seen annually irregardless of whether they present with a problem or not. Inmates under the age of 40 have to request to be seen or have to present when they come into the prison what the condition is that needs follow-up care and has to be seen.
Q. Okay. So, for example, you would agree that Mr. Moreau presented with a condition of hydrocephalus upon his admission at the Adult Correctional Institution; correct?
A. That's what the form says, yes.
Q. Is that the type of condition that would have been followed on an annual basis?
MS. RAND: Objection.
MR. PALOMBO: Objection. You can answer.
A. I'm not a physician, so I wouldn't know.
Q. If that was the type of condition that was followed on an annual basis, would there be some type of documentation that would act as a particular letter or reminder to call the particular patient back in one year's time?
MS. RAND: Objection.
MS. DURANT: Objection.



MR. PALOMBO: Objection. You can answer.
A. I think that if the inmate were put on medications -- and I'm not sure that he had been for this particular condition -- upon the ordering of the medications, the physician would meet with and monitor the inmate's medical condition to see if he needed to have a physical or an exam or needed to be sent to a specialist relative to that condition.
Q. Now, on March 5, 2000, referring your attention to the Exhibit 10, do you know the physician that would have performed this physical?
A. That's Dr. Lisa Santa Teresa.
Q. And if Dr. Lisa Santa Teresa thought Mr. Moreau should be reexamined in one year, is there some type of document that would have been generated to make sure that Mr. Moreau was brought back in a year?
MS. RAND: Objection.
MR. PALOMBO: Objection. You can answer.
A. In her medical note in the medical records, she would have noted the inmate's condition and the fact he needed to be reexamined.

Page 162

answer.
A. Not necessarily.
Q. Was it the normal practice to retain one -- or one of the parts of this multipart form in the fall of 2001?
MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: Objection.
A. Not that I know of.
Q. Why do you say, "Not that I know of"?
A. Because in many instances, these forms are filled out. Sometimes they don't reach the infirmary. Sometimes they do, but once the nurse triages these forms they're discarded. There's no policy where we keep these forms as part of the formal medical record.
Q. And whose determination was it to discard these forms once they are triaged?
MS. RAND: Objection.
MR. PALOMBO: Objection. You can answer.
A. That's the decision -- up to the discretion of the nurse that reviews the form.
Q. And is the practice of discarding those forms still followed today?

Page 163

MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: Objection. You can answer.
A. Yes, it is.
Q. Has there been discussions as of recent to some protocol for retaining forms that are triaged by nurses?
MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: Objection. You can answer.
A. We've talked about numbering them, which is impractical, and we decided not to, and we're also currently discussing electronic medical records at the prison which would make the use of these forms obsolete.
Q. So presently, there's some discussion for retaining inmate requested medical appointments?
MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: Objection.
A. No.
Q. Okay. Now, relative to Exhibit 11, do you have an understanding as to who performed that physical on

Page 164

September 26, 2001?
A. It's signed off by Barbara Carroll, and reviewed by Dr. Osei on the 27th.
Q. And --
MR. PALOMBO: Hang on just a second, Joe. I'm behind you. Okay. I'm caught up. Could you read back his answer? This is Number 11 now; right? Could you read back his answer?
(PREVIOUS ANSWER READ)
Q. Drawing your attention to the notation "See D.O.," do you see that notation?
THE WITNESS: Where are you looking?
MR. DIMAIO: Directly underneath the words, "Examined by S. Carroll" (sic) in the middle of the page.
THE WITNESS: Right here?
MR. DIMAIO: In the middle of the page, I'm sorry.
THE WITNESS: Can you point it out to me, please?
Q. If you flip to the next page, do you see the words "Examined by," in the middle of the page?
A. Yes.
Q. Now, do you see the words that I'm referencing?
A. I see something written under her name that

