Page 14

A. Custody and control of adult inmates.
Q. And do you make any distinction between inmates as opposed to detainees?
A. No.
Q. Okay. Do those terms mean the same thing to you?
A. I guess they could.
Q. More specifically, on a professional basis within the context of your job duties, do you make any distinction between detainees as opposed to inmates?
A. What's the difference between them?
Q. Would you agree that the Intake Service Center houses people who are not yet convicted of a crime but are awaiting trial?
A. Yes.
Q. Okay. And would you agree that the term detainee describes those people?
A. Yes.
Q. Okay. And could the term detainee also include those people that have been convicted? For example, people with an immigration detainer, would they be housed at the Intake Service Center?
A. Can you repeat the question again.
Q. Could the term detainee include people who had perhaps an immigration detainer that had already been convicted?

Page 15

A. Are you talking about in the past?
Q. Yes.
A. We've had people with immigration in the past.
Q. And also the term inmate, at the Intake Service Center, what would that mean to you?
A. Somebody that's incarcerated.
Q. Would you have anyone incarcerated at the Intake Service Center who had been convicted of a crime related to that particular visit?
MR. PALOMBO: Objection. You can answer if you understand the question.
A. I don't know what you're talking about.
Q. You get a lot of people who are repeat offenders in and out of Intake Service Center, right?
A. Yes.
Q. Some of them with extensive criminal histories?
A. Yes.
Q. Okay. And for the most part, after someone goes to court and is convicted of a crime for which they're going to serve a term of incarceration, do they serve that incarceration at the Intake Service Center or do they go to a different building?
A. They do some time there.
Q. A small portion of their time up front?
A. Yes.

Page 16

Q. And then they would be classified to a different facility; is that correct?
A. Yes.
Q. Okay. And do you know who Dr. Smiley is?
A. No.
Q. Do you know who Nurse Hale is?
A. No.
Q. Marylyn Hale?
A. Don't know her.
Q. Do you know somebody by the name of Marylyn Grejdus?
A. No.
Q. Okay. And what about Barbara Carroll? Did you know Barbara Carroll?
A. Do I know her or -- I've seen her in the building. I don't know her.
Q. Who do you know Barbara Carroll to be?
A. The nurse practitioner.
Q. Nurse practitioner for the Intake Service Center?
A. I've seen her in the Intake Service Center.
Q. You haven't seen her recently, have you?
A. No.
Q. When did you last see her?
A. I don't recall.
Q. Did you see her sometime in 2001?
A. I don't know. I don't know when I seen her.

Page 17

Q. And in 2001, who was the warden for the Intake Service Center?
A. I don't recall.
Q. And in 2001 who was Ann Spaulding?
A. I don't know.
Q. And in 2001 who was Dr. Scott Allen?
A. I don't know.
Q. Do you know who he is today?
A. No.
Q. Okay. What education -- what's the highest level of education you've obtained?
A. 12th grade.
Q. And where was that?
A. Tolman High School.
Q. And what year did you begin working as a correctional officer?
A. '92.
Q. And how old were you then?
A. 25 I think.
Q. And have you worked continuously at the correctional institution since 1992?
A. Yes.
Q. Okay. And in 2001 you were stationed at the Intake Service Center, right?
A. Yes.

Page 26

complaining he couldn't see weeds or cigarette butts?
A. I don't recall. Oh, you said from September to whatever it's considered the fall, right? I want to make sure we get that straight.
Q. Just for the month of September 2001?
A. I don't know. I don't remember.
Q. Do you think he complained about that at some time in the fall of 2001?
A. He might have.
Q. If he did, would you have generated some type of document?
A. No.
Q. If he made a complaint of that nature, what would you have done?
A. Told him to get a medical slip.
Q. And was there some type of document that would keep track of the days that Mr. Moreau actually performed services as a yard porter?
A. Porter's pay.
Q. I'm sorry. What?
A. It was a porter's pay thing.
Q. Is that a document that you kept track of?
A. Yes.
Q. Is that what it's called, porter's pay?
A. Yes. It's a piece of paper with days of the month

Page 27

on it.
Q. You would fill that out?
A. Yes.
Q. And if somebody showed up for work but said they didn't feel up to working for whatever reason and just decided to sit, would you mark them as somebody who should get paid that day?
A. Would I or did I?
Q. Did you?
A. I usually paid everybody whether they worked or not.
Q. Do you remember if Mr. Moreau got paid for work even though he did not in the fall of 2001?
A. I don't -- what are you getting at? I don't know what you mean.
Q. I'm trying to figure out what piece of paper would have been generated if Mr. Moreau had a problem performing his services as a yard porter. Can you tell me what piece of paper would have been generated?
A. Just the porter's pay.
Q. Just the what?
A. Porter's pays. That's it.
Q. And how would you know from the porter's pay document that Mr. Moreau had a problem doing his job?
A. From that document?

