Q. What types?
A. Well, if his visual acuity were worse and if he really had problems and I asked him about his complaints, so if he had real bad dizziness or anything in that field, he would go to Rhode Island, because they have an ophthalmology resident on duty there.
Q. Now, when you refer to he, in your last answer, are you referring specifically to Mr. Moreau?
A. Yes, I am.
Q. Okay. So you weren't referring in general as to any other patient? You were being accurate about how Mr. Moreau would have been treated if there was an acute vision-related issue on September 26, correct?
A. Yes.
Q. Okay. And you referenced an ophthalmology examination, correct?
A. Yes.
Q. Now, why would there be an ophthalmology examination if you noticed an acute condition?
A. Well, a doctor in ophthalmology is very learned in diseases of the eye, so --
Q. Okay. And what is an optometrist?
A. A person that checks visual acuity, that orders glasses sometimes, and improves the patient's living.



They can read. They can do a lot of other things.
Q. And an ophthalmologist, what is that?
A. Well, he operates on eyes, takes care of some of the bad things that could lead to permanent disability. But we in the profession are very, very careful. This is just a comment. I don't know if I should make it. Careful about eyes, because there should be nobody go blind, nobody. So that's always kept in mind.
Q. Now, to the best of your recollection before your examination of Mr. Moreau on September 26, 2001, did you have an understanding that he was born with hydrocephalus?
A. Well, he had a scar on his head, and I questioned him about the scar, and that's how I knew that he had the problem since birth. Then I asked him about the shunt and about surgery, and he said yes.
Q. In September of 2001, was it your normal practice to review a patient's medical chart before you conducted a physical examination?
A. Yes.
Q. Okay. And did you follow that normal practice for Mr. Moreau before his examination on September 26, 2001?
A. Yes.



Q. And do you recall any information in his medical chart regarding his hydrocephalus before you spoke to him about it?
A. No. There was no notation.
Q. Okay.
MR. PALOMBO: I move to strike that answer.
MR. DIMAIO: The basis?
MR. PALOMBO: It's inconsistent with prior testimony for one thing, but again, it's -- I'm just preserving this for the record.
Q. And now, if there was a need to address an acute condition that you observed on September 26, 2001 that required emergency room attention, how would you initiate that attention?
A. First of all, I'd tell the nurse, then I would write it in the doctor's orders, to ER now, so they would call Rhode Island Hospital and make sure that the resident was on for the eyes.
Q. Now, you indicated that before your employment at the Department of Corrections you had some education regarding hydrocephalus, correct?
A. Yes.
Q. Okay. And now, if you noted a problem with visual acuity on September 26, 2001, what would your training



dictate you do if you noted that problem with somebody who had hydrocephalus?
A. Well, first we'd go by the blood pressure, because it's usually reflected in that. Then maybe he had gone to his own private doctor. We'd ask about the care before.
Q. And then if someone had hydrocephalus and you noted a problem with visual acuity on September 26, 2001, what was your normal practice?
A. To refer them to an optometrist. They check the eyes more thoroughly.
Q. What time frame would you refer them to an optometrist?
A. Well, Dr. Smiley comes to the prison on a certain schedule. So we'd make the next time he was there.
Q. So in terms of days, how long would you take to make that referral?
A. Well, that would be about five days.
Q. So if someone with hydrocephalus had for example decreased visual acuity which you noted on September 26, 2001, you would have made sure he saw Dr. Smiley within about five days; is that correct?
MR. PALOMBO: Objection. You can answer.
A. Yes.





092be678-1d39-4499-9ed2-bb7bf134d938

This is the same section right here that we're looking at, plan, and there's a couple of things.
A. Okay.
Q. You would agree that is a fair and accurate copy of the first page; is that correct?
A. Yes.
Q. Just blown up and a little easier to see?
A. Yes.
Q. And do you see the two downward arrows that we're talking about over the word plan?
A. One here, one here.
MR. DIMAIO: Okay. And we can let the record reflect that she just referred to the two downward arrows that I've referred to by pointing. Attorney Palombo.
MR. PALOMBO: Yes, we may.
Q. Okay. And now, the bottom most arrow, there's the abbreviation WKS, correct?
A. That's weight, w-e-i-g-h-t.
Q. So that indicates he was losing weight?
A. He was too fat.
Q. All right.
A. He was -- let me see now. His height is usually here.
MR. PALOMBO: We might have to look on



the first page for his height.
A. Yes. That's true. Yes. And they weigh him, too. Okay. He was five, five, and he was 166 pounds.
Q. What weight should he have been?
A. Well, at five, five, he should be 100 at five feet, then for every ten pounds another five -- for every inch another ten pounds. So he should have been -- let me see.
Q. Roughly 150 pounds for his height?
A. Yes.
Q. Okay. And is there an adjustment that you make relative to age to determine whether he's the right weight?
A. No. Not age, no. We only chart changes for the women.
Q. So it's fair to say that he was only perhaps 16 pounds off his target weight; is that correct?
A. Yes, but he had hypertension, so that was important for him to lose.
Q. Do you see the uppermost -- do you see where it has his vision where you wrote words, without glasses?
A. Yes.
Q. And then you started a big downward arrow from the number 20 down to plan, correct?
A. Yes. Yes. Yes.



Q. What does that indicate?
A. That I discussed with the patient that I was going to send him to the optometrist, then I also explained weight to him.
Q. Okay. And now, where did you make a notation that you were going to send him to the optometrist?
A. Well, in the doctor's order sheet.
Q. So it would not occur on this?
A. It's written here, too, but that's just extra.
Q. When you say it's written here, too --
A. Here. See where it says without glasses? So that's important. If he's looking through his glasses, he should go back to the optometrist and get some others, maybe another exam.
Q. Okay. Do you see to the right of the word glasses you've written the word see, s-e-e?
A. Yes.
Q. And if it's easier to refer to the next page --
MR. PALOMBO: Maybe we should look at this on the next page. It's right here. This is underneath -- this is --
A. Oh, yes. See. Oh, yes. Yes.
Q. What's to the right of the word see?
A. D, period, O, period. Should be.
Q. What does that mean?



A. See doctor of optometry.
Q. Now, after making that notation, whose job is it to line him up with an optometrist?
A. The nurse.
Q. And do you know which nurse was helping you when you conducted the examination on --
A. No. I don't know. I can see on the order sheet who signed it off so the patient would go to see Dr. Smiley.
Q. And Dr. Osei, was he one of these visiting physicians in September of 2001?
A. No. He wasn't visiting. He was full time as a matter of fact, yes.
MR. DIMAIO: I think I can take a break now. I know it was asked earlier. I know your son would like that as well.
MR. CARROLL: That would be great.
MR. DIMAIO: Is that a diplomatic way of putting that?
MR. CARROLL: That is very diplomatic.
THE WITNESS: Thank you.
MR. DIMAIO: We all agree that the deposition may be reconvened at a future date? We're all going to work on that?
MR. PALOMBO: Yes. Yes.





092be678-1d39-4499-9ed2-bb7bf134d938