time that she's been a nurse at the Department of Corrections.

MR. DIMAIO: I reserve the same right, and I make an oral motion compelling the State to provide that information.

MR. PALOMBO: I make an oral response to the motion with the objections that I previously stated.

Q. And now, who are you presently employed for?
A. State of Rhode Island, Department of Corrections
Q. And what's your position?
A. Registered nurse.
Q. And how long have you occupied that position?
A. Seven years.
Q. So you began in the position as a registered nurse with the State of Rhode Island since roughly 1999; is that fair to say?
A. Probably close to 1996.
Q. Is it fair to say you've been employed as a registered nurse for the Department of Corrections for just about twelve years then; is that fair to say?
A. Well, I had a different position, a different capacity.
Q. Okay. I'm going to get to those. So your present position, you have been employed for six years with



the Department of Corrections; is that correct?
A. Well, if we -- I don't know when I took over the position.
Q. Why don't you explain how long -- explain the chronology you're referring to.
A. I came to work in 1992 as a nursing supervisor. I stayed in that position for approximately four years, at which -- at the end of which I became a registered nurse for the Department.
Q. So at the end of that nursing supervisor position, you're a registered nurse, and that's the position you still hold today?
A. Yes. So we're looking at what? '96. So I've been a nurse for ten years through the Department.
Q. So for sure in the year 2000 you held your present position?
A. Yes.
Q. Correct? And for sure in the year 2001 you held your present position?
A. Yes.
Q. And likewise 2002, correct?
A. Yes.
Q. Okay. And had you received any specific education relative to a condition known as hydrocephalus?
A. No. Other than what you get in normal nurse's



training.
Q. And what training would that have been?
A. We take a course in pediatrics. It lasts about three months. We learn all the childhood diseases at that time. So if we touch on it for two classes, one class, when you're looking at 200 different illnesses of pediatric children.
Q. Okay. So you understand hydrocephalus is something that you're born with for the most part? Is that what you're referring to?
A. Yes. It's an infants' disease.
Q. What does the word chronic mean to you?
A. Chronic. Ongoing.
Q. So is hydrocephalus a chronic disease to you?

MR. PALOMBO: Objection, but you can answer.

A. There are two kinds of hydrocephalus. There's communicating and non-communicating. One that is communicating is no longer chronic.
Q. Why do you say it's no longer chronic?
A. Because the body has found a pathway for the extra cerebral spinal fluid to manage to get out of the brain.
Q. When you say the body has found, are you referring to the body on its own has found a pathway?



A. Yes.
Q. And therefore if there was some human intervention to create the pathway, is that within the category of non-communicating?
A. Yes.
Q. Okay. And now, your duties in 2001, were they the same as they are today?
A. Yes.
Q. Okay. And what were your duties in 2001 as they related to inmate care?
A. I dispensed doctors' ordered medications in the morning. I assist the doctors in clinic. Pretty much act as a secretary, and do -- wait for emergencies to happen.
Q. So in 2001, was there a particular building that you went to work at?
A. High Security.
Q. Okay. And did you also perform services at Intake Service Center?
A. On occasion.
Q. Which events would cause you to do -- perform services in the Intake Service Center?
A. Because I had a small facility, they frequently called on me to go out and assist in other facilities. It would probably be for one or two hours in the





37d3f74d-e84c-497e-a43c-ad70ac227fc2

morning, and it occurred once or twice a week.
Q. Okay.
A. And it would include all the other buildings, women's, medium two.
Q. When they call you to assist, it would be to perform the very same duties that you've just listed, correct?
A. It depends on the needs of the facility. I would do whatever they asked of me. It might be sitting with the doctor and transcribing orders. It might be doing treatments for the day.
Q. Okay. In 2001, can you recall occasions that you performed services in the Intake Service Center?
A. Sure.
Q. Okay. And what duties did they include at the Intake Service Center?
A. That would be to do treatments. That's normally what they had me do there.
Q. And what were treatments?
A. Dressing changes, I.V. infusions, giving shots that were done on a weekly basis.
Q. What about dispensing medicine?
A. Not usually. In fact, I don't think I've ever had to dispense medicine there.
Q. Okay. What about assisting physicians?
A. No.



