blank piece of paper, we will simply mark that to reserve it as any portions of your calendar which we need to photocopy at the conclusion of your deposition. Is that okay?
A. Yes. It's okay.
(PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)
Q. I'm going to write on this, Redacted copies of -- I guess you call it patient calendar. Is that what you call it?
MR. TATE: Office calendar.
A. Office calendar.
Q. And those are the only documents that you brought, what you thought were responsive to the Exhibit A, correct?
A. Correct.
Q. Okay. Now, you've filed responses to requests for production in this case, correct?
A. Correct.
MR. DIMAIO: And I'd ask this be marked.
(PLAINTIFF'S EXHIBIT 5 MARKED FOR IDENTIFICATION)
MR. TATE: I'm not sure we filed these, but it doesn't matter. You can ask him to identify it. I think they pertain to him. I don't think we filed them. Doesn't really matter I suppose.



MR. DIMAIO: I think it was attached to his Answers to Interrogatories.
MR. TATE: Oh, it was? Whatever.
MR. DIMAIO: I keep the envelope.
MR. TATE: No problem. Let's go. Whatever you say.
Q. Now, do you recognize what's been marked for identification as Exhibit 5?
A. Yes.
Q. Okay. What is that document?
A. Okay. This is a notice of an award of the bid that I applied for for the on-site care.
Q. Now, this applies for a bid award after January 28, 2003, correct?
A. Correct.
Q. All right. Do you know whether you have any documents which are available to you that control any bid award that would apply for the fall of 2001?
A. No. I don't have any.
Q. You made a look for it pursuant to our request and you couldn't find anything; is that correct?
A. Yes. Yes.
Q. Just so that we understand my language for future questions, when I say fall of 2001, will you agree that under that you understand that to mean the months



of September 2001, October and November 2001?
A. Yes.
Q. Okay. And this Exhibit 5 is a copy of a bid award not for the fall of 2001, but is it in all other material respects the same as that which would have applied for the fall of 2001?
MR. TATE: I object to form. You may answer if you understand the question. Go ahead.
A. I really don't remember receiving this on those other years. It would just be -- I remember a letter from the administrator saying that, you know, I was approved and so forth, and this is the first time there was a bid award for a five-year period.
Q. So it's fair to say that Exhibit 5 in no way has anything to do with any of the events of the fall of 2001, correct?
A. Correct.
Q. It had nothing to do with controlling any part of any service that you rendered to any inmate, correct?
A. Correct.
Q. And none of the concepts or terms or language or more specifically the terms and conditions of pricing agreement sheet did not apply in the fall of 2001, correct?
A. I think it was -- I don't think it applied.



Q. Okay.
A. But in other words, I don't remember receiving a form like this. It was just, you know, over the phone telling my receptionist how to bill and so forth and -- but I don't remember, you know, receiving this.
Q. Now, drawing your attention to the lower left-hand corner of that last sheet that has the words terms and conditions of pricing agreement, do you see a date reference of 7/25/01?
A. Yes.
Q. Does that refresh your recollection as to whether this terms and conditions of pricing agreement would have controlled any pricing or billing or invoicing arrangement you had with the State of Rhode Island during the fall of 2001?
MR. PALOMBO: Objection.
MR. TATE: I object to form. You may answer.
A. I really don't know. It could have, but I really don't.
Q. Just don't remember?
A. I don't remember.
Q. Now, getting back to your educational history?
A. Yes.
Q. After UMass Dartmouth --

Page 42

Q. Office calendar?
A. Office calendar.
Q. Okay. Before today you had a chance to review your office calendar, at least the pages that you brought with you for today, correct?
A. Yes.
Q. And those pages that you brought with you encompass what dates, please?
A. All of September and all of October.
Q. Okay. And before today's deposition, did you examine each day, without having you speak all the names of the patients, did you examine each day for September and October to make sure that this billing record that appears as Exhibit 3 is accurate?
A. Yes.
Q. Okay. And you're satisfied that there are no other occasions that you saw Mr. Moreau during that time period of September and October 2001, correct?
A. Yes.
Q. And you're also satisfied that there are --
MR. TATE: No other occasions other than -- you're talking about all of September?
MR. DIMAIO: I'm clarifying right now.
MR. TATE: Okay. Thank you.
MR. DIMAIO: I'm getting there.

