**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

RICHARD MOREAU )
)
vs. ) **C.A. No.:04-059S**
)
STATE OF RHODE ISLAND, et. al. )

**PLAINTIFF'S PRE-TRIAL MEMORANDUM**

Now comes the Plaintiff in the above-entitled matter and for his cause does hereby submit his pre-trial memorandum as follows:

**A) In support of his claim, Plaintiff expects to prove the following:**

**1. Negligence[1]:**

Plaintiff expects to prove he was injured as a result of the Defendant's negligence. Plaintiff was admitted to the adult correctional facility in the fall of 2000. That year, in September 2000, Plaintiff was examined by the eye doctor, and his vision was fine, "20/40" corrected by ordinary glasses for perfect vision. Plaintiff went from fine vision to permanent blindness in the fall of 2001 because of the Defendant's negligence.

Defendant made a medical mistake either by (1) ignoring the Plaintiff's complaints in light of Plaintiff's known medical history of hydrocephalus, and despite his specific request for an eye doctor; or by (2) failing to make the medical referral to the eye doctor when it was

---

1 Plaintiff's Amended Complaint originally raised three (3) causes of action against several defendants both in their individual and official capacities. As a result of pre-trial motion

appropriate, regardless of the Plaintiff's known prior medical history; or by (3) making the wrong medical decision regarding the length of time for before Mr. Moreau would get to see the optometrist; or by (4) a combination of all previous three. Either or all mistakes in combination were entirely within the Defendant's control and were the proximate cause of the Plaintiff's permanent blindness and damages.

**2. Witnesses (not necessarily in the order of their expected testimony):**

**a) Plaintiff:**

Richard Moreau is expected to testify consistent with his deposition testimony and facts further elaborated in Plaintiff's Pre-trial Memorandum of Law. His testimony may include some or all of the following:

(i) A history of his physical conditions –specifically including hydrocephalous;

(ii) A history of his incarceration and a chronology of his interactions with the Defendant's agents and employees regarding his medical and health care; including those with the Health Care Administrator before September, 2001.

(iii) Submission of a Medical Request Slip in September, 2001

(iv) Concerns regarding growing vision deterioration and problems related to growing vision deterioration after submission of a Medical Request Slip in early September 2001.

(v) Correspondence between himself and the Health Care Administrator after September, 2001 and the events and facts referenced therein;

(vi) Examination and communications on September 26, 2001;

---

practice, the only count viable for trial is "Count I" for Negligence. The State of Rhode Island has been substituted for all individually named Defendants.

(vii) Subsequent communications regarding his vision;

(viii) Growing feelings of concern and anxiety;

(ix) Examination by the optometrist on October 29, 2001;

(x) Subsequent medical treatment and surgery;

(xi) Damages: Feelings, thoughts, concerns, and worries regarding his injuries and changes in life style, work aspirations, personal safety, and loss of life's enjoyment associated with permanent blindness.

**b) Dr. Thomas Hedges:**

Dr. Hedges is expected to testify as an expert consistent with his report/disclosure which is attached hereto, for ready reference, as Exhibit A.

Dr. Hedges is available with a minimum of three (3) weeks notice to allow for patient rescheduling. In addition, due to personal commitments, Dr. Hedges is not available from May 23, 2007 through June 19, 1007.

**c) Dr. Edward A. Blanchette:**

Dr. Blanchette is expected to testify as an expert witness consistent with his report/disclosure which is attached hereto, for ready reference, as Exhibit B. He is available with a minimum of three (3) weeks notice, however is more comfortable with one-month advance notice. Dr. Blanchette has no personal vacation planned for the next few months.

