v-00459-S-LDA Document 131-2 Filed 01/26/2007

New England Eye Center * Tufts University School of Medicine

750 Washington Street, Box 381, Boston, Massachusetts 02111

THOMAS R. HEDGES III, M.D.
*Professor of Ophthalmology and Neurology*

*Director, Neuro-Ophthalmology*
Office: (617) 636-5488
1-800-231-3316
Fax: (617) 636-4866

May 9, 2006

Attorney Joseph-Anthony Dimaio, Esq.
McKinnon & Harwood
1168 Newport Avenue
Pawtucket, Rhode Island 02861

Dear Attorney Dimaio:

Thank you for asking me to prepare a medical expert opinion regarding Richard Moreau. My curriculum vitae summarizes my qualifications and is attached to this letter. Also, I have included a list of cases in which I have testified as an expert at trial or by deposition within the last four years along with my fees for this case.

Based upon my review of the materials provided to me and those medical texts utilized in the preparation of this report, itemized at the end of this report, and based upon my education, training, skill and experience, to a reasonable degree of certainty, Mr. Moreau's care was clearly deficient and did not meet the minimum standard of care called for under the circumstances. The Defendants' errors and/or omissions in this case strongly support the conclusion that there was an intentional disregard for the serious medical needs of Mr. Moreau. The level of care exercised in Mr. Moreau's case was, more likely than not, the product of either intentional omission with knowledge of the risk of blindness or deliberate indifference to the serious medical needs of Mr. Moreau.

On more than one occasion appropriate and timely scheduling of vision specific care could have prevented Mr. Moreau's vision loss. Had the requisite minimal care under the circumstances been exercised, Mr. Moreau would not have gone blind and would have suffered only a small amount of temporary vision loss, if any at all.

To a reasonable degree of medical certainty, Mr. Moreau would not have experienced permanent vision loss had his shunt been properly monitored and revised on a timely basis after the occurrence of visual symptoms. Patients suffering from hydrocephalus will not suffer permanent blindness with the proper management and monitoring of the increased intracranial pressure, which is the basic abnormality which can lead to optic nerve damage. It is presumed by the Defendants that Mr. Moreau did not have a full understanding of the complications associated with hydrocephalus.

While the Defendants harmful conduct and inaction occurred in late September and early October of 2001, Mr. Moreau's correspondence and deposition testimony supports the conclusion that he probably did not know nor should have known that his vision deterioration and eventual permanent vision loss was related to his chronic condition or the Defendants' errors or omissions until receiving an expert opinion from a qualified individual regarding the causal connection. Though Mr. Moreau may have had suspicions of a shunt malfunction as early as February 2002, it appears from the initial materials presented to me, that, given his confinement and recent permanent blindness, he diligently collected whatever records he could, then sought and eventually engaged counsel.

The pertinent facts and history are as follows:

Mr. Richard Moreau was born on September 13, 1971 (age 30 in the fall of 2001) with a condition known as hydrocephalus. This condition, commonly known as "water-on-the-brain," is usually apparent in affected patients since it is associated with a visible degree of cranial deformity. In many instances, the damage caused by increased intracranial pressure can result in mental retardation as well as severe impairment of other parts of the nervous system. Since it is a birth defect that remains with the patient for life, it is considered a chronic condition.

Treatment consists of a shunt implanted within the cranium, which enables fluid to drain into the abdominal cavity. Once a shunt is properly installed, assuming periodic monitoring and maintenance, further complications can be avoided. However, affected individuals remain at risk for shunt failure throughout their lives. While there are many different complications that can occur, the remainder of this report focuses on the permanent blindness that Mr. Moreau developed.

Mr. Moreau was admitted to the Intake Service Center and came under the Defendants' care in January of 2000 when he was 29 years old. Standard operating procedure required a physical examination each time a person was taken into custody at the Department of Corrections, regardless of the number of entrances for that person, and then only annually for persons 40 years of age or older, unless otherwise medically indicated. Mr. Moreau received his entrance physical on March 5, 2000. At that time, his chronic condition was noted and his vision recorded as 20/40 in both eyes. Mr. Moreau was purposefully not referred to the chronic care clinic as noted on the March 5, 2000 physical record, nor was he scheduled for any subsequent physical examinations based on the absence of any document provided to the contrary. In addition, the Defendants were aware of the chronic condition due to the protective custody status imposed for medical reasons.

