**MEMORANDUM**

**DATE:** December 20, 2006

**TO:** Joseph-Anthony DiMaio, Esq.
Attorney at Law
McKinnon & Harwood
1168 Newport Avenue
Pawtucket, RI 02861

**FROM:** Edward A. Blanchette, MD
Clinical Director, Connecticut Department of Correction
Correctional Medicine, Infectious Disease &
Internal Medicine Consultant

**RE :** **Richard Moreau vs. State of Rhode Island et al.**
**Civil Action No. : 04-4769**

---

Thank you for your patience while I recovered from my equipment failure caused by a November storm.

Following an in-depth review of official records and reports concerning the above-referenced case, I am prepared to render an expert medical opinion on several issues raised in this complaint. In this report, I have reviewed and will reference the following materials:

a. Complaint Re: Negligence and Professional Malpractice, Violation of Open Records Statute, and Deprivation of Rights under the Rhode Island Constitution and the United States Constitution: Richard Moreau vs. State of Rhode Island et al., Superior Court Civil Action No. 04-4769 - dated September 29, 2004.

b. Rhode Island Department of Corrections Policy and Procedure, Policy Number 18.11 DOC, Re: Inmate Complaints Relative to Health Services, Effective Date 4/12/99, Pages 1 & 2.

c. Rhode Island Department of Corrections Policy and Procedure, Policy Number 13.10 DOC, Re: Inmate Grievance Procedure, Effective Date 5/20/96, 12 pages.

d. Letter from Richard Moreau, Inmate # 113743, to Scott Allen, MD, Medical Program Director, Adult Correctional Institution, Cranston, RI - dated 11/27/2001, stamped received on 11/29/2001.

e. Excerpt from RIDOC Inmate Handbook, Section IX, GRIEVANCE PROCEDURES

f. Deposition of Joseph Morocco, taken on January 31, 2006.

g. Deposition of Richard Michael Moreau, Volumes I, II, & III.

h. Letter to A. Bucci, Assistant Director, Department of Corrections from Richard M. Moreau, dated 12/14/2001.

i. Deposition of Officer Jeffrey Laurie, taken on January 23, 2006.

j. Expert Report of Thomas R. Hedges, MD, Director of Neuro-Ophthalmology at the New England Eye Center, Tufts University School of Medicine, dated May 9, 2006.

k. Rhode Island Department of Corrections Policy and Procedure, Policy Number 18.31, Re: Information On Health Care Services, including Routine Medical Request (Sick Call Visit) and Emergency Sick Calls. Effective Date: 2/7/2000, Pages 1 – 3.

l. Curriculum vitae of Joseph R. Marocco

m. Health Care Request Form, from the Rhode Island Department of Correction

n. Letter from Richard M. Moreau, Inmate # 113743, to Ann Spaulding, MD, Medical Program Director, dated 10/24/2000 – stamped received on 10/25/2000.

o. Inter-Office Memorandum – Rhode Island Department of Corrections, Health Care Services, from Joseph R. Marocco, Hospital Administrator to Richard Moreau, Inmate # 113743, Intake Service Center, dated 11/15/2000.

p. Description of the Duties, Responsibilities, and Required Qualifications for Appointment Re: the Class Title - Associate Director of Health Services (Corrections). Class Created 12/29/2002 with Editorial Review on 3/15/2003.

q. Memo on Rhode Island Department of Corrections Health Care Services letterhead, from Joseph R. Marocco (Hospital Administrator) to Inmate Richard Moreau, ID # 113743, dated 9/26/2001, Re: "Your 9/17/2001 Letter".

r. Memo on Rhode Island Department of Corrections Health Care Services letterhead, from Joseph R. Marocco (Hospital Administrator) to Inmate Richard Moreau, ID # 113743, dated 11/5/2001, Re: "Your 10/14/2001 Letter".

s. R.I. Department of Corrections Health Care Services Memorandum, from Joseph Marocco (Hospital Administrator) to Inmate Richard Moreau, ID # 113743, dated November 29, 2001. RE: Your Letter to Dr. Allen Dated 11/27/01.

t. Deposition of Barbara A. Carroll, RN – taken on January 17, 2006.