Page 165

says "See" -- and I have no idea what that next -- whatever that is that's written there. It looks like the bottom of her first name, B, and it looks like .01 to me, but I'm not sure what it is.
Q. Are you familiar with the manner in which this physical examination form was used within the Department of Corrections in the fall of 2001?
MR. PALOMBO: Objection. You can answer.
A. Yes.
Q. It recorded someone's physical condition for the most part; correct?
A. Correct.
Q. Okay. And it had sections that were designed to basically record or perform functions which are noted by the language such as -- strike that. And it had sections for recording specific types of information; correct?
A. Yes.
Q. And it had sections for directing a particular course of action; correct?
A. Yes.
Q. And are you familiar with the manner in which this form was used for directing a course of action after a physical examination?

MR. PALOMBO: Objection. You know, I've objected as to relevance, and, you know, I further object that it's almost harassing to ask that type of question. That's the first time I've said that today or in any of these depositions for the last number of weeks, but I mean a hypothetical that has nothing whatsoever to do with the case, I don't understand -- you know, I will allow him to answer that, but if you're going to keep going with these far-fetched hypotheticals, I'm going to instruct him not to answer on that basis. You may go ahead, Mr. Marocco.
A. In that hypothetical scenario, if a nurse called me and said that inmate so-and-so was having acute chest pains and has a history of a coronary condition, I would -- first of all, they wouldn't be calling me. They would be sending the guy out automatically because it's an emergency. But if they did call me to inquire, I would tell them send him out immediately to be seen.
Q. And if they had an underlying condition of hydrocephalus where you believed a complication included death or blindness, and that was presented to you on September 17 with some



information indicating that vision was getting worse, what time frame would you act?
MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: Objection. You can answer.
A. If I received the call from a nurse, and she told me that an individual had hydrocephalus, and who's having an immediate problem, I would probably have told her to have him sent out immediately to be seen. If an inmate wrote me a letter, as he did, talking about glasses and wanting to pay for a pair of glasses, I think I would have said have him seen by the physician the next time he's in the building to see if there's an underlying problem. His letter of the 17th in no way indicated he was in any type of emergency situation, whatsoever.
Q. If the inmate was a pizza delivery guy and had no training as to the complications of hydrocephalus, would you expect him to understand the urgency of his complaint?
MS. RAND: Objection.
MS. DURANT: Objection.
MR. PALOMBO: I object. You can



answer.
A. I don't expect any inmate to understand the complexities of his or her condition. That's why we have nurses that are on site to evaluate inmates, and we have physicians available 24/7 to take that evaluation into consideration and make a decision whether somebody needs to be treated or not.
Q. And if you thought one of those situations presented itself, it would be -- one of those emergency situations presented itself, it would be this policy which is identified as Exhibit 13 that would facilitate immediate emergency referral; correct?
MR. PALOMBO: Objection. You can answer.
A. Again, if there was an emergency situation as outlined in this particular policy or Exhibit 13, there would be no need for a nurse to contact me or a physician to ask if she could send somebody out under emergency conditions.
(OFF THE RECORD)
Q. Now, earlier you testified that there are certain parts of Mr. Moreau's medical record that included physician contact notes; correct?



A. Yes.
Q. And that would be true not just for Mr. Moreau, but for all people housed at the Intake Service Center; correct?
A. Who were at any one time rendered medical care, yes.
(PLAINTIFF'S EXHIBIT 14 MARKED FOR IDENTIFICATION)
Q. I'm handing to you what's been marked as Plaintiff's Exhibit 14, and I'll ask that you review that, and tell me if you know what that document is.
A. It's a physician contact sheet.
Q. Now, I'll have you look at it carefully, and reflect upon it for my next set of questions.
(PAUSE)
A. Okay.
Q. Do you recall the first time that you saw what's before you and marked today as Exhibit 14?
THE WITNESS: The first time I've seen this?
MR. DIMAIO: Yes.
THE WITNESS: Specific to Mr. Moreau?
MR. DIMAIO: Yes.
A. God, several months ago.