Page 28

Q. Yes.
A. I wouldn't have any, unless he didn't get paid.
Q. Unless you didn't think he should get paid?
A. No. Unless he didn't get paid.
Q. The reason he would not get paid is what?
A. If he didn't do any work.
Q. So if he showed up for work and said, I can't see today, would you pay him?
A. Would I pay him? Today?
Q. No. In the fall of 2001 if he showed up for work and said, I can't see today. I don't want to do it, would you have paid him?
A. Probably I would have told him to put a medical slip in.
Q. Do you think it's more likely that you would have told him to try your best to feel for the cigarettes if he said he couldn't?
MR. PALOMBO: Objection. You can answer.
A. Would I tell him to what?
Q. Did you tell Mr. Moreau to try feeling around for cigarettes if he couldn't see them?
A. No.
Q. Did you tell Mr. Moreau to try feeling around for weeds if he couldn't see them?

Page 29

A. No.
Q. Thank you. Do you remember him complaining that the cigarettes blended in with the sidewalk?
A. No.
Q. Okay. Do you know what Mr. Moreau's ability to see is today?
A. No.
Q. Do you recall Mr. Moreau being somebody that you were supervising in the fall of 2001?
A. Yes.
Q. How do you recall that?
A. He was the yard porter.
Q. How many yard porters were there?
A. One.
Q. So if he didn't pick up the cigarettes or the weeds, then it wouldn't get done?
A. That's correct.
Q. And if the cigarettes and weeds didn't get done, would you get in trouble as an O/P mod officer?
A. The lieutenant would tell me, make sure the yard gets cleaned.
Q. Would you pick up the weeds yourself if Mr. Moreau did not?
A. No.
Q. Would you pick up the cigarette butts yourself if

Page 30

Mr. Moreau did not?
A. No.
Q. So how would they get picked up if Mr. Moreau said he couldn't do it?
A. I would tell him to pick them up.
Q. Do you recall the last time you told Mr. Moreau to pick up the cigarette butts or the weeds?
A. No.
Q. Do you know whether you told him to do that in October of 2001?
A. No. I don't know.
Q. Do you know whether you told him to do that in September of 2001?
A. No.
Q. Do you recall getting any communications from anybody in medical staff regarding Mr. Moreau's ability to see weeds or cigarette butts?
A. No.
Q. Okay. Is that something you would remember if it happened?
A. If they told me I'd probably remember it, yes.
Q. If an inmate had some physical difficulty performing a job that you were supervising, what would you do to check that out?
A. Rephrase it.

Page 31

Q. All right. If somebody said they were having a medical problem that affected their ability to work --
A. Right.
Q. Somebody being an inmate, would you do something to make sure they weren't lying to you?
A. Yes.
Q. What would you do?
A. Tell him to put a medical slip in.
Q. If they indicated they did put in a medical slip, what would you do?
A. I wouldn't do nothing unless medical told me, called me and said he had a problem.
Q. So there was somebody in medical that you would expect to receive some type of information from?
A. Yes. They would call me and tell me whatever.
Q. Now, when you say they, I need to get an understanding of who they is or was in fall 2001.
A. I don't know who was -- is.
Q. Okay.
A. They would call --
Q. Would you call medical to inquire about somebody's ability to perform work?
A. Yes, I would.
Q. Okay. And do you recall the names of anybody you would speak with at medical?

Page 32

A. No. Not at that time, no.
Q. All right. Do you think you would have gotten information from a secretary or somebody different than a secretary?
A. Different.
Q. Somebody with some medical training?
A. I don't know. I would assume so, yes.
Q. So if you spoke to somebody in medical relative to an inmate's ability to perform services as a yard porter, you would have made sure that you spoke to somebody with medical training and who was aware of Mr. Moreau's situation, right?
A. I don't know if they're aware of it. I don't know what somebody else is aware of.
Q. Okay. If Mr. Moreau had a problem performing work, you would have called medical to check that out, right?
A. Right.
Q. Okay. And when you called medical you wouldn't just simply stop at a secretary. You would speak with a medical person, right?
A. Right.
Q. And you would ask questions to make sure and satisfy yourself that you were speaking with somebody who knew about his medical situation, right?