Q. What about -- earlier you used the term dispense doctors' orders. Do you recall that term?
MR. PALOMBO: Objection. You can answer.
A. Dispense doctors' orders?
Q. Yes.
A. I would -- I would -- what's the word I'm looking for? Cosign them and carry them out, whatever doctors' orders are written.
Q. So would you cosign and carry out doctors' orders in the Intake Service Center in 2001?
A. No.
Q. So that was not one of your duties at the Intake Service Center in 2001?
A. No.
Q. And so that I understand what a physician is, are there other individuals that are not M.D.s but physician extenders that you would include in the term physician?
A. Yes.
Q. Okay. Would that term include Nurse Barbara Carroll?
A. Yes.
Q. Okay. Do you know Barbara Carroll?
A. Yes, I do.
Q. How long have you known Barbara Carroll?



A. Since 1992.
Q. Do you recall working with Barbara Carroll on occasion?
A. Yes.
Q. Okay. And assisting her in her capacity as a physician extender?
A. Yes.
Q. That would be the same type of assistance that you would give a physician, correct?
MR. PALOMBO: Objection. You can answer.
A. No.
Q. How would it be different from the type of assistance you would give a physician?
A. Barbara Carroll did physicals. I would prepare the inmate for a physical. That was all -- the only time I ever worked with her was for that purpose.
Q. And do you recall if there -- if in 2001 there was any document that would be generated that would help you remember if you prepared a particular patient?
MR. PALOMBO: Objection. You can answer.
A. There is a document, but my name would not be on it.
Q. Would your handwriting appear on that document you're



thinking of?
A. The only thing that would be on there that would be in my handwriting would be numbers.
Q. What document are you thinking of?
A. The physical form.
Q. What type of numbers are you thinking of?
A. Temperature, pulse, respiration, blood pressure, eye exam.
Q. When you say eye exam, is that because you would perform the eye exam?
A. Yes.
Q. And then after you performed the eye exam, the inmate would see the physician or the nurse extender?
A. Yes.
Q. And now, do you recall preparing a Richard Moreau for a physical in September of 2000 -- in September of 2001?
MR. PALOMBO: Objection.
A. No.
MR. PALOMBO: Objection. You can answer. And let me just mention, Nurse Hale, just take a second before you answer in case I want to raise an objection, and then you can go ahead and answer. Okay?
A. Thank you. No. I do not remember.

Q. Okay. And do you know whether Barbara Carroll would conduct her own eye exam?
A. Yes.
Q. And would she conduct eye exams for the patients she was conducting a physical examination on?
MR. PALOMBO: Objection. You can answer.
A. I think so.
Q. And do you recognize the handwriting on this document?
A. I see her signature. I thought she writes larger than that. I don't recognize anything on here as belonging to one person or another. I don't have much experience with seeing her physicals.
Q. Okay. Now, what's the purpose of the area marked intake data approximately two thirds of the way down the sheet?
A. What in particular are you asking for? The vision?
Q. You see two bold lines running parallel from left to right on that sheet roughly two thirds down, correct?
A. Yes.
Q. And in that area in large bold print there are the words intake data, correct?
A. Right. Yes.
Q. And what's the purpose of the markings -- what's



the -- strike that. What's the normal use of making markings in that area on this form?
MR. PALOMBO: Objection. You can answer.
A. Well, let's see. It says mammogram. That would be whether or not he had it done. Whether there was a tetanus that was up to date, what some of the lab tests that would have been performed. There is a vision, place to write down vision.
Q. Okay. And if there were instructions that resulted after a physical examination, where should that be marked on this sheet?
MR. PALOMBO: Objection. You can answer.
A. It would not be marked on this sheet.
Q. Why not?
A. Because this is a history and exam form. Any instructions would have been written on the doctor's order sheet.
Q. Now, was it normal practice for a nurse to assist either a physician or a physician extender in 2001 while conducting a physical examination?
MR. PALOMBO: Objection. You can answer.
A. No.



Q. And if a physician or a physician extender needed to make some type of further direction after a physical, that would be noted only on the physician order form; is that correct?
A. That's correct.
Q. Okay. And it should not be noted on this physical examination form; is that correct?
A. The -- there may be a statement or a notation of a problem. Below the intake data there is a list, a place for problems, but it wouldn't -- there wouldn't be anything on here about what they were going to do about the problems.
Q. Okay. And do you see the area under the intake category that says plan, indicate if priority?
A. Yes.
Q. What's the -- in 2001 what was the normal use of that area of this form?
MR. PALOMBO: Objection. You can answer.
A. Well, I guess it would be to put down how an inmate would be taken care of a problem.
MR. PALOMBO: I move to strike the answer.
Q. And now, do you see the portion that says chronic care clinic below the problems in the plan area?