Page 43

Q. You're satisfied that the only time you went to Intake Service Center in the month of October 2001 was October 29, 2001; is that correct?
A. Yes.
Q. And now, I note on the bottom of the second page of Exhibit 3 you have three groupings of dates, that being October 1 through 19, October 23 through the 11th, and October 29 through the 7th. Do you see that?
A. I see October 1, October 23, and October 29.
Q. And therefore, have I misinterpreted the significance of the number to the right of, for example, October 1 there's a 19?
A. 19 patients seen.
Q. Got you. Now, what we have here is a redacted copy of the full version, correct?
A. Correct.
Q. And therefore, for each and every instance where we see a listed number, and drawing your attention to those below October 1, 2001, we see 19 numbers represented there, correct?
A. Correct.
Q. And we're to understand that on each occasion that we see a number you actually saw a patient, correct?
A. Yes.

Page 44

Q. So therefore, for example, you did not see ten but the list went up to 19, correct?
A. Yes.
Q. You actually saw 19 patients on October 1 at Minimum Security?
A. Yes.
Q. And likewise on October 23 you saw 11 patients, correct?
A. Yes.
Q. And October 29 you saw seven patients, correct?
A. Yes.
Q. And is it that on some occasions inmates are transported to you from different facilities to be seen at a given facility?
A. Yes.
Q. And is that true for October 2001?
MR. TATE: You mean, was that true in October 2001?
A. I don't recall.
MR. DIMAIO: Off the record.
(DISCUSSION OFF THE RECORD)
Q. And was that true for October 29, 2001?
A. I don't recall if they were transported from another facility.
Q. Okay. Was that information that was made known to you

Page 45

at the time? I'll rephrase the question. At the time of your examination of any given patient --
A. Yes.
Q. -- was it typical that they would share with you information to let you know which facility the patient was coming from?
A. Yes.
Q. Actually, now that I think about it, referring your attention to the medical request slip which is an exhibit, Number 7, is there some reference where they would write down the building they were from?
A. Yes. I see a building printed in here.
Q. And you indicated that there would be a list of patients that they would refer to to make sure they showed up for their visit prior to your examination; is that correct?
A. Yes.
Q. And in addition you said that they would use slips as a form of lining up patients for you to examine in the fall of 2001?
A. Yes.
Q. And if you were given some slips, would that be instead of the list that we talked about earlier?
A. No. That would be slips representing the people on the list.





c03cb5e3-d1c2-4f47-835e-b1147d526b4a

Q. Okay. And you indicated that in some instances you were not given slips for an examination in the fall of 2001, correct?
A. Correct.
Q. And more likely than not, why would you have not been given a slip for a patient for an examination?
MR. PALOMBO: Objection.
MR. TATE: I object.
A. I don't know.
Q. Okay. And now, you have brought with you a copy of your billing record for the month of September of 2001, correct?
A. Correct.
Q. And you have that document in front of you now, correct?
A. Correct.
Q. And how many occasions were you in the Intake Service Center for the month of September 2001?
A. None.
Q. And which facilities did you provide services in the month of September 2001?
A. Medium 1.
Q. Were there any other facilities?
A. No.
Q. Okay. And now referring to the pages of your



September 2001 calendar that you brought with you, can you tell me were there any occasions in September that you were scheduled to go to the Department of Corrections for examinations beside the occasion at Medium 1?
A. No. No other occasions.
Q. Could I have Number 4, please. May I have Exhibit Number 2? That's the September billing record I assume. Based upon Exhibit 2, you only performed optometry services on one day for the whole month of September 2001; is that correct?
A. Correct.
Q. Let me rephrase that. You only performed optometry services at the Department of Corrections on one day in the month of September 2001, correct?
A. Correct.
Q. Okay. Were there other days from your office calendar that you were scheduled to perform services at the Department of Corrections for the month of September 2001?
MR. TATE: Isn't that the question he just answered?
MR. DIMAIO: Off the record.
(DISCUSSION OFF THE RECORD)
A. No.



Q. Now, during the month of September 2001, it was then your normal practice to make weekly visits, was it not, at the Department of Corrections?
A. Yes.
Q. And was there some explanation why you were not performing weekly visits in the month of September of 2001 as you had testified to earlier?
A. Yes.
Q. What was the reason?
A. Okay. Monday, September 3 was the Labor Day holiday.
MR. TATE: Actually it was no labor day.
THE WITNESS: Oh, right. Very good. Very good.
MR. TATE: It is Friday afternoon.
MR. DIMAIO: Now, you're putting that on the record, right?
A. Okay. September 10, I've got no ACI, and what that generally means is I called and they didn't have anywhere for me to go to, because I look forward to going. And now September 17, I was at Medium 2. September 24, I've not no ACI. And September 24 is the last Monday of September.
Q. So in the fall of 2001, your normal practice was to go