**d) Defendant, Nurse Barbara Caroll,**

If called by Plaintiff, Nurse Carroll, a nurse practitioner, is expected to testify either through live testimony or based upon her transcript depending on her availability[2]. In summary, and without limitation, that testimony encompasses the seriousness of all vision complaints, the sentiment in the profession that no one should have to go blind, that she referred the Plaintiff to the Optometrist, and that vision related complaints should be seen by the visiting optometrist within five days of the complaint. Her testimony may in addition include some or all of the following:

(i) The nature of her professional relationship with the Defendant;

(ii) Her background, education, training, skill, and experience;

(iii) Her job functions;

(iv) Actions regarding the Plaintiff's medical care;

(v) The Medical Request Slip

(vi) The September 26, 2001, "Health Services -Hx and Pe Form"

(vii) The Physician Order Form;

(viii) The level and standard of care within the profession associated with vision related complaints; and more specifically that level and standard of care which should have been followed in the Plaintiff's case;

---

2 Barbara Carroll appeared for a deposition on January 17, 2006, in a wheel chair attended by her son, Attorney John Carroll, Esquire. Shortly after Attorney Carroll requested, the deposition was suspended. Based upon information provided by the Defendant's counsel, it is believed that due to her health issues, her trial testimony may be restricted to her deposition transcript.

(ix) The five (5) day period regarding referrals to the optometrist;

(x) The referral of the Plaintiff to an optometrist;

(xi) And otherwise regarding her professional observations, thoughts, and opinions regarding the treatment she rendered to the Plaintiff and the course of conduct and/or further treatment she indicated and/or intended to order;

**e) Correctional Officer Jeffrey Laurie:**

If called by Plaintiff, Officer Laurie is expected to testify either through live testimony or based upon his transcript depending on his availability. In summary, and without limitation, that testimony encompasses his observations, dealings, and communications with the Plaitniff in the fall of 2001, and Plaintiff's complaints regarding his vision. His testimony may in addition include some or all of the following:

**f) Defendant, Nurse Marylyn Hale[3] (Grejdus):**

If called by Plaintiff, Nurse Hale is expected to testify either through live testimony or based upon her transcript depending on her availability. In summary, and without limitation, that testimony encompasses her actions regarding the scheduling and transfer of the Plaintiff for his October 29, 2001 appointment with the optometrist. Her testimony may in addition include some or all of the following:

---

[3] It is understood by the parties that this person changed her name and will be referred to by her present last name of "Hale".

(i) The nature of her professional relationship with the Defendant;

(ii) Her background, education, training, skill, and experience;

(iii) Her job functions;

(iv) Actions regarding the Plaintiff's medical care;

(v) The Medical Request Slip

(vi) Standard protocol regarding use of different medically relevant sheets and forms such as the "Health Services -Hx and Pe Form", and the Physician Order Form

(vii) Plaintiff's September 26, 2001, "Health Services -Hx and Pe Form"

(viii) Plaintiff's Physician Order Form regarding his medical care in September and October of 2001;

(ix) And otherwise regarding her professional observations, thoughts, and opinions regarding the treatment she rendered to the Plaintiff and the course of conduct and/or further treatment she indicated and/or intended to order;

**g) Dr. Harrison Smiley:**

If called by Plaintiff, Dr. Smiley is expected to testify as a witness, either through live testimony or based upon his transcript depending on his availability[4], consistent with, and not limited to, his deposition testimony. In summary, and without limitation, that testimony may encompass some or all of the following:

(i) The nature of his professional relationship with the Defendant

(ii) His background, education, training, skill, and experience;

---

4 Plaintiff's counsel has communicated with prior counsel representing Dr. Smiley, whom indicates that testimony by way of the deposition transcript would be preferable.

(iii) The manner in which eye appointments for persons serving a period of incarceration are scheduled by the Defendants;

(iv) His actual schedule and availability and presence at different correctional facility buildings during the months of September and October of 2001.