Mr. Moreau's initial physical examination did not indicate the need for chronic care, despite his well established chronic condition and despite the procedures section of policy number 18.44 DOC effective 7/12/99 referring to chronic care, and despite policy number 18.49 DOC effective 1/17/00 regarding special needs treatment plans for chronically ill patients. Moreover, it is surprising the no Defendant made reference to the particularly time relevant procedure outlined in the then recent policy number 18.31 effective 2/7/00 which was clearly violated either as a routine medical request or emergency sick call. Mr. Moreau's September 17, 2001 letter clearly indicates a failure of those administrative scheduling acts, notwithstanding the fact that the administrator's admitted knowledge of Mr. Moreau's chronic condition and risk of blindness which qualifies as "a condition likely to result in lasting or severe bodily harm if treatment is delayed until the next regularly scheduled sick call."

There is no record indicating that Mr. Moreau was ever disciplined for abusing the sick call procedures referred to in that policy. Therefore, one should conclude that his complaints were justified, and his September 17, 2001 letter, speaking of desperation, conveys sufficient urgency to qualify under paragraphIII(B)(3) of policy number 18.31 effective 2/7/00. Based on Mr. Marocco's September 26, 2001 memorandum to Mr. Moreau, Mr. Moreau was scheduled for the "next regularly scheduled" appoint with an optometrist. Furthermore, his symptoms described on the September 17, 2001 letter, as well as those described on the medical request slip, apparently destroyed by the Defendants, indicated a sufficient level of intolerable discomfort following a sudden change of a chronic condition which Mr. Moreau did not fully appreciate but certainly conveyed with a sense of sudden change and urgency.

There are many other administrative acts required by those policies which were not apparent in any of the documents provided to counsel either voluntarily or by direct request. Some administrative acts and response times are referred to in the Defendants deposition testimony. It should be noted that Mr. Moreau made specific requests for protective custody due to the limitations that his hydrocephalus condition placed on his daily functioning or mobility for fear of harm which would potentially physically damage his shunt, and to ensure continuity of his own medical treatment and care. Mr. Moreau wrote a letter on October 24, 2000, to the medical director outlining in detail his birth defect, hydrocephalus, his shunt, and need for annual CAT scan as well as the need to alert "medical staff" so they would have a medical history on file. The Hospital Administrator, Defendant Joseph R. Marocco, responded to the October 24, 2000 letter on behalf of the medical director. Through deposition testimony, it is believed that Mr. Marocco maintained a separate correspondence file presumably for reference purposes in his office separate and apart from a patient's medical file. Mr. Marocco noted that he spoke with a nurse, Mary LouO'Neil, regarding the care issue.

The next relevant communication occurred on April 5, 2001, when Mr. Moreau wrote to Mr. Marocco regarding his recent CAT scan, complaining about sharp headaches and dizziness. Although here is no vision related complain in this correspondence, Mr. Moreau informed Mr. Marocco "I do have medical conditions--see file." It is unknown whether Mr. Marocco then referred to any particular file.

Mr. Marocco responded on April 16, 2001, indicating that he spoke to Nurse Brenda Abelli. Based on information from Mr. Moreau's medical record, the nurse informed him that no further testing had been ordered. Mr. Marocco

indicated that arrangements would be made to be seen within the next couple of days to review any further symptoms the patient was experiencing. It is believed that no vision related symptoms existed at that time. It is not known what, if anything, was reviewed by the doctor. This document does however begin to establish the ability of Mr. Marocco to initiate medical intervention within a few days.

The next relevant communication from Mr. Moreau is dated September 17, 2001, wherein he indicated that he had received new glasses from the state but recently noticed that his eyes were worse. He also indicated that heplaced a slip in to see the eye doctor and was told he comes in every few weeks. He further mentions that he was getting in trouble during his yard maintenance duty because he could oot see the weeds or cigarette butts, and that he asked to be placed "at the very top of the list for seeing the eye doctor next time he visits" further stating, "I need to see him desperately to have it corrected."