u. Rhode Island Department of Corrections Policy and Procedure, Policy Number 18.37, Re: Written and Telephone Clinicians' Orders, Effective Date 10/25/99, Pages 1- 2.

v. Rhode Island Department of Corrections Medical Record for Inmate Richard Moreau, Medical Entrance Screen For Men form, dated 1/22/00 at 12:05 AM, 2 pages - signed by Nurse Henderson.

w. Letter from Richard M. Moreau to Dr. Scott Allan, Medical Director, Adult Correctional Institution, dated February 15, 2002, stamped RECEIVED on Feb 19, 2002.

x. RI D.O.C. – Health Services – Hx and Pe Form, for Richard Moreau, ID # 113743, dated 9/26/01, signed by Barbara A. Carroll, RMS.

y. Rhode Island Department of Corrections Nursing Contact Notes for Richard Moreau, dated from 7/8/2000, 7/9/2000, and 12/24/2001.

z. Rhode Island Department of Corrections Physician Contact Notes for Richard Moreau, dated 3/9/2001, 3/17/2001, 3/21/2001, 6/23/2001, 6/7/2001, 6/26/2001, 11/15/2001, 2/25/2002, and 4/5/2002.

aa. Rhode Island Department of Corrections – Health Services Physician's Order Form, for Richard Moreau, ID # 113743, top order dated 9/5/01, single page.

bb. Letter from Richard M. Moreau, ID # 113743, to Mr. Marocco, dated September 17, 2001, stamped RECEIVED Sep 2?, 2001.

cc. Deposition of Marylyn Hale, RN – taken on January 23, 2006.

dd. General Laws of Rhode Island, Title 42 – State Affairs and Government, Chapter 56 – Corrections Department, Section 10 – Powers of the director (2006).

ee. Letter from Anne Fitzpatrick, MD, Department of Ophthalmology, Brown University School of Medicine, Rhode Island Hospital, sent "To Whom It May Concern", dated 4/22/2002, and stamped RECEIVED Apr 29, 2002 RIDOC Medical Program Director.

ff. Request For Eye Examination Form, for Richard Moreau, Case No. 113743, signed by Dr. Harris Smiley, dated 9/17/00.

gg. Letter from Richard M. Moreau to Mr. Marocco, dated 10/14/2001, stamped RECEIVED on Oct 25, 2001, Re: My letter to you dated 9/17/01.

hh. Deposition of Dr. Harrison Smiley taken on January 27, 2006, pages 10 – 13, 42 – 49, 62–65.

ii. Statement from Dr. Harrison Smiley, East Bay Eye Care, for services (Eye Exams) rendered during the month of September 2001 at Medium I on September 17, 2001, also dated that same day.

jj. Statement from Dr. Harrison Smiley, East Bay Eye Care, for services rendered (Eye Exams) during the month of October 2001, specifically listing inmate Moreau, Richard # 113743 on 10/29/2001 at the "Intake". Statement is dated October 30, 2001 and is addressed to Mr. Joseph Marocco, Hospital Administrator.

kk. Request for Eye Examination Form for Richard Moreau, ID # 113743, dated 10/29/2001, and signed by Dr. Harrison Smiley.

ll. Rhode Island Hospital History and Physical, Neurosurgery, for Richard Moreau. The Date of Admission was 1/7/2002. Cranial CT scan results, Impression, and Therapeutic Plan were also discussed. Signed by Arno Sungarian, MD.

mm. Rhode Island Hospital Operating Record for Richard Moreau, dated May 14, 2002, for a Distal ventriculoperitoneal shunt revision performed by J.F. Harrington, MD.

nn. Combined Expert Reports of John P. Santoro, M.D. (Department of Emergency Medicine, Baysate Medical Center) and Joseph F. Rizzo, III, M.D., (Massachusetts Eye and Ear Infirmary), dated 6/23/06 and 6/21/06 respectively.

oo. Expert Report of John P. Santoro, M.D., Department of Emergency Medicine, Baystate Medical Center, dated July 24, 2006.

pp. Expert Report of Joseph F. Rizzo III, M.D., Massachusetts Eye & Ear Infirmary, dated July 24, 2006.

qq. National Commission on Correctional Health Care (NCCHC) Jail and Prison Health Standards.

rr. Deposition of Scott Allen, MD, taken on January 27, 2006.