Page 33

A. What are you getting at?
Q. Do you understand the question?
A. No. I don't understand it. So what are you getting at?
Q. You wouldn't ask the secretary in medical, tell me about Moreau. Can he see cigarettes, correct?
A. No.
Q. You would speak to either a nurse or a doctor, right?
A. I would never speak to a doctor.
Q. You would speak to the nurse then?
A. Right.
Q. Would you speak to a physician extender or a regular nurse or both?
A. I don't know what they are. They're just nurses up there.
Q. You just call them nurses?
A. Right.
Q. Do you know if one of those people that you would communicate with was Barbara Carroll?
A. No. I wouldn't talk to her.
Q. You didn't know her by name?
A. No.
Q. All right. What about Marylyn Hale or Grejdus?
A. What?
Q. I can't pronounce her name. Marylyn Grejdus. You

A. I don't recall.
Q. Was it there 2001?
A. I'm not sure when it was there. I know they used to use it. I don't know when though.
Q. Do you know how long they used the lock box for?
A. I don't recall.
Q. Do you know why they don't use the lock box any more?
A. I don't have that -- no.
Q. Do you know who would know the answers to those questions?
A. No.
Q. Now, you called it a lock box. Was it really locked?
A. Yes. It had a lock on it.
Q. Like a pad lock?
A. Yes.
Q. And who would have access to the lock box?
A. I don't know.
Q. Who would be able to open the pad lock?
A. I don't know.
Q. Did you see anybody open the lock box?
A. No.
Q. Do you know what types of people were supposed to get into the lock box?
A. No.
Q. And where was the lock box stationed?



A. Down in front of the dining room.
Q. Now, would you see inmates that put these medical request slips in the lock box?
A. Yes.
Q. Did you see Mr. Moreau put any of these slips in the lock box in the fall of 2001?
A. I don't know. I don't recall.
Q. Do you know if Mr. Moreau was sending letters to anybody complaining about his ability to see in the fall of September -- strike that. Do you know if Mr. Moreau was sending letters to anyone complaining of his ability to see or not see in the fall of 2001?
A. I don't know.
Q. Did he say anything to you about it?
A. Yes.
Q. What did he say to you?
A. He said he can't see.
Q. When did he say that to you?
A. I don't know. I don't know when.
Q. Do you know if he said that in 2001 or a different year?
A. I don't know when.
Q. After he told you he couldn't see, what did you do?
A. I told him to put a slip in.
Q. Was that a point in time when he was a yard porter for



you?
A. I don't know.
Q. After he told you he couldn't see, did you have him continue services as a yard porter?
A. Yes.
Q. For how long after he told you he couldn't see did you have him continue for you?
A. I don't know.
Q. More than one day I assume?
A. Yes.
Q. More than one week can I assume?
MR. PALOMBO: Objection to --
A. I don't know.
Q. Less than a month?
A. I don't know.
Q. Well, it's important I get your best recollection.
A. But I don't have an answer for that.
Q. Is your best recollection that you did have him continue services as a yard porter after he told you to see but you just don't recall exactly how many days he continued doing that?
A. Yes.
Q. Okay. Do you recall a point in time when he stopped performing services for you as a yard porter?
A. No.



Q. Is it your recollection that he continued performing services for you as a yard porter until after he was transferred out of your facility?
A. I don't know. I don't remember.
Q. Do you have a recollection of Mr. Moreau being transferred out of the Intake Service Center?
A. Yes.
Q. All right. If I represent to you that occurred October 28, 2001, would you agree with that date?
A. I don't know. I don't know when he left.
Q. Does that seem to make sense with what you recall?
MR. PALOMBO: Objection. You can answer.
A. I don't know. I don't know when he left.
Q. I'm going to represent to you that he was transferred out of Intake Service Center on October 28, 2001. Okay?
A. Okay.
Q. Now, do you have some impression of how close to that date Mr. Moreau was still performing yard porter services?
A. No. I don't know.
Q. Do you have an impression as far as being close to Halloween when Mr. Moreau was still performing yard porter services?





9bf82096-3472-451f-8e53-0e950a863441