A. Yes.
Q. Okay. And do you see a check mark in the yes area?
A. Yes.
Q. Okay. What's the purpose for checking that off on this form?
MR. PALOMBO: Objection. You can answer.
A. Well, I don't really know. I mean, she must have had a reason. It says medical.
Q. What was the normal use in 2001 of the chronic care clinic portion of this form?
MR. PALOMBO: Objection. You can answer.
A. I don't know. I don't know what you're asking me.
Q. After a physical had you experienced reviewing these forms in 2001 in general?
A. No. I don't in general review them.
Q. Okay. After -- are you familiar with the standard practice of physicians or physician extenders in 2001 for the processing of this form after a physical?
A. The practice of --
Q. Yes. What were they supposed to do with this form after they finished the physical.
A. They put it in the chart.
Q. That's it? Just put it in the chart?

whether you attended any examination by Dr. Figueroa on November 15, 2001?
A. No, I do not.
MR. DIMAIO: I'm going to hand to you the next document that I'd ask be marked as Plaintiff's Exhibit 6.
(PLAINTIFF'S EXHIBIT 6 MARKED FOR IDENTIFICATION)
Q. It's fair to say that this is Mr. Moreau's -- a copy of one page from Mr. Moreau's dental chart; is that correct?
A. It says dental at the bottom. I'm not familiar with these forms. I don't usually read them.
Q. Okay. And the signatures on the right, do you recognize any of those signatures as your handwriting?
A. No.
Q. So the entry on September 10, '02 is not yours, correct?
A. No. That's -- I know that person.
Q. Okay.
(PLAINTIFF'S EXHIBIT 7 MARKED FOR IDENTIFICATION)
Q. I'm handing to you what's been marked as Plaintiff's Exhibit 7. Is any of the handwriting on that sheet your handwriting?
A. No.
Q. Whose handwriting do you recognize that to be?



A. I -- I can read the signature, but I am not familiar with his handwriting per se.
Q. Okay. Do you recognize the form that's in front of you?
A. Yes.
Q. It says request for eye examination, correct, at the top?
A. Yes. That's what it says, but it's an odd thing to put there.
Q. Is this a copy of some type of form that an inmate would pass in if requesting an eye examination?
A. No. The inmate would have no access to this type of form.
Q. So for sure, if he wanted an eye examination it would not belong on this form?
A. That's correct.
Q. That's true in 2001?
A. That's correct.
Q. If he needed an eye examination in 2001, it should only be through the methods that you described earlier, correct?
A. It would go on a medical slip or a doctor would refer him.
Q. I'm done with that form.
(PLAINTIFF'S EXHIBIT 8 MARKED FOR IDENTIFICATION)



Q. I'm now handing you Plaintiff's Exhibit Number 8. This one bears a date of examination of October 29, 2001, correct?
A. Yes.
Q. And again, this is an -- a request for eye examination form, correct?
A. Yes.
Q. Okay. And do you recognize the handwriting on this form?
A. I recognize the signature. I'm not familiar with the handwriting.
Q. Is any of the handwriting on this form yours?
A. No.
Q. Would you assist Dr. Smiley in eye examinations in 2001?
A. No.
Q. I'm done with that form.
(PLAINTIFF'S EXHIBIT 9 MARKED FOR IDENTIFICATION)
Q. Okay. You're now reviewing Plaintiff's Exhibit Number 9, correct?
A. Yes.
Q. Okay. And do you recognize any of the handwriting on that form?
A. Yes.
Q. Okay. And what handwriting do you recognize?



A. My own.
Q. And where do you see your own handwriting?
A. The inmate name, ID, date of birth, security, at the consultation to, requesting physician, request -- date of request, current meds, allergies, and my signature.
Q. Okay. And who else -- who -- who else's handwriting do you recognize on this form?
A. I could take a guess, because the signature is not --
MR. PALOMBO: I -- I -- I -- I object, but -- I guess that I object to you guessing, but if you think you have some reasonable basis for your answer, then please go ahead.
A. The only basis on my answer is it looks familiar to other things that we have looked at this morning.
Q. Okay. You're referring to the markings made in the signature of consultant box at the bottom of the form; is that correct?
A. No. I'm referring to the content of the report of consultant, because the signature at the bottom is not similar to one I've seen. Well, it's not a good signature of, a recognizable signature of one I have seen from this person.
Q. When you say report of consultant, I'm looking on this





37d3f74d-e84c-497e-a43c-ad70ac227fc2