on a Monday, correct?
A. Correct.
Q. And you testified from your calendar that September 17 you were at Medium 2; is that correct?
A. Correct.
Q. And now, looking at your billing record for September 17, 2001, that indicates Medium 1, correct?
A. That indicates Medium 1. And why? It could be because the equipment is always there that they -- from the time the week before when I put Medium 1 down there, they could have called me and said, we've got a change in plans. I want you at this facility instead.
Q. So are you suggesting that there was some habit of scheduling your visits at a place where the equipment already was in the fall of 2001?
A. Yes. And see, the equipment, there's a permanent setup of equipment at Medium 1. And that's always a fallback place to go to if the equipment cannot be moved to another facility, if they have patients for me to see at Medium 1.
Q. Now, if there was a need to be seen on a more frequent basis than once a week, was that something that you did in the fall of 2001?
MR. PALOMBO: Objection.
MR. TATE: Objection.

Q. And now, to the right of those observations you wrote some language. Would you read what you wrote, please.
A. Under assessment I put unexplained vision loss, and I had suspicion -- I used the wrong term, S/P optic neuritis.
Q. When you say you used the wrong term, which term are you exactly referring to?
A. Instead of S/P I should have written suspicion of optic neuritis.
Q. Now, what is neuritis?
A. Inflammation of the nerve, optic nerve.
Q. And you anticipated my next question. So therefore, optic neuritis is inflammation of the optic nerve and the -- I'm sorry. Yes?
A. Yes.
Q. And the significance of the word optic is to refer to the actual nerve, not the eye, correct?
A. Correct.
Q. Okay. And when you say suspicion, why do you recall today that you should have written the word suspicion?
A. Because I never write, I mean, S/P is not a common term that I use, and --
Q. Let me ask you to carefully scrutinize that handwriting. Is that in fact your handwriting?
A. This is my handwriting.



Q. Are you familiar with medical abbreviations?
A. I'm familiar with some.
Q. Okay. Have you seen the abbreviation S, slash, P used in a medical context?
A. No.
Q. Okay. Do you use an abbreviation to convey the words status post?
A. No.
Q. So you would not know what that abbreviation looks like?
A. Correct.
Q. Okay. So if I told you that it looked just like the S/P that you wrote, you would tell me that's purely coincidence, correct?
A. Yes.
Q. Okay. And the message you intend to convey is that this S/P means suspicion?
A. Suspicion, yes.
Q. Now, underneath this assessment what did you write?
A. I put under plan, refer to Dr. Figueroa.
Q. And what timetable did you assign for this referral?
A. I brought it to the attention of the nurse and asked her to quickly schedule Mr. Moreau to talk to Figueroa.
Q. Now, when you say quickly schedule, is there a



notation on this form that conveys quickly?
A. There is no notation.
Q. How do you know today that you instructed her to do it quickly?
A. I just know that my -- in other words, his vision has dropped drastically. You know, my heart begins to beat faster. I just -- I just know.
Q. And when you say quickly, in terms of minutes? Hours? Days or weeks? What time frame did you convey --
A. Days.
Q. -- to the nurse?
A. Couple of days.
Q. Are you familiar with the term atrophy?
A. Yes. Somewhat.
Q. Okay. And what is optic atrophy?
A. Well, long-term inflammation will create optic atrophy, and when you look at the optic nerve head --
MR. TATE: He asked you what optic atrophy was. Can you explain what optic atrophy is.
A. Optic atrophy is long -- it is the optic nerve head would, instead of being a normal, small, nourishing vessel in it, it would be -- they would be nonexistent, and so the -- it would be pale white.
Q. Is this a condition that you were trained to observe in 2001?



A. I'm trained to look for departures from normal, and I am trained with the proper equipment. I -- yes. I am trained.
Q. Okay. So in October of 2001, what equipment would you need to make observations indicating optic atrophy?
A. Well, I view my role as basically as a triage person. In other words, the ophthalmologist is better qualified to view that and take it one step higher. So you know, I -- when in doubt, refer. And I'm trained to determine departures from normal, and that's basically what I did.
Q. Okay. So it's fair to say the higher the level of doubt, the quicker the amount of expediency you would make for an outside referral?
MR. TATE: Objection.
Q. Now, what equipment would you use to observe optic atrophy in October of 2001?
A. I would use my ophthalmoscope.
Q. Which ophthalmoscope? The monocular one?
A. Monocular.
Q. What observations would you make if you noticed atropic conditions present, being present?
MR. TATE: Objection. You may answer.
A. If I -- if there was an enlarged view, a very enlarged view, and I could see or -- the presence or





c03cb5e3-d1c2-4f47-835e-b1147d526b4a