(v) Knowledge regarding the transportation of patients from different correctional facility buildings;

(vi) The manner in which the October 29 eye appointment with the Plaintiff was scheduled and conducted;

(vii) Professional observations, thoughts, and opinions[5] regarding the treatment he rendered to the Plaintiff and the course of conduct and/or further treatment indicated;

(viii) Causation and prognosis consistent with his professional observations, thoughts, and opinions[6] regarding the treatment he rendered to the Plaintiff and the course of conduct and/or further treatment indicated;

**h) Defendant, Joseph Marocco:**

If called by Plaintiff, Joseph Marocco is either expected to testify through live testimony or based upon his transcript depending on his availability. In summary, and without limitation, that testimony encompasses his education, skill, training, and experience and personal knowledge of the particular risk of blindness that Mr. Moreau was probably was not aware, the defendants prior

---

5 Doctor Smiley was not specifically identified or retained as a trial expert. It is, however, expected that he will testify consistent with his deposition testimony and will otherwise render his professional opinions consistent with the reasoning outlined in Rutkowski v. Providence College, 2006 U.S. Dist. LEXIS 86182 (D.R.I. 2006).

6 Id., FN 5

knowledge of Mr. Moreau's hydrocephalus condition, the health care communications and actions taken in light of the Defendant's knowledge and despite Mr. Moreau's September 17, 2001 desperate request for an eye doctor. His testimony may in addition include some or all of the following:

(i) The nature of his professional relationship with the Plaintiff;

(ii) His background, education, training, skill, and experience;

(iii) His job functions;

(iv) Knowledge of the Plaintiff and prior dealings and communications with the Plaintiff regarding his medical care;

(v) Actions regarding the Plaintiff's medical care;

(vi) The Medical Request Slip

(vii) Knowledge of hydrocephalus and complications, including vision loss, associated with hydrocephalous;

(viii) Expectations regarding the Plaintiff's understanding of the complexities of his own medical condition.

(ix) Communications with the Plaintiff and others regarding the Plaintiff's medical care.

**i) Additional Witnesses:**

Additional witnesses may be called for purposes of admissibility of any document, and its contents, which the Defendant may challenge. These potential additional witnesses may include, without limitation, keeper(s) of records, and/or medical care provider(s) or other person(s) with personal knowledge of any information contained in any challenged document.

**B) Memorandum of supporting law:**

See attached "Plaintiff's Pre-Trial Memorandum of Supporting Law"

**C) Plaintiff's Trial Exhibits:**

| **Exhibit Number** | **Descriptive Reference** | **Purpose(s) Offered** (without limitation) |
|---|---|---|
| 1. | Medical Entrance Exam | Offered as an Admission as to Defendant's observations and knowledge. Shows notice by the Defendant's of Plaintiff's medical condition and status of health upon admission. |
| 2. | 9/17/00 eye examination | Offered as an Admission as to Defendant's observations and knowledge. Shows notice by the Defendant's of Plaintiff's medical condition and status of vision prior to the incident. |
| 3. | 10/24/00 letter from Plaintiff to the Medical Director | Notice regarding the need for special care and attention related to Plaintiff's hydrocephalus and his shunt |
| 4. | 11/15/00 letter from Joseph Marocco | Additional admission regarding defendant's further notice through its Health Care Administrator of the Plaintiff, his hydrocephalus condition and its needs |
| 5. | Health Care Request Form | Offered as an exemplar of the medical request slip submitted by the Plaintiff when he initially complained of decreasing vision, and requested a visit with the eye doctor |
| 6. | Policy 18.31 | Written procedure regarding use of a Medical request slip/form. |