Based on this language, it is believed that one or more medical request slips were submitted by Mr. Moreau requesting vision specific medical care and that the slips would not have requested a general physical examination by a nurse. Based on depositions and discovery responses, it is believed that the Defendants systematically destroyed all three parts of that multi-part slip and that no written response is provided to the inmate. Based on the contents of this letter, I conclude that Mr. Moreau's request slip requested vision specific care, that it probably conveyed a sense of urgency, but that his request was ignored without regard to any special chronic condition. Based on the contents of the September 17, 2001 letter, even a layperson would appreciate the urgency of the request to see an eye doctor.

Had Mr. Moreau's requests been properly addressed, he would have seen Dr. Smiley, the optometrist, in September of 2001. Dr. Smiley testified that his regular day was Monday. He was unaware of which inmates he would see prior to his arrival at a correctional facility. He was instructed by the correctional staff as to which facility to work at on any given day. His visits would be scheduled on a revolving basis between the different correctional facilities.

Dr. Smiley was available within the Department of Corrections at a different facility on September 17, 2001, the very day Mr. Moreau felt the need to write to the administrator. Assuming Mr. Moreau did submit a slip before that date, proper triage of his medical request slip should have resulted in an intra-facility transfer to see Dr. Smiley. Dr. Smiley also indicates that, when he called the Department of Corrections on September 24, 2001, he was told by the Defendants that there were no appointments.

Dr. Smiley was present at Minimum Security on October 1, 2001, but Mr. Moreau was not examined that day. October 1, 2001 was exactly five days after Nurse Carroll examined him on September 26, 2001. Dr. Smiley was also physically present at the Department of Corrections seeing patients on October 23, 2001 and on October 29, 2001. October 8th may have been an observed holiday, however there is no explanation for not having Mr. Moreau examined on October 15, 2001. For reasons presently unknown to Mr. Moreau, the State of Rhode Island did not schedule Dr. Smiley to attend to vision patients next until October 23, 2001, when he was present at Medium Security. Mr. Moreau was not seen on that day either.

There is no excuse for not having Mr. Moreau seen on October 1, 2001. The administrator has admitted that he read Mr. Moreau's letter on September 26, 2001, and then spoke with an unidentified nurse. On that basis he scheduled an appointment over 33 days later, not the 5 day standard of care established by Defendant Barbara Carroll's testimony. This is the first correspondence where Mr. Marocco does not identify by name the nurse with whom he would have communicated, thus drawing into question whether the communication even occurred.

Of remarkable note is the fact that Mr. Marocco indicated that he knew blindness was a complication associated with Mr. Moreau's chronic condition of hydrocephalus. Despite that prior knowledge, Mr. Marocco still scheduled the optometrist appointment at the Defendants' convenience for the next occasion they would direct Dr. Smiley to Mr. Moreau's facility. It would be incredible to presume that, on September 26, 2001, Mr. Marocco was not aware of the October 1, 2001 schedule, especially in light of his conversation with the unidentified nurse.

The failure to make arrangements to have Mr. Moreau transported within the Department of Corrections to the medium security facility where Dr. Smiley was on October 1, 2001 is remarkable, and leads to the conclusion that Mr. Marocco was well aware of a substantial risk of a very substantial and serious harm to Mr. Moreau, that Mr.

Marocco presumed Mr. Moreau was ignorant of the risk, and that Mr. Marocco disregarded Mr. Moreau's risk of blindness.

Based on testimony of Barbara Carroll, it is apparent that the standard utilized for vision complaints would have resulted in some type of medical attention within five days. It is clear, by virtue of the September 17, 2002 letter, that there was no timely response to the medical request slip, nor was there a timely response within five days of that letter.

The destruction of the medical request slip(s) as well as prohibiting Mr. Moreau from communicating directly with the optometrist may have contributed to the perilous circumstances which affected Mr. Moreau's care. Certainly, had an appropriate referral to a vision specific provider such as an optometrist occurred within five days after the request slip was submitted, a consultation with an ophthalmologist or a neurosurgeon would have been arranged within days to weeks. This would then have afforded private medical care providers adequatetime to rectify the shunt malfunction and save Mr. Moreau's vision. Had Mr. Moreau presented to the ophthalmologist or a neurosurgeon during or before the week of October 21, 2001, to a reasonable degree of certainty, he would have experienced only minimal, temporary vision loss consistent with his testimony. Had an ophthalmologist or a neurosuregon consultation occurred prior to the week of October 21, 2001, then it is likely that there would have been restoration of vision to the levels prior to those described in Mr. Moreau's September 17, 12001 letter.