Thank you for the opportunity to offer my medical expert opinion concerning this case. I have enclosed my curriculum vitae separately from this report. I have also separately enclosed a partial list of court cases in which I have testified in court or via deposition in the past several years. Since I do not keep such records, I have not included my numerous appearances for Claims Hearings before the Connecticut Claims Commissioner on behalf of the Connecticut Department of Correction (CT-DOC), nor have I included my numerous appearances in Connecticut courts for habeas hearings involving inmates.

My fees for serving as an expert witness are as follows: $ 250 per hour for review of records and formulating a report, $ 2000 for a deposition (regardless of time) and $2,000 for each day of court appearance necessary (regardless of time).

I have been a licensed physician since 1975, having maintained my physician's license with the State of Connecticut throughout my career. I am currently the Clinical Director for the Connecticut Department of Correction, and have served in this capacity since 1984. I have been certified as a Correctional Medicine expert by both the Federal and State of Connecticut Superior Court on a number of occasions. I currently serve as a Correctional Medicine Expert Monitoring Panel Member appointed by the Federal Court for two separate Consent Judgments involving the Connecticut Department of Correction (CT-DOC). I am Board-Certified in both Internal Medicine and Infectious Disease, and have served in the role of an Infectious Disease Consultant and Internal Medicine Consultant for the State of Connecticut Department of Correction since 1984. I have testified in a number of cases as an expert witness in Correctional Medicine, Infectious Disease and Internal Medicine over the past twenty years. I have been employed as a full-time correctional physician for 22 years, and I was employed as a correctional physician on a part-time basis for 4 additional years (1976 to 1979). In summary, I believe that I am well qualified to offer an expert opinion concerning the issues raised by Dr. Santoro's and Dr. Rizzo's reports, and more generally regarding the Correctional Medicine standard of care, as well as the community standard of care, in this case.

**Clinical Course Summary and Comments: Richard M. Moreau ID # 113743**

Born on September 13, 1971, Mr. Richard M. Moreau was 29 years-old when he was admitted into the Rhode Island Department of Correction (RIDOC) Intake Services Center on January 22, 2000 at 12:05 AM. According to his Medical Entrance Screen For Men Form (see item v.), he was alert, oriented, but also depressed and suicidal. He was identified at that time as having chronic hydrocephalus (entered as an acute illness), but no scars were mentioned, there was no mention of his ventriculoperitoneal (VP) shunt, and his past hospitalizations were not mentioned.

His past medical history prior to this incarceration was remarkable for congenital hydrocephalus, a birth defect that causing increased intracranial pressure that must be relieved in order to avoid serious neurological sequelae, including mental retardation secondary to brain atrophy, intractable headache, visual disturbances, and partial complex seizure disorder. He had undergone a number of shunt revisions prior to this incarceration, the most recent of which took place in 1995. He also has a history of hypertension and a hearing disorder.

Mr. Moreau had a physical examination (the so-called entrance exam physical) on March 5, 2000, at which time his visual acuity was recorded as 20/40 in both eyes, without glasses. There were apparently no referrals to the Chronic Care Clinic at that time, and it appears from the medical record that the patient was never given this medical follow-up despite his well-established chronic medical condition. I find it remarkable that an incarcerated patient with this diagnosis would not have had either a chronic care clinic referral or a specific treatment plan outlined to ensure routine medical evaluations necessary to properly monitor his condition.

In their expert reports, the defendants' medical experts note that on 3/1/2000 Mr. Moreau stated to a RIDOC physician that he "knows signs of blockage (VP shunt) and is to alert medical staff if these should occur." I would point out that Mr. Moreau would identify with those symptoms of shunt failure that he had noted in the past, and could not reasonably be expected to be familiar with manifestations that deviated significantly from his past experience. The responsibility of relating the patient's symptoms to possible shunt malfunction would be the responsibility of the RIDOC physicians and/or nurse practitioners, and not the patient or other lay persons, such as RIDOC administrative staff.

It is clear from the RIDOC medical records that the medical staff at the Intake Services Center, both nursing staff and physicians, were very familiar with Mr. Moreau's hydrocephalus diagnosis and the presence of his shunt. For example, there are several entries in the Nursing Contact Notes that refer to his neurologic status in July 2000 (item y), at which time he had been assaulted by another inmate, suffered a number of contusions, and was observed for 24 hours on head trauma precautions before his release by the attending physician, Dr. Santa Theresa.