| | | |
|---|---|---|
| 7. | 9/17/01 letter from Plaitniff to Joseph Marrocco | Notice regarding growing concerns with recent vision loss, concerns regarding reprimand on work details; and a desperate plea for an appoint with the eye doctor. |
| 8. | 9/26/01 Examination form and notes taken by Barbara Carroll | Offered as an Admission, in conjunction with Barbara Carroll's testimony, and to show notice of the Defendant's observations and communication with the Plaintiff, and again, of the growing vision problem in conjunction with the Plaintiff medical condition; and that a referral to the eye doctor was appropriate. It is significant for notations made thereon, and to show an ineffective eye doctor referral. It was completed in a negligent manner which may have contributed to the Plaintiff's blindness. |
| 9. | Policy 18.37 | This establishes the standard protocol to ensure clinical treatment in correctional facilities is performed pursuant to written or telephone order. |
| 10. | Plaintiff's "Physician Order form" for 9/5/01 through early 2002. | This shows an absence of any entry as a result of Barbara Carroll's 9/26/01 examination and intended referral. It shows she did not do her job per her own admission that the referral to the eye doctor had to be made on this sheet. |
| 11. | 9/26/01 letter from Joseph Marocco | This document demonstrates the Defendant's actions, through its employees, in scheduling of Plaintiff for a visit with the eye doctor on 10/29/01. |
| 12. | 10/14/01 Letter from Plaintiff to Marrocco | Additional notice of Plaintiff's concerns regarding vision deterioration. |
| 13. | 10/29/01 Eye Examination | Observations and opinions of a treating physician, the eye doctor, regarding Plaintiff's vision deterioration complaints. |
| 14. | 9/17/01 Invoice from the eye doctor to the State | Offered to show the eye doctor's availability in September of 2001, and specifically on 9/17/01. |

| | | |
|---|---|---|
| 15. | 10/30/01 Invoice from Dr. Smiley | Offered to show eye doctor's availability in October of 2001 at a nearby correctional facility building. |
| 16. | 11/5/01 Letter from Joseph Marrocco to Plaintiff | Demonstrates the Health Care administrator's ability to transfer people to the facility where the eye doctor may be on a given visitation day. |
| 17. | 11/29/01 Letter to Plaintiff | Offered to provide a more complete picture of the vision related communications during the relevant time. |
| 18. | Nurse Contact Notes for the Plaintiff from 7/8/00 – 12/24/01 | Provided to give a more complete picture Defendant's awareness of Plaintiff's hydrocephalus, and the of the lack of medical attention given to the Plaintiff despites repeated requests for an appointment with an eye doctor. |
| 19. | Physician Contact notes for the Plaitniff from 3/9/01 – 4/5/02. | Provided to give a more complete picture of the lack of medical attention given to the Plaintiff despites repeated requests for an appointment with an eye doctor. |
| 20. | 1/11/02 treatment note of Dr. Arno Sungarian. | Medical impressions of a treating care provider regarding the likely cause of the vision loss being due to correctible malfunctioning shunt. |
| 21. | 4/22/02 Letter from Anne Fitzpatrick. | Opinion of a treating physician regarding status of Plaintiff's vision as legally blind as of 11/16/01 to the Defendant, through its Medical Program Director and/or Tony Amaral |
| 22. | 5/14/02 RI Hospital Operative Notes | Provides confirmation of the shunt malfunction and blockage. |
| 23. | Life Expectancy Chart | Demonstrates the length of time that the Defendant will have to endure his blindness. |
| 24. | Work Life Expectancy Chart | Length of time that plaintiff would labor without the benefit of vision |
| 25. | Barbara Carroll Deposition | **Reserved** if necessary to provide her testimony in this fashion. |

| | | |
|---|---|---|
| 26. | Harrison Smiley Deposition | **Reserved** if necessary to provide his testimony in this fashion. |
| 27. | Marylyn Hale Deposition | **Reserved** if necessary to provide his testimony in this fashion. |
| 28. | Joseph Marocco Deposition | **Reserved** if necessary to provide his testimony in this fashion. |
| 29. | Joseph Laurie Deposition | **Reserved** if necessary to provide his testimony in this fashion. |

**D) Anticipated motions in limine:**

Plaintiff proposes that motions *in limine* be filed no later than ten days before opening statements. Plaintiff anticipates the need to file the following motions *in limine*:

a) Motion to suppress/preclude testimony regarding the charges for which the Plaintiff is serving an extensive period of incarceration. Plaintiff was convicted of child molestation. That information is unduly prejudicial to the Plaintiff's rights.

b) Motion to preclude Defendant's experts from testifying based on DiPetrillo v. Dow Chem. Co., 729 A.2d 677 (R.I. 1999) and based upon the limitations of the Defendant's disclosures.

c) Motion regarding the applicability of the State tort cap, R.I.G.L.§9-31-2.