In fact, based on Dr. Smiley's deposition, he intended to refer Mr. Moreau to an ophthalmologist, Dr. Figueroa, within days of his examination. While that instruction and examination with Dr. Figureoadid not occur until November 15, 2001, since Mr. Moreau had already reached an atrophic condition by October 29, 2001, the delay after October 29, 2001, did not result in any further significant harm. Dr. Smiley's testimony supplies the response time by which the Defendant's should have ensured Mr. Moreau was examined by an ophthalmologist, whether on the premises or outside the facility.

It should also be noted from nurse Marylyn Hale's deposition that, once a nurse believed an urgent need for outside care was called for, that nurse could initiate a sequence of events which would result in same day transfer to an outside facility. Therefore, under these circumstances, I conclude that the Defendants had the ability to transfer Mr. Moreau on an immediate basis. This is further supported by the transfer of Mr. Moreau from the High Security facility to a different facility where Dr. Smiley was on the day of Mr. Moreau's October 29, 2001 examination.

Had the referrals been made while Mr. Moreau had vision, the private medical care providers, Dr. Smiley and/or Dr. Figueroa, would have been made the appropriate surgical referrals on an urgent basis. Once Mr. Moreau's optic nerve reached an atrophic condition and vision loss stabilized at its present low level, the need for shunt revision was less urgent since his vision was permanently lost and he was legally blind. Surgery was then scheduled in due course. Had other symptoms presented subsequent to the vision loss, then his condition would have been upgraded consistent with those symptoms which would have then resulted in immediate surgery.

At the time Mr. Moreau was seen on September 26, 2001, referral to an ophthalmologist or a neurosurgeon should have been arranged at least within days to weeks, although the standard of care within would have required same day referral. Under the circumstances, the 5-day response time testified to by the nurse practitioner with regard to vision complaints would not have been unacceptable. However, scheduling that follow-up appointment should have occurred that day before conclusion of the examination. Failure to do this is unacceptable.

Nurse Carroll testified at her deposition that she was the nurse practitioner and had the authority of a doctor with regard to referrals at the correctional facility. She testified that she examined Plaintiff on September 26, 2001, discussed his weight and his declining vision. While the physical form has places to convey the need for urgent treatment of some sort, she testified that she did make a referral to an eye doctor. Since it was vision related, she should have taken such issues very seriously and was expected to make an appointment within five days. Nurse Carroll did not make any notation on the physician contact notes, or the physician order form, nor did she complete any furlough documentation

Review of the September 26, 2001 treatment note indicates that no priority was indicated in the area designated for that purpose, and there is a minimal amount of documentation regarding the precise nature of the visual problem. Even assuming a review by the medical doctor occurred on the next day, since that was still within the 5day response time testified to by the nurse practitioner, nothing out of the ordinary would have beenassumed by that medical doctor.

The nurse practitioner testified that the physical examination form is not used to convey instructions. The nurse testified that the referral would appear in the Physician Orders. Review of the time relevant section ofthe Physician Orders indicates that the nurse failed to alert anyone of the need for any type of followup care. The nurse did testify to her understanding of the seriousness of all vision complaints. Therefore, it is surprising that these omissions existed in this patient's chart given the nurses own notation of the chronic condition and the high priority assigned to vision complaints. The failure to make the appropriate notations and timely referral fell far below the minimum standards under the circumstances and is evidence of intentional conduct and/or deliberate indifference. The Nurse Practitioner's conduct was well below the requirements of the Defendant's own policy number 18.37, effective 10/25/99, regarding written and telephone clinicians' orders. She failed to make any notation on the proscribed order form. That type of conduct is remarkable, and demonstrates that Barbara Carroll was well aware of a substantial and serious risk of blindness to Mr. Moreau, not just due to his hydrocephalus, but simply because he was complaining of a decrease in vision. In light of Mr. Moreau's vision complaint, she acted with disregard to the risk of blindness, with disregard to the five day standard she testified to, and with disregard to the administratvie requirements pertaining to completion of order forms.