On 10/24/2000, Mr. Moreau wrote a letter to Dr. Anne Spaulding, the Medical Program Director at that time (item n). In this correspondence, he describes his custodial status, states that he has congenital hydrocephalus with a shunt, gives a brief description of his medical history, including his shunt malfunction 5 years earlier, and gives the name of his neurosurgeon, Dr. Salame. Mr. Moreau then requested the yearly CT scans needed for his follow-up, as there was no plan for such scans scheduled or planned to his knowledge. He also asked how he could arrange to have his most recent cranial CT scan sent to the RIDOC medical staff. In essence, he was reminding the RIDOC medical staff of the need to monitor his hydrocephalus and shunt function as it had been done in the community. In my opinion, these issues should have already been addressed by this time.

The response to this letter came via an Interoffice Memo from Joseph R. Marocco to Richard Moreau, dated 11/15/2000. Mr. Marocco arranged to have Mr. Moreau placed "on the list to see the physician again. When you meet with him, please let him know of your condition and he will decide if it is necessary to send you for a CT scan at this time." In my opinion, this is an appropriate response that illustrates the role of a medical administrator in this situation. Mr. Marocco did not make any clinical decision in this matter, but appropriately referred the issue to a RIDOC physician for further action. Mr. Marocco did not order a CT scan himself at this time, nor did he determine the timeframe for this study.

In January 2001, Mr. Moreau did have a cranial CT scan performed at the Rhode Island Hospital, and the results of which were reviewed by Mr. Moreau's neurosurgeon, Dr. Salame. This CT scan did not demonstrate signs of shunt failure, and these results were communicated to RIDOC physicians and Mr. Moreau. In March 2001, Mr. Moreau was seen on at least 3 occasions by RIDOC physicians for complaints of "swaying", dizziness, and ear pain (see item z). He had a neurological evaluation at that time, and his symptoms resolved.

During the summer of 2001, Mr. Moreau's had a few brief encounters with the RIDOC physicians for dizziness (?ear wax) and a sore throat (see item z). The headaches noted in the spring 2001 were not present at that time.

Mr. Moreau remained clinically stable until September 2001. On September 17, 2001, Mr. Moreau writes once again to Mr. Marocco (item bb), and his major concern is his vision. "Just recently I noticed my eyes are worse." (suggests an acute change) He goes on to say that he submitted a Health Care Request Form to see the optometrist. Mr. Moreau then further describes his visual impairment:

"My job as an outside porter involves picking up cigarette butts in the ground cement cracks. My vision is so bad that I miss them, they (sic) cigarettes blend in. I can't see them. I am getting yelled at by my boss for missing cigarette butts on the cement ....". "As we speak, I can't see the thin blue lines on this paper." Mr. Moreau then requests to be placed at the top of the optometry list, and that he be seen at his next visit. He then says, "I need to see him desperately to have it corrected. I am willing to buy my own eyeglasses."

This very poignant letter, with its dramatic description of very substantial visual loss (dramatic both in its degree and in its recent occurrence), should have resulted in Mr. Marocco's immediate communication with a RIDOC physician, to have Mr. Moreau evaluated by a physician at the earliest opportunity, and to have a physician decide on a treatment plan (Optometry or Ophthalmology Consultation, repeat cranial CT scan) with an appropriate timeline. Mr. Marocco stated quite clearly in his deposition that he was fully aware that hydrocephalus could cause significant and permanent visual impairment, a fact not appreciated by Mr. Moreau. In view of his previous correspondence concerning the CT scan done in January 2001, there is no doubt that Mr. Marocco was aware of Mr. Moreau's hydrocephalus diagnosis and his VP shunt, as he made this quite clear in his deposition. Moreover, in his deposition, Mr. Marocco specifically listed blindness and death as complications of hydrocephalus, and he admitted that he was aware of these possible complications before the fall of 2001.