**E) Plaintiff's Jury Instructions:**

See Exhibit C

**F) Probable length of trial.**

Plaintiff submits that trial could take from two to five days depending on the need for expert testimony, and exclusive of jury empanelment and hearing on any *in limine* motions.

**G) Additional matters which counsel feels will aid the Court in the disposition and/or hearing of said action.**

Plaintiff submits that a pre-trial hearing and determination regarding the applicability of the state tort cap, R.I.G.L. §9-31-2, may be instrumental in resolving the parties dispute. Plaintiff proposes that the parties reach agreement regarding the value of Plaintiff's damages, which would then be subject to the state tort cap, if at all. This matter would then be resolved through the submission of legal memorandum on the applicability of the tort cap.

Plaintiff,
By Counsel,

/s/ Joseph-Anthony DiMaio, Esq.

Joseph-Anthony DiMaio, Esq. (#3910)
Mckinnon & Harwood
1168 Newport Avenue
Pawtucket RI 02861
(401) 723-9655
(401) 722-9160
contact@mckinnonharwood.com

**CERTIFICATION**

I hereby certify that on Friday, January 26, 2007, a true copy of the within, was served upon the following and in the following manner(s):

**Thomas A. Palombo Esq.**, by electronic means only to " tpalombo@riag.ri.gov".

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RICHARD MOREAU | ) | |
| | ) | |
| vs. | ) | **C.A. No.:04-059S** |
| | ) | |
| STATE OF RHODE ISLAND, et. al. | ) | |

**PLAINTIFF'S PRE-TRIAL MEMORANDUM OF SUPPORTING LAW**

Now comes the Plaintiff in the above-entitled matter and in support of his pre-trial memorandum does hereby submit his brief regarding the law applicable to the within case as follows:

**Facts:**

Plaintiff was born with a condition known as hydrocephalus, or "water on the brain", and required monitoring of his drainage shunt to ensure no harm would result from anticipated blockages. The nature of Plaintiff's incarceration was such that he was sentenced to an extensive period of incarceration. His incarceration began in early 2000. That year, Plaintiff's vision was tested in September, 2000, and was fine, "20/40" corrected by ordinary glasses for perfect vision.

Plaintiff went from fine vision to permanent blindness in the fall of 2001 because of the Defendant's negligence. Plaintiff alleges that his blindness was caused by the Defendant's actions or inactions. The Defendants had actual and constructive notice through written and oral

communications with the Plaintiff regarding a growing vision problem, but failed to respond appropriately under the circumstances.

Plaintiff specifically told the Defendant, though its employees, that his vision was changing and becoming worse beginning in September 2001, and continually through the remainder of that fall. The initial notice was through use of Medical Request Slip submitted by Plaintiff in early September 2001. The Defendant routinely destroyed the Medical request Slip, without recording or other preservation of any information, in violation of state statute. Plaintiff continued to complain about his vision to correctional officers and was getting in trouble on work details because of his growing inability to see. Plaintiff wrote a detailed letter on September 17, 2001 voicing his desperation and need to be examined by the eye doctor.

Instead of being examined by the eye doctor or any doctor, on September 26, 2001, the Defendant had the Plaintiff examined by a Nurse practitioner. The Nurse determined that referral to an optometrist was appropriate, but did not make the appropriate referral. An appointment was scheduled for thirty-three (33) days later, October 29, 2001, more than one month after the September 26, 2001 examination, which was forty-two (42) days after the September 17, 2001 letter to the Health Care Administrator, and nearly two (2) whole months after submission of the medical request slip.