If on September 26, 2001, scheduling a referral with an optometrist or other vision care provider had been performed, there would have been adequate time for diagnosis and scheduling Mr. Moreau for shunt revision surgery and his vision would not have been permanently impaired.

It is apparent that all levels of medical care personnel and correctional officers had methods to initiate same day emergency medical referrals in the rendering of timelycare.

Coincidentally, Joseph Morocco, the health care administrator, reviewed Mr. Moreau's September 17, 2001 letter on the same day as his physical examination, on September 26, 2001, but it is unknown whether this occurred before or after the exam.

Nurse Hale has testified that even a nurse could arrange same-day treatment on an emergency basis outside the correctional facility, if she thought it was warranted. Joseph Morocco was considered a superior to all nursing and medical staff, but subordinate to the medical director, Dr. Allen and/or Dr. Anne Spaulding

In a responsive memo to Mr. Moreau dated September 26, 2001, Mr. Morocco, told him that he spoke with an unidentified nurse at the intake service center and on that basis, scheduled him for an appointment with an eye doctor, Dr. Smiley, more than one month away, on October 29, 2001. Mr. Morocco testified that, before the fall of 2001, he knew blindness was a complication associated with hydrocephalus.

The Defendants had a procedure for patients to request medical care, which included the use of a multi-part form. Based on Mr. Moreau's September 17, 2001 letter to the health care administrator, it is clear that Mr. Moreau had requested vision care via the medical request slip process, but that his requests were ignored. It has been established that the Defendants did not complete the response portion of the request slip, did not return those slips to the patient, and in fact destroyed those request slips containing vital information germane to medical care. No slips were produced from the Defendants which allow any basis to challenge the decision to give Mr. Moreau a physical examiniation administered by a Nurse Practiotioner on September 26, 2001. In fact, no documents are available, nor can the Defendants explain the coincidental reason Mr. Moreau was given a physical examination by a nurse practitioner in lieu of a doctor on that occasion, despite their previously stated practice. It is therefore presumed that an error in triage of the medical request slip occurred.

Deposition testimony indicates that the medical request slip was used for triage purposes, that a nurse would screen these slips and make a medical decision regarding the type and urgency of care. It appears that this triageprocess

does not include a familiarization of any particular patient's medical history prior to making a medical care decision. Deposition testimony further indicates that a nurse had the authority to initiate same day emergency medical care to a hospital if that nurse believed the circumstances warranted such action.

While the triage process may have been defective, Mr. Moreau did receive some type of medical care on September 26, 2001, in the form of a physical examiniation administered by Nurse Practioner Barbara Carroll. It is clear from deposition testimony that in many respects she was licensed and authorized to act in the same capacity as a medical doctor.

Once the optic nerve deterioration reached a stable end condition, within days of October29, 2001, the need for surgery for the purposes of either preserving or reversing vision deterioration was less urgent and would have been medically futile with regard to restoring useful vision to Mr. Moreau. Shunt revision surgery was still medically indicated for a number of other long-term health reasons. However, once the vision loss ceased to significantly progress after October 29, 2001, there were no other factors indicating the need for surgery as an emergency, on the same day or within days. Shunt revision was still required and was provided thereafter with no other ill affect to Mr. Moreau, beyond the permanent vision loss.

I have not been asked to comment on the facts pertaining to Mr. Moreau's work requirements, however information provided in deposition transcripts confirms the vision loss and the complaints. It does appear from the correctional officers testimony that there was a complete system wide disregard for the importance of responding to Mr. Moreau's vision complaints. Despite policy which would have permitted an medical absence from work, it is beyond decency that Mr. Moreau was required to perform some job functioning given his the progressive and pervasive nature of his vision complaint and eventual blindness.

On October 14, 2001, Mr. Moreau wrote again to Mr. Morocco indicating this his vision was even worse. Mr. Morocco had a number of institutional excuses explaining the delay in his mail delivery, resulting in a response to Mr. Moreau on October 25, 2001.