But instead of communicating directly with a RIDOC physician, or to refer the matter to the Medical Program Director, Dr. Scott Allan, for immediate action, Mr. Marocco responded with a Memo dated 9/26/2001 (see item q), in which he scheduled an appointment with Dr. Smiley, the on-site Optometry Consultant, for 10/29/2001, over a month away. In my opinon, this health services administrator in essence made a clinical decision (i.e. the timing of a consultation) that was: 1st) completely inappropriate for a non-clinical health care provider to make and 2nd) clinically inappropriate if this visual loss was related to a VP shunt malfunction, even based on Mr. Marocco's own stated understanding of hydrocephalus. Certainly a physician familiar with hydrocephalus would have raised the issue of possible VP shunt malfunction as the most likely serious diagnosis to be considered.

In my opinion, Mr. Joseph R. Marocco's handling of this medical situation was the most significant factor that led to Mr. Moreau's permanent blindness, and can be characterized as shocking, egregious, and deliberately indifferent to a serious medical need. Mr. Moreau's health care at this point also did not meet the minimum standard of care, either in a community or a correctional setting. Appropriate and timely diagnostic evaluation at this time, to a reasonable degree of medical certainty, would have resulted in either a return to baseline or near-baseline vision status for Mr. Moreau.

I would also note that Mr. Marocco had the ability to facilitate an appointment for Mr. Moreau with the Optometry Consultant Harrison Smiley for 10/1/2001, since Dr. Smiley was conducting a clinic at the Minimum Security prison that day. In my opinion, if an Optometry appointment had been arranged for this time, it would have triggered a series of actions that would have likely resulted, to a reasonable degree of medical certainty, with ultimate preservation of the plaintiff's vision.

To underscore Mr. Moreau's deteriorating condition prior to his appointment with the Optometrist Dr. Smiley, one need only read Mr. Moreau's next communication with Mr. Marocco, a letter dated October 14, 2001. Mr. Moreau states, "In the dining room it is difficult to see what is on the plate and table. In my cell with the light on ......to me it's so dark. It's like I am outside at 7 PM dusk – very dark. I can barely read a newspaper." Mr. Moreau goes on to say he has $100 set aside to buy

his own glasses, and he respectfully asks permission to write to Dr. Smiley directly, in the hope of expediting his optometry appointment. Once again, this moving correspondence would set off alarm bells for any physician familiar with hydrocephalus, or even a lay person with no familiarity of hydrocephalus. The report of visual dimness and darkness is particularly alarming, as this is not an issue with pure refraction problems.

For reasons that are not clear to me, Mr. Moreau's 10/14/2001 letter is not received by Mr. Marocco until 10/25/2001, and he does not respond until 11/5/2001. Mr. Marocco does state in this Memorandum that he had Mr. Moreau transferred from the High Security institution to the Intake Service Center for Dr. Smiley's 10/29/2001 appointment, and that he was seen at that time. This further illustrates Mr. Marocco's ability to facilitate medical appointments to an earlier time period if he so desired.

Also of relevance during the early fall of 2001 was Mr. Moreau's interaction with the Nurse Practitioner Barbara Carroll on September 26, 2001, coincidentally the same day as Mr. Marocco's correspondence with the plaintiff as described above. The materials supplied to me for review make it clear that this Nurse Practitioner was authorized to assume many of the responsibilities of an on-site physician, including the ability to prescribe medications and to schedule necessary medical appointment. She conducted a physical examination of Mr. Moreau on 9/26/2001, but it is very unclear (both to myself and Nurse Carroll) why this exam was scheduled or who was responsible for ordering it, as it does not appear to be a result of routine institutional protocol. In view of the multiple health care request forms submitted by the plaintiff in September 2001, and the correspondence with Mr. Marocco dated 9/17/2001, one cannot help but wonder if this scheduled physical exam was prompted by one or both of these medical interactions. All Health Care Request Forms were routinely destroyed, and apparently no written responses were sent back to Mr. Moreau at any time, despite a specific section of this form designed to provide this written response to the inmate.

Nurse Practitioner Barbara Carroll does make it quite clear in her deposition of 1/17/2006 (item t) that she was aware that Mr. Moreau had congenital hydrocephalus with a shunt in place, since she specifically questioned him about his cranial scar. She also stated that she had received training with regard to hydrocephalus and was aware of potential complications. While not aware of blindness as one of these potential complications, she was specifically concerned about his vision, making the comment in her deposition that "nobody should go blind, nobody". And she further states in her deposition that it was her intention to have Mr. Moreau seen by the Optometry Consultant, Dr. Smiley, within 5 days. Yet despite her alleged concern, the completed physical examination form by this Nurse Practitioner does not record the detailed medical information that should be noted in addressing potentially serious visual disturbances. Specifically, there is detailed description of a funduscopic examination, except the notation "WNL" (within normal limits) under HEENT (Head, Ears, Eyes, Nose, Throat). A description of the optic discs and associated vessels is essential in this situation. There is no specific notation concerning extra-ocular movements, pupil responses, or gross peripheral field testing. The testing of visual acuity is recorded as 20/40 bilaterally without glasses. In view of Mr. Moreau's multiple complaints and poignant correspondence describing his

visual disturbances, as well as the subsequent events, I have difficulty with the validity of this acuity testing if it reflects testing done that day. Since this information is entered under the heading "INTAKE DATA", I wonder if it reflects data taken at another time, i.e. his intake physical examination of 3/5/2001. If so, then it would mean that Nurse Practitioner Barbara Carroll did not test visual acuity at all. It is interesting to note that, in a letter from Mr. Moreau to Scott Alan, MD, dated 11/27/2001, the plaintiff states that he saw a physician for a routine physical examination in mid-September 2001, that he mentioned his recent and impressive visual deterioration, and was told to put in a request slip. He then goes on to say "the doctor did not check my eyes". I can only believe he is referring to Nurse Practitioner Carroll.

Finally, it is clear from Nurse Practitioner Carroll's deposition and the Physical Exam Form of 9/26/2001 that while she did refer Mr. Moreau to Dr. Smiley, she did not communicate her concerns regarding Mr. Moreau's visual complaints to any RIDOC physician, except her cryptic notations on the physical examination form itself. Per her own testimony, and consistent with RIDOC policy, she was required to make the referral on the Physician's Order Form. She made no such entry. If I were the physician reviewing this form, I would have had no idea that I was dealing with a patient with shunted hydrocephalus, with a history of shunt malfunction, who was complaining of serious visual disturbances of recent origin. In my opinion, Nurse Practitioner Barbara Carroll was deliberately indifferent to the plaintiff's serious medical needs, and clearly did not meet the minimal medical standard of care (community and/or correctional standards) that I would expect of a nurse practitioner. Her conduct was shocking and egregious in light of the substantial lapse in protocol and her own understanding of the seriousness of visual complaints.

Mr. Moreau was finally seen by Dr. Harrison Smiley, Optometry Consultant, on 10/29/2001. By this time, the plaintiff had light perception only and could only appreciate hand motion at 6 inches. Pupils were sluggish at 5 mm OU, and the funduscopic exam suggested "optic neuritis". A referral to Dr. Figueroa, Ophthalmology Consultant, was made and the patient was evaluated on 11/15/2001, confirming the diagnosis of optic atrophy, chronic papilledema bilaterally, and permanent blindness. Mr. Moreau was subsequently sent to the Rhode Island Hospital ER on 11/19/2001, where he was evaluated by a neuro-ophthalmologist, Dr. Margerie Murphy, and a cranial CT scan was performed. According to Mr. Moreau's correspondence to Dr. Scott Allen dated 11/27/2001 (item d), the "eye specialist ...concluded the same results"...as Dr. Figueroa and that "the concern was the shunt in my head malfunctioned." He was subsequently admitted to the Rhode Island Hospital Neurosurgery Service on 1/17/2002 for a preliminary evaluation, and the VP shunt revision itself took place on 5/15/2002.

## COMMENTS RE: DEFENDANT'S MEDICAL EXPERT REPORTS

The defendant's medical expert witnesses have come to a number of conclusions in their reports that, in my opinion, are false and/or misleading. For example, Dr. Joseph F. Rizzo, III states that the plaintiff "was aware of the possibility of shunt failure" and "knew the signs of blockage and/or infection of his shunt, and would alert medical staff if any of the symptoms occur." Dr. John P. Santoro stated in his report that in the fall of 2001 "the patient describes a vision loss but suggests he needs an eye exam and new glasses. The patient emphasizes his need for new eyeglasses quite strongly, I thought." The implication made by these physicians is that Mr. Moreau was at least partly responsible for the delay in his evaluation because he did not associate his vision loss with possible shunt failure. This is disingenuous. It is the physician's responsibility to determine the possible etiology of our patient's symptoms, not the patient's. Mr. Moreau had experienced shunt failures in the past, and had undergone several revisions as a result. He was familiar with the symptoms of nausea, vomiting, and headache, as well as fever and chills. It is only natural that he would associate shunt failure with these symptoms, and not appreciate visual loss as a symptom, because he had never experienced that problem related to shunt failure in the past.

Dr. Joseph F Rizzo, III states in his report, with regard to Mr. Marocco's correspondence and actions on September 26, 2001, that "there was no practical means by which the facility staff could have known that Mr. Moreau had the potential to become blind from a medical condition for which he had been treated long ago and which was believed to be stable." Dr. John P. Santoro makes a similar claim in his report, adding that "It seems reasonable....that a lay person administrator would take this (recent vision problems & a request for new glasses) at face value and the only accommodation necessary would be to be sure that the patient was given an eye exam. However, Mr. Marocco admitted in his deposition that he was aware that blindness could result from untreated hydrocephalus or with shunt failure. Mr. Marocco also was aware of the need for yearly CT scans to monitor his condition, for the obvious reason that his shunt could fail at any time. No clinician would accept the premise that shunted hydrocephalus is an essentially stable condition. Moreover, the chart documents that Mr. Moreau required his last shunt revision due to failure in 1995. I would therefore vigorously disagree with Dr. Rizzo's conclusion that Mr. Marocco was not deliberately indifferent, nor was he negligent.

Both of the defendants' medical experts suggest that, since several months passed between the 11/16/2001 (the date of the Rhode Island ER evaluation that included specialty consultation and a cranial CT scan) and the Ventriculoperitoneal (VP) shunt revision of 5/15/2002, that there was some confusion whether the patient's visual loss was a result of shunt malfunction. There is no question that the major diagnosis under consideration had always been shunt malfunction. However, once the patient was found to have bilateral optic nerve atrophy, without other acute neurologic sequelae, there was no need to proceed with an emergency surgical revision. The patient was deemed to be legally and irreversibly blind at that time. Therefore the surgery was planned on an elective basis by the neurosurgical consultants at that point. There may also have been some communication issues

between the RIDOC Health Services Unit and the neurosurgical consultants at Rhode Island Hospital. The May 15, 2002 Operative Note when the VP shunt was revised simply confirmed that the major diagnostic consideration (shunt malfunction) was indeed correct.

In his report, Dr. Joseph F. Rizzo makes a claim that "his central acuity was already compromised (20/40 versus a normal level of better than 20/20) indicates that Mr. Moreau had more likely than not already lost 40% or more of his optic nerve fibers." I would point out that this measure of visual acuity was performed in March 2001 without glasses, since he had lost them. When he was supplied with a new seft of glasses, his vision had returned to baseline. Both medical experts claim that the Nurse Practitioner performed a visual acuity test on Mr. Moreau on 9/26/2001, and that he tested 20/40 bilaterally at that time. As discussed previously, I question that the patient was tested for visual acuity at all.

## SUMMARY OF OPINIONS

As stated in the body of my report, Mr. Moreau's blindness was a completely avoidable tragedy. Prompt diagnosis and shunt revision would have relieved his elevated CSF pressure, and consequently, would have saved this man's vision. Mr. Moreau's blindness was the direct result of serious failures on the part of Mr. Joseph Marocco, and the failure to ensure a timely Optometry and/or Ophthalmology consultation by the Nurse Practitioner, Barbara A. Carroll, RN. There was a window of opportunity to successfully intervene in this case, but by the time Mr. Moreau was seen by Dr. Smiley on 10/29/2001, it appears that optic atrophy was present, and his blindness was permanent.

As a health care professional, if Mr. Marocco had involved appropriate clinicians in the triage process upon receipt of Mr. Moreau's correspondence of 9/17/2001, knowing that recent and significant visual loss as described could well be related to shunt malfunction, an expedited Optometry or Ophthalmology consultation could surely have been arranged. Once the presence of papilledema and visual loss not related to refraction issues was appreciated, subsequent referral to a neurosurgeon, as well as arrangement for an expedited cranial CT scan, would then be scheduled promptly as befits this situation. In my opinion, involvement of the Medical Program Director by Mr. Marocco when these visual issues first surfaced would have been extremely helpful to ensure proper health care delivery and close clinical monitoring. In summary, I believe that the RIDOC Health Care System had the ability to address this issue in a timely fashion if Mr. Marocco had functioned appropriately in that medical environment.

The Nurse Practitioner, Barbara A. Carroll RN, was well aware that Mr. Moreau had hydrocephalus and was complaining of visual loss during the course of a physical examination she conducted on 9/26/2001. She admitted in her deposition that Mr. Moreau should have seen an

Optometrist within 5 days of her examination. Yet she made no effort to my knowledge to ensure that this important evaluation did take place, despite her admission in her deposition that "we in the profession are very, very careful about eyes, because nobody should go blind, nobody." The physical examination was not adequately recorded in a manner that would have communicated the important facts and findings germane to this case. Consequently, the physician countersigning this physical form could not know that a critical clinical issue was at stake. Most importantly, she did not speak directly with her supervising physician, nor did she take other measures, including discussions with the Medical Program Director (Dr. Anne Spaulding), Mr. Joseph Marocco, or Dr. Smiley himself, that would have expedited an earlier optometry or ophthalmology evaluation.

Systemic dysfunction in the provision of medical care was another factor that contributed to the tragic outcome in this case. The practice of destroying the medical request slips cannot be defended. **By not including the inmate medical request and the response as part of the medical record, the health care professional reviewing this chart is barred from obtaining information that could significantly alter clinical decisions**. Most state correctional systems, as well as the federal correctional system, have a designated section of medical record to place such information – usually a single sheet that includes both the inmate request and the response by a clinical health professional (nurse, physician, dentist, psychiatrist, etc). A xerox copy is then returned to the inmate for his/her records. I am not aware of another state correctional system (or federal institution) that does not consider inmate medical requests and medical staff responses as part of a legal medical record. If the multiple inmate medical request slips generated by Mr. Moreau in the fall of 2001 had been available for review in the medical record, and judging from the urgency and dramatic impact of his correspondence to Mr. Marocco at this time, I think it likely that an earlier optometry or ophthalmology evaluation would have resulted.

Mr. Joseph Marocco, as noted in his curriculum vitae, achieved the status of a Certified Health Care Professional (CCHP) with the National Commission on Correctional Health Care (NCCHC) in 2003. I also noted that several of the Rhode Island Department of Corrections Policy and Procedure policies directly referenced NCCHC standards. Yet it seems clear that, at least in Mr. Moreau's case, essential standards such as a Special Needs Treatment Plan was not developed by a physician or other qualified clinician shortly after intake. This is a significant deviation from an essential standard from the leading national organization dealing with correctional health care (see Standards for Health Services in Jails). A well-developed treatment plan may well have avoided the poor clinical outcome seen in this case.

**In my opinion, the medical care rendered the plaintiff, Richard M. Moreau, was seriously deficient and did not meet the minimal community or correctional standards of care**. I also believe that there was a deliberate indifference to Mr. Moreau's serious medical needs, primarily manifested by the actions and omission of Mr. Joseph Marocco, Hospital Administrator, and Nurse Practitioner Barbara A. Carroll.

I can testify in court regarding my experience with this issue in the Connecticut Department of Correction, as I have dealt with it on at least 2 or 3 occasions in our correctional setting. In those instances, the patients' visual function returned to its baseline, since the appropriate diagnostic studies and clinical evaluations were addressed promptly after initial complaints of visual disturbance.

It should be noted that, in rebuttal, since both Dr. Santoro and Dr. Rizzo made broad statements of "no liability" without reference to any particular minimum standard of care, it is my intention to opine and testify that their testimony is therefore defective, unsupportable, and contrary to the minimum standards of care which I have articulated in this report. Based upon my education, training, skill and experience, all of the above statements and opinions are given to a reasonable degree of correctional medical certainty.

I trust that this report has addressed the major issues important to you in this case. Please let me know if you require any further information concerning this matter.

Sincerely,

(signature electronically redacted)

**Edward A. Blanchette, MD**
**Correctional Medicine & Internal Medicine Consultant**