The medical decisions to ignore the Plaintiff's medical complaints, or to delay or not provide care on a timely basis failed to meet the Defendant's own five (5) day period detailed by the Nurse at

her deposition, and failed to comply with the minimum standard of care in light of the facts and circumstances regarding the vision complaint and the grave risk of harm which those facts indicated.

Thus, the Defendant made a medical mistake either by (1) ignoring the Plaintiff's complaints in light of his know medical history and despite his specific request for an eye doctor, or by (2) failing to make the medical referral to the eye doctor when it was appropriate regardless of the knowledge of a prior medical history, or by (3) making the wrong medical decision regarding the length of time for before Mr. Moreau would get to see the optometrist, or by (4) a combination of all previous three. Either or all mistakes in combination were entirely within the Defendant's control and was the proximate cause of the Plaintiff's permanent blindness and damages.

**Issues:**

The pertinent issues are (1) negligence; (2) violation of statute as evidence of negligence; (3) spoliation; and (4) the application of the tort cap.

**1) Negligence:**

In a negligence action the plaintiff must establish that the defendant owed a duty of care to the plaintiff, that the defendant breached this duty of care and that the defendant’s breach of that duty was a proximate cause of the harm or injury about which the plaintiff complains. Montuori v. Narragansett Electric Co., 418 A.2d 5 (1980).

In a medical negligence case, a medical professional is under a duty to use the degree of care and skill that is expected of a reasonably competent practitioner in the same class to which he or she belongs, acting in the same or similar circumstances. Carlson v. Gillie, 723 A.2d 801 (R.I. 1998) and in Sheeley v. Memorial Hospital, 710 A.2d 161 (R.I. 1998).

Since at all material times, Plaintiff was incarcerated at the Adult Correctional Facility, Plaintiff need only show he was serving a term of incarceration in order for the duty to provide medical care to attach. Farmer v. Brennan, 511 U.S. 825, 832 (U.S. 1994) ("...prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care..." Id).

The breach of care is supplied through the documents and anticipated witness testimony consistent with the facts outlined in section "A", above. Given the facts of this case and the statements of the Defendants regarding knowledge of blindness as a complication of hydrocephalus and a five (5) day referral period, and the amount of time from the Plaintiff' initial complaint in early September, 2001, expert testimony may not be necessary to prove liability, or the failure to act as a reasonable and prudent medical care provider under the circumstances, however causation will be established by expert witness testimony. Proof of the harm or injury will be supplied by the Plaintiff's testimony and expert witness testimony.

**2) Violation of Statute:**

At all material times, Defendant routinely destroyed the Plaintiff's medical request slips without making a notation or in some other fashion preserving the information contained on the slip. Plaintiff is seeking one or more jury instructions regarding the violation of different statutes.

"In this state a statutory violation can be considered by the fact finder as evidence of negligence when the plaintiff demonstrates that he or she is a person whom the statute was designed

to protect..., and that the harm that occurred was the kind of harm the statute was designed to prevent. Restatement (Second) of Torts § 286, at 25 (1965). But 'if the injured person falls outside the protective orbit of the statute, his claim based on breach of a statutory duty of care will not be presented to the jury for no such duty was owed to him.' " (internal citation omitted) Bandoni v. State, 715 A.2d 580, 628 (R.I. 1998).

Chapter 1 of Title 38 is entitled "CUSTODY AND PROTECTION" see R.I.G.L. §38-1 et. seq. Chapter 1 defines a public record as "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, or other material regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency. R.I. Gen. Laws § 38-1-1.1(c).

Penalties for failure to comply with the custody and protection provisions of Title 38, are found within Chapter 1. They are R.I.G.L. § 38-1-2 "Delivery of records to lawful custodian" Id. and R.I.G.L. § 38-1-4. "Keeping of records in vaults provided -- Penalty ". The later is a better fit for the allegations plead in plaintiff's complaint, It provides in relevant part that "[w]hoever unlawfully keeps in his or her possession any public record, or... alters, defaces, mutilates, or destroys any public record, or violates any provision of this section, shall, for each offense, be punished by a fine of not less than twenty dollars ($20.00) nor more than five hundred dollars ($500)" Id. Thus, the destruction of the medical request slip was a clear violation of law.

Since the public at large is not entitled to the Plaintiff's medical records pursuant to R.I.G.L.§38-2 et. seq., the only possible person that could benefit by the retention laws found under Chapter One of Title 38 would necessarily be the Plaintiff. Even from a lay person point of view, most people understand that medical care providers need all historical information to aid in the swift

and correct medical decisions. This sentiment is further supported in Title five (5) of the Rhode Island General Laws.

In addition to the record retention and preservation laws found in Title 38, R.I.G.L. § 5-34-24 provides "Grounds for discipline of licensees, The board of nurse registration and nursing education has the power to deny, revoke, or suspend any license to practice nursing; to provide for a non-disciplinary alternative only in situations involving alcohol or drug abuse or to discipline a licensee upon proof that the person is:...(6) Guilty of unprofessional conduct which includes, but is not limited to... (iii) Willful omission to file or record nursing records and reports required by law;" R.I. Gen. Laws § 5-34-24(6)(iii).

Moreover, regarding records retention in the practice of medicine and/or medical licensure, R.I.G.L. §5-37-5.1 provides, "Unprofessional conduct, The term "unprofessional conduct" as used in this chapter includes, but is not limited to, the following items or any combination of these items and may be further defined by regulations established by the board with the prior approval of the director:... (9) Willfully omitting to file or record, or willfully impeding or obstructing a filing or recording, or inducing another person to omit to file or record, medical or other reports as required by law;" R.I. Gen. Laws § 5-37-5.1(9)

These statutes directly relate to competent medical care and are obviously designed to protect a patient's medical history, placing the Plaintiff within the class of those whom the statute is intended to protect to ensure proper medical treatment decisions.

**3) Spoliation:**

The destruction of the Plaintiff's medical request slips also creates an evidentiary issue regarding spoliation. Under a spoliation analysis, Plaintiff typically will receive a beneficial

jury instruction or, depending on the facts, better. see generally Allstate Ins. Co. v. Creative Env't Corp., 1994 U.S. Dist. LEXIS 13307 (D.R.I. 1994); see also Mead v. Papa Razzi, 2006 R.I. LEXIS 92 (R.I. 2006) ("Mead II"). For these reasons, Plaintiff is seeking a spoliation jury instruction.

**4) Tort Cap:**

The State of Rhode Island is liable in all actions of tort in the same manner as a private individual or corporation subject to monetary limitations established by law. R.I. Gen. Laws § 9-31-1. However, those monetary limitations do not apply when the State is engaged in a proprietary function. R.I. Gen. Laws § 9-31-2. The test is not whether a government entity is performing the services versus a private individual or corporation, otherwise all private function activities would be reclassified simply by virtue of the identity of the actor. It is common knowledge that the manner in which functions are performed by the State of Rhode Island, through its employees, are restricted to a greater extent for one reason or another than if performed by the private individual or corporation. Thus, the analysis is dependent upon the function, not the actor. Plaintiff can find no authority that allows for a reclassification of the proprietary function to public duty.

A function is proprietary when "the governmental entity engage[s] in activities normally undertaken by private individuals or corporations" Morales v. Town of Johnston, 895 A.2d 721, 731 (R.I. 2006). Thus, whether the State of Rhode Island is providing medical care and making medical scheduling decisions to the needy in a publicly owned clinic staffed by state employees, or within its correctional facilities, the test is one of whether the function is a proprietary one. There services at issue here meet the definition of a proprietary function.

In 1988, five years after the Rhode Island Supreme Court decided Saunders v. State, 446 A.2d 748 (R.I. 1982), the United States Supreme Court decided West. v. Atkins, 487 U.S. 42 (U.S. 1988). In West, the US Supreme Court recognized that "the provision of medical services is a **function traditionally performed by private individuals**..." (emphasis supplied) West v. Atkins, 487 U.S. 42, 57 (U.S. 1988). Though the prison context in which those services were performed changed the nature of the patient relationship, Id., it only changed the relationship for the purposes of finding that an independent physician was a state actor "acting under color of law", it did not change the nature or characteristic of the function that was performed. See generally, West v. Atkins, 487 U.S. 42 (U.S. 1988).

West recognized that there are non-medical functions of prison life which "inevitably influence the nature, timing, and form of medical care provided to inmates" Id. @ 57. Thus, since West contrasted "nonmedical (sic) functions" against "the nature, timing, and form of medical care provided to inmates," logic and reason lead to the conclusion that they are medical functions. Stated another way, by making the distinction, through negative implication, the "nature, timing, and form of medical care provided to inmates" are medical functions since they are not "nonmedical functions". Plaintiff complains of a deficiency in exactly those areas, in the nature, timing, and form of medical care provided.

Consistent with the changing post-Saunders trend, in 1999, our First Circuit Court of Appeals recognized that "Government customarily involves itself in many types of activities, but few of those activities come within the State's exclusive preserve. To date, the short list of activities that have been held to satisfy this demanding criterion includes 'the administration of elections, the

operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park...' When a plaintiff ventures outside such narrow confines, she has an uphill climb." (internal citation omitted) Perkins v. Londonderry Basketball Club, 196 F.3d 13, 19 (1st Cir. 1999).

And more recently, in 2000, our Federal District Court recognized that the "Supreme Court expressly stated that 'correctional facilities have never been exclusively public.' (quoting Richardson v. McKnight, 521 U.S. 399 at 405) Lawson v. Liburdi, 114 F. Supp. 2d 31, 40 (D.R.I. 2000). Noting the heavy involvement of private contractors in the prison environment, "in prison management throughout our nation's history, dating back to the 18th century, [Richardson] at 405-406. As a result, the management of prisons cannot be fairly construed as a function that has traditionally been 'an exclusive prerogative of the sovereign.' See Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 160, 98 S. Ct. 1729, 1735, 56 L. Ed. 2d 185 (1978). 'While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.' (quoting Flagg Brothers, Inc., 436 U.S. at 158, 98 S. Ct. at 1734.)". Lawson v. Liburdi, 114 F. Supp. 2d 31, 40 (D.R.I. 2000).

For these reasons, the tort cap does not apply to these circumstances involving the nature, timing, and form of medical care provided to the Plaintiff.

Alternatively, even in instances where the state is engaged in a public duty, the public duty doctrine "will not shield a municipality that has engaged in 'egregious conduct' where it 'has knowledge that it has created a circumstance that forces an individual into a position of peril and

subsequently chooses not to remedy the situation" Martinelli v. Hopkins, 787 A.2d 1158, 1168 (R.I. 2001).

Plaintiff,
By Counsel,

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio, Esq. (#3910)
Mckinnon & Harwood
1168 Newport Avenue
Pawtucket RI 02861
(401) 723-9655
(401) 722-9160
contact@mckinnonharwood.com

## CERTIFICATION

I hereby certify that on Friday, January 26, 2007, a true copy of the within, was served upon the following and in the following manner(s):

**Thomas A. Palombo Esq.**, by electronic means only to " tpalombo@riag.ri.gov".

/s/ Joseph-Anthony DiMaio, Esq.
Joseph-Anthony DiMaio