While Mr. Moreau waited for his eye appointment, his vision continued to get worse, he continued to complain, he continued to submit slips, and complained to Correctional Officer Joseph Knight who instructed him to put in another slip.

All of the above opinions are provided to a reasonable degree of certainty based on the science and practice of medicine.

Presently, I may utilize the following exhibits to either summarize or support my opinions:

- Standard medical publications such as Walsh and Hoyt's Clinical Neuro-ophthalmology, Miller and Newman Editors, William and Wilkins, Baltimore, 2005.
- Time-line chart (yet to be generated by myself or counsel)
- Life Expectancy and work life expectancy charts or tables.

I considered the following documents delivered[1] to me and/or made available for my inspection[2] purposes through counsel:

---

1 Those marked "delivered" indicates that a working copy was left with Dr. Hedges;

2 Those with the notation "discussed" were brought for discussion only, and only copies specifically requested were either delivered through copying during conference, or subsequently provided upon request.

1. Copies of Plaintiff's Memorandum in support of opposition to Motion to certify and substitute, together with all exhibits A - M, inclusive (delivered);

2. Copy of Plaintiff's Deposition Transcripts, Volume 1, Volume 2, and Volume 3 (delivered) (exhibits discussed);

3. Rhode Island Hospital records from 12/27/05 records deposition/subpoena (delivered);

4. Joseph Morocco's January 31, 2006 deposition (delivered) (exhibits discussed)

5. Dr. Harrison Smiley's Answers to Interrogatories signed on 12/21/05; (delivered)

6. Dr. Harrison Smiley's Deposition Transcript with exhibits (delivered to Dr.)

7. Barbara Carroll's January 17, 2006 deposition transcript (with exhibits) (delivered to Dr.);

8. Defendant's Supplemental Response to Plaintiff's Request for Initial Discovery Disclosure (discussed)

9. Defendant's Response to Plaintiff's Request for Initial Discovery Disclosure dated April 14, 2005 (discussed);

10. Deposition of Pauline Marcussen (discussion)

11. Deposition of Scott Allen (discussion)

12. Marylyn Hale deposition, volume 1 and volume 2 (discussion)

13. Jeffrey Laurie deposition (discussion)

14. Answers to interrogatories (discussion) from:

    a. James Weeden;
    b. Joseph Marrocco;
    c. Ashbel T. Wall;
    d. Marylyn Hale;
    e. Barbara Caroll;

15. Selected Documents from the January 11, 2006, Defendants' Response to Plaintiff's First request for Production of Documents (delivered) as follows:

    a. c.v. for Joseph R. Marocco;
    b. "Job identify" record as of 10/28/01;
    c. "Job identify" record as of 7/13/02;
    d. Policy 18.05 DOC effective 4/12/99 –quality improvement;
    e. Policy 18.36 DOC effective 2/7/00 –emergency services;
    f. Policy 18.37 DOC effective 10/25/99 –clinicians orders;
    g. Sample Physician Order Form;
    h. Policy 18.44 DOC effective 7/12/99 –health education
    i. Policy 18.49 DOC effective 1/17/00 –special needs treatment plans
    j. Policy 18.60 DOC effective 8/23/99 –sharing health care info;
    k. Policy 18.31 DOC effective 2/7/00 –Information on Health Services;
    l. Policy 18.31-1 DOC effective 6/7/04 –handling of medical requests;
    m. Policy 1.21.01 effective July 20, 1993 -Procedures for conducting medical/dental appointments and examinations

n. Policy 18.71 DOC effective 10/22/01 –procedure for conducting medical examinations

16. Record depositions for the following (discussion)

a. Dr. Saleme
b. St. Joseph's Medical center
c. Dr. Figueroa
d. Dr. Barry
e. Dr. Jacewicz
f. William Backus Hospital

17. Materials labeled "Department of Corrections 8-6-04" correspondence, which includes R.I. D.O.C. Health Services notes regarding Richard Moreau, beginning 1-22-00 through 5-15-02, as well as client provided materials. I am under the impression that these materials are those very same materials voluntarily exchanged between the State of Rhode Island and the client at inception of the litigation.

Thank you again for asking my expert opinion regarding this matter.

Sincerely,

Thomas R. Hedges